UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NICHOLAS OUDEKERK,

Plaintiff,

v.

9:24-cv-0109<br>(ECC/CBF)

SERGEANT THOMAS, et al.,

Defendants.

_____

APPEARANCES:                                                OF COUNSEL:

NICHOLAS OUDEKERK
*Plaintiff, pro se*
11 Summit Street
Ford Edward, NY 12828

FITZGERALD MORRIS BAKER FIRTH, P.C.          COREY A. RUGGERIO, ESQ.
Attorneys for Defendants
68 Warren Street
Glens Falls, NY 12801

**CARLA B. FREEDMAN**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.      INTRODUCTION

This matter has been referred to the undersigned for a report and recommendation by the

Hon. Elizabeth C. Coombe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(c).  Plaintiff Nicholas Oudekerk ("Plaintiff") commenced this action pursuant to

42 U.S.C. § 1983.  *See generally*, Dkt. No. 1.  Currently before the Court is a motion to dismiss,

filed by Defendants Warren County Jail Sergeant Thomas and Corrections Officer Crumb

("Defendants"), pursuant to Fed. R. Civ. P. 12(c).  *See generally*, Dkt. Nos. 53, 60; *see also* Dkt.

Nos. 62, 63.  For the reasons set forth below, the undersigned recommends the Defendants' motion to dismiss be granted in part and the complaint be dismissed without prejudice and with leave to refile.

## II.   BACKGROUND

Plaintiff commenced this action by filing a complaint which was received by the Court on January 23, 2024, *see* Dkt. No. 1 at 1, along with a motion to proceed *in forma pauperis* ("IFP"), *see generally*, Dkt. Nos. 2-3, while he was incarcerated at the Warren County Correctional Facility ("Warren County C.F.").[1]  By Order dated February 21, 2024, the Hon. Anne M. Nardacci, United States District Judge, granted Plaintiff's IFP application and found Plaintiff's Fourteenth Amendment excessive force and failure to intervene claims against Defendants Thomas and Crumb survived *sua sponte* review and required a response.  Dkt. No. 4 at 12.

On May 13, 2024, Defendants filed an answer, Dkt. No. 12, and on September 13, 2024, Defendants filed a motion to dismiss Plaintiff's complaint due to Plaintiff's failure to prosecute in violation of Federal Rule 41(b) and Local Rules 41.2(a), 41.2(b), and 10.1(c)(2).  *See* Dkt. No. 21-1 at 6-18.  Defendants further argued, to the extent Judge Nardacci's February 21, 2024, Decision and Order which, *inter alia*, ordered Plaintiff to promptly notify the Clerk's Office and all parties of any change of address, is construed as a Pretrial Order, Plaintiff's failure to comply with such Order warranted dismissal pursuant to Federal Rule 16(f)(1).  *See id*. at 19-23.

---

[1] Citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Plaintiff subsequently filed a response in opposition to the Defendants' motion to dismiss. *See generally*, Dkt. No. 31.[2]

This case was reassigned to United States District Judge Elizabeth C. Coombe by Text Order dated January 17, 2025. Dkt. No. 34. On June 9, 2025, the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, issued a Report-Recommendation and Order recommending the Defendants' motion to dismiss be denied without prejudice, citing Plaintiff's *pro se* status and recent communication with the Court. *See generally*, Dkt. No. 40. District Judge Coombe subsequently issued a Memorandum-Decision and Order adopting the Report-Recommendation in its entirety, *see generally*, Dkt. No. 41, and Text Order resetting the discovery and dispositive motion deadlines, *see generally*, Dkt. No. 42.

On November 25, 2025, Defendants filed a motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(c). Dkt. No. 53. Defendants first aver Plaintiff failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), prior to commencing this action, therefore, dismissal of the complaint in its entirety is warranted under Rule 12(c). *See* Dkt. No. 53-1 at 7-12. The Defendants further contend Plaintiff's Fourteenth Amendment excessive force and failure to intervene claims must be dismissed for failure to state a claim. *See id.* at 13-20.[3]

Plaintiff filed a response in opposition to Defendants' motion to dismiss, wherein he argues he "completed all administrative rem[e]d[ie]s that are in [his] control[]," and the evidence

---

[2] For further information on the Defendants' motion to dismiss for failure to prosecute, reference is made to Dkt. Nos. 40, 41.

[3] Additionally, the Defendants requested all remaining discovery be stayed pending resolution of the motion to dismiss. *See* Dkt. No. 53-1 at 21-22. Magistrate Judge Dancks subsequently issued a Text Order holding all deadlines, including the dispositive motion deadline, in abeyance until a decision is issued on the motion. Dkt. No. 67.

"do[es] not support [the] Def[]end[a]nts' version of [the] events . . . ." Dkt. No. 62 at 2, 4 (capitalization changed). The Defendants submitted a reply. *See generally*, Dkt. No. 63. This matter was reassigned to the undersigned by Text Order on February 13, 2026. Dkt. No. 70.

## III.    LEGAL STANDARD

"Rule 12(c) provides that '[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.'" *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting Fed. R. Civ. P. 12(c)). "For a complaint to withstand judgment on the pleadings, it 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,' which is the same standard that governs a motion to dismiss under Rule 12(b)(6)." *Beck v. Manhattan Coll.*, 136 F.4th 19, 22 (2d Cir. 2025) (quoting *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023)); *see also*, *e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor . . . . This presumption, however, does not extend to legal conclusions." *Decker Advert. Inc. v. Delaware Cnty., New York*, 765 F. Supp. 3d 128, 141 (N.D.N.Y. 2025) (first citing *ATSI Commc'ns, Inc.*, 493 F.3d at 98; then citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are 'integral' to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings."

4

*Decker Advert. Inc.*, 765 F. Supp. 3d at 141 (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

> Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.

*Johnson v. N.Y.S. Div. of Parole*, No. 9:24-CV-0167 (ECC/ML), 2025 WL 4086755, at *4 (N.D.N.Y. Sept. 25, 2025), *report and recommendation adopted*, 2026 WL 228423 (N.D.N.Y. Jan. 27, 2026).  Therefore, District Courts in this circuit have held that "[w]here [the] exhaustion of administrative remedies is a prerequisite to bringing suit, a court may take judicial notice of the records and reports of the relevant administrative bodies, as well as the facts set forth therein on a Rule 12(b)(6) motion." *Levinson v. United States Fed. Bureau of Prisons, Metro. Corr. Ctr. - New York*, 594 F. Supp. 3d 559, 566 (S.D.N.Y. 2022) (internal quotations and citations omitted); *see also*, *e.g.*, *Manon v. Albany Cnty.*, No. 9:11-CV-1190 (GTS/CFH), 2012 WL 6202987, at *4 n.4 (N.D.N.Y. Oct. 9, 2012) (taking judicial notice of the Albany County Correctional Facility Rules and Regulations outlining the facility's "grievance procedures and various administrative remedies, a copy of which was filed by the defendant."), *report and recommendation adopted*, 2012 WL 6202984 (N.D.N.Y. Dec. 12, 2012).  Furthermore, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) (citing *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)).

## IV.    DISCUSSION

As an initial matter, insofar as Plaintiff contends the Court's denial of Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 41(b) and 16(f) without prejudice precludes the instant motion, *see*, *e.g.*, Dkt. No. 62 at 3 (arguing "the court has already decided on Defendants' motion to dismiss previously" and the "current motion to dismiss is collaterally estopped by the previous denial . . . .") (cleaned up), the undersigned disagrees.

Turning to the merits of the instant motion, under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The Supreme Court has held "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds*, *Ross v. Blake*, 578 U.S. 632 (2016).

Further, "the PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  "Proper exhaustion of administrative remedies is dependent on the rules and regulations of the prison in which the grievance is filed; that is, an inmate of a county-level correctional facility must satisfy the requirements, including procedural and substantive requirements, specifically applicable to such facilities." *See*, *e.g.*, *Vega v. Broome Cnty.*, No. 9:21-CV-0788 (BKS/DJS), 2023 WL 6318919, at \*17 (N.D.N.Y. Sept. 28, 2023) (citing *Hayes*

*v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.")).

Failure to exhaust administrative remedies is an affirmative defense that must be raised by the defendants. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Therefore, "defendants bear the initial burden of establishing the affirmative defense of non-exhaustion by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures which demonstrate that a grievance process exists and applies to the underlying dispute." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 126 n.6 (2d Cir. 2016) (internal quotations and citations omitted). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors . . . rendered a nominally available procedure unavailable as a matter of fact." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted).

The regulations governing grievance procedures at county-level correctional facilities in New York provide that "the chief administrative officer of each local correctional facility shall establish, implement and maintain a formal inmate grievance program," which "shall include," among other things, "a detailed description of grievance program operations including steps, timeliness, investigative processes and available internal and external appeal procedures." N.Y. Comp. Codes R. & Regs. tit. 9, §§ 7032.1, 7032.3(b). As set forth in the Warren County Correctional Facility Inmate Rules and Regulations applicable in 2023 and 2024, *see generally*, Dkt. Nos. 53-3, 53-4, the facility's grievance procedure provided:

> Correctional staff will make every effort to resolve inmate complaints in an informal manner . . . . If the inmate's complaint cannot be resolved on an informal basis and the inmate wishes to file a written grievance, he/she must complete and file the prescribed Grievance Form with the facility within five days of the date of the act or occurrence giving rise to the grievance . . . . Once the

7

Grievance Coordinator has received the complaint(s) he/she shall ensure the grievance is investigated . . . . Within five (5) business days of receipt of a grievance the Grievance Coordinator shall issue a written determination . . . . A copy of such determination shall be provided to the grievant . . . . Within two (2) business days after receipt of a Grievance Coordinator's written determination the grievant may appeal to the Correction Administration Office . . . . Within five (5) business days after receipt of a grievance appeal the Correction Administration Office shall issue a written determination on the grievance appeal and provide a copy of such determination to the grievant . . . . Within three (3) business days of the receipt of the Correction Administration Office's determination any grievant dissatisfied with the determination may appeal such determination to the State Commission of Corrections by indicating his/her desire to appeal on the Inmate Grievance Form in the appropriate space provided . . . . Within three (3) business days after receipt of the grievant's notice of appeal the Grievance Coordinator shall mail a copy of the appeal, the accompanying investigation report, and all other pertinent documents to the Commission Citizens' Policy and Complaint Review Council . . . . The Grievance Coordinator shall provide the grievant with a receipt indicating the date the appeal was submitted to the Commission Citizens' Policy and Complaint Review Council . . . . The Citizens' Policy and Complaint Review Council shall issue a written determination to the appeal within 45 business days of receipt and copies shall be sent to the grievant, the Correction Administration Office and the Grievance Coordinator.

Dkt. No. 53-3 at 16-17; Dkt. No. 53-4 at 16-17; *see also Vega*, 2023 WL 6318919, at *17 (explaining the minimum standards and regulations governing county facilities' implementation of formal grievance programs).

Here, Plaintiff submitted grievance #2023-0822, alleging "excessive use of force" by way of "use of [a] chemical agent" on January 4, 2024. Dkt. No. 1 at 20; *see also* Dkt. No. 60-1 at 6. Following investigation, on January 9, 2024, the Grievance Coordinator issued a written decision denying #2023-0822 on the merits. Dkt. No. 1 at 20; *see also* Dkt. No. 60-1 at 6. On January 9, 2024, Plaintiff appealed the Grievance Coordinator's unfavorable decision to the Chief Administrative Officer. Dkt. No. 1 at 23; *see also* Dkt. No. 60-1 at 5. The Chief Administrative Officer issued a decision agreeing with the Grievance Coordinator and denying Plaintiff's

8

grievance on January 16, 2024.  Dkt. No. 60-1 at 5.  On January 17, 2024, Plaintiff indicated he

wished to appeal the Chief Administrative Officer's decision to the Citizens' Policy and

Complaint Review Council ("CPCRC"), *id.*, and the Warren County Correctional Facility

Grievance Coordinator transmitted grievance #2023-0822 and the accompanying documents to

the CPCRC and provided Plaintiff notice of his forwarded appeal, *id.* at 4.  The CPCRC issued a

written determination denying grievance #2023-0822 on March 14, 2024.  *Id.* at 2.

Accordingly, the Defendants' contentions that: (1) Warren County Correctional Facility's

grievance process was available to Plaintiff; and (2) Plaintiff did not fully exhaust his

administrative remedies prior to filing his complaint, which was received by the Court on

January 23, 2024,[4] are correct.  *See generally*, Dkt. No. 53-1 at 10-12.  In his response in

opposition to the Defendants' motion, Plaintiff argues he:

> Did in fact exhaust all administrative remedies because (1) a
> grievance was filed, (2) the 1st level of appeal was completed, (3)
> the 2nd level of appeal was completed, (4) regardless of the decision
> by the CPCRC the grievance would not provide the relief that only
> a 42 USC 1983 civil action can provide & therefore Defendants
> argument regarding this is moot, (5) Plaintiff is only responsible for
> exhausting his end of the administrative remedies what the CPCRC
> does is not part of the Plaintiff's responsibilities nor would the
> outcome of the CPCRC effect Plaintiff's complaint in favor of the
> Defendants & therefore what the CPCRC decided would have no
> effect on the current stage of this matter & therefore regardless of
> the Defendants' argument regarding the grievance procedure and the
> PLRA the fact of the matter is that [Plaintiff] did in fact follow the
> grievance procedure & fulfilled everything regarding the PLRA that
> is within the Plaintiff's control therefore the complaint would've
> been filed regardless of the PLRA & the CPCRC's decision.  The
> only thing that could possibly but does not have any effect in this
> matter is if the CPCRC agreed with Plaintiff & if that was the case
> its reasonable to believe that if the CPCRC did agree with Plaintiff

---

[4] Plaintiff's complaint is signed and dated "12/30/23."  *See* Dkt. No. 1 at 11.  However, the pleading was submitted with exhibits including the Plaintiff's appeal of grievance #2023-0822 to the Chief Administrative Officer dated "1/9/24," *id.* at 23, and was marked filed by this Court on January 23, 2024, *id.* at 1.

> the Defendant would've used the same argument as they are now using because then it would be beneficial for them to do so but under the current circumstances that is not the case & their argument is moot.

Dkt. No. 62 at 9-10 (cleaned up); *see also* Dkt. No. 62 at 2 ("Plaintiff completed all administrative remedies that are in the control of the Plaintiff therefore Plaintiff exhausted all remedies available to him that are in his control there was physically nothing more Plaintiff could do regarding exhaustion of administrative remedies & the decision of the CPCRC was no different [from] the decision by the grievance coordinator and the captain so the CPCRC's decision wouldn't have made a difference & the CPCRC can not provide relief that the Northern District Court can provide Plaintiff is only responsible for exhausting administrative remedies within his control to expect the Plaintiff to wait for the CPCRC's decision would not effect this case & would be erroneous & arbitrary.") (cleaned up).

Such arguments are unavailing.  It is well established that "[t]o the extent [] civil rights claims must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by highest level of decision-maker, must be completed *before* an action asserting that claim may be initially filed." *Rodriguez v. Heit*, No. 9:16-CV-706 (GTS/ATB), 2018 WL 3121626, at *4 (N.D.N.Y. Mar. 30, 2018) (emphasis in original) (citing *Casey v. Brockley*, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision . . . *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice.") (emphasis in original) (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002)), *report and recommendation adopted*, 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015); *Rodriguez v. Rosner*, No. 9:12-CV-958 (TJM/ATB), 2012

WL 7160117, at *5 (N.D.N.Y. Dec. 5, 2012), *report and recommendation adopted*, 2013 WL

614360 (N.D.N.Y. Feb. 19, 2013)) (additional citations omitted), *report and recommendation*

*adopted*, 2018 WL 2316687 (N.D.N.Y. May 22, 2018).  Here, because Plaintiff indisputably

commenced this action *before* the CPCRC issued a decision on grievance #2023-0822, the

undersigned finds he failed to exhaust his administrative remedies.  *See*, *e.g.*, *Casey*, 2015 WL

8008728, at *5.  Moreover, given that Plaintiff's administrative remedies were properly

exhausted upon receipt of the CPCRC's timely March 14, 2024,[5] decision, Dkt. No. 60-1 at 2,

Plaintiff is unable to contest the availability of such remedies.

Accordingly, the undersigned recommends the Defendants' motion to dismiss Plaintiff's

complaint for failure to exhaust administrative remedies be granted.  *See*, *e.g.*, *Rodriguez v. Heit*,

2018 WL 3121626, at *4 ("In this case, it is clear that although plaintiff ultimately exhausted his

administrative remedies with respect to his complaint . . . he did not complete the exhaustion

process until after he filed this action.  Thus, plaintiff has failed to exhaust his administrative

remedies as to both of his claims, and this court must recommend dismissal of the entire

complaint for failure to exhaust.").  However, the undersigned recommends dismissal of the

complaint without prejudice and with leave to refile.  *See*, *e.g.*, *Rodriguez v. Rosner*, 2012 WL

7160117, at *5 ("Because plaintiff failed to exhaust his administrative remedies by failing to

wait for the [CPCRC]'s decision, this court is constrained to recommend dismissing this

complaint without prejudice.  Plaintiff may immediately re-file his action for damages because

he has now exhausted his remedies."); *Levinson*, 594 F. Supp. 3d at 567 (S.D.N.Y. 2022)

---

[5] *See*, *e.g.*, *Osborn v. Harris*, No. 9:20-CV-673 (TJM/ATB), 2021 WL 1131413, at *4 (N.D.N.Y. Jan. 15, 2021) ("The CPCRC has forty-five [business] days within which to issue a written decision.") (citing N.Y. Comp. Codes R. & Regs. tit. 9, §7032.5(d)), *report and recommendation adopted*, 2021 WL 1124575 (N.D.N.Y. Mar. 24, 2021).

(explaining "when a motion to dismiss is granted, the usual practice is to dismiss the claims without prejudice and grant plaintiff leave to amend the complaint . . . . Leave to amend should be granted unless there is evidence of undue delay, bad faith, undue prejudice, or futility.") (first citing *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); then citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (additional citation omitted); *see also*, *e.g.*, *Casey*, 2015 WL 8008728, at *6; *Bennett v. Onua*, No. 1:09-CV-7227 (SAS), 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010).

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 53) be **GRANTED IN PART**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

---

[6] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated:  March 11, 2026
        Syracuse, New York

Carla B. Freedman
U.S. Magistrate Judge

2025 WL 4086755
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Melvin JOHNSON, Plaintiff,

v.

N.Y.S. DIVISION OF PAROLE; and Cayuga County, Defendants.

9:24-CV-0167 (ECC/ML)

|

Signed 09/25/2025

**Attorneys and Law Firms**

MELVIN JOHNSON, Pro Se Plaintiff, 1641 Brace Lane, Dundee, New York 14837.

LETITIA A. JAMES, SUSANNA KLOSE, ESQ., Assistant Attorney General, Attorney General for the State of New York, Counsel for Defendant N.Y.S. Div. of Parole, The Capitol, Albany, New York 12224.

JAMES A. LONG, ESQ., THE LONG LAW FIRM, PLLC, Counsel for Defendant Cayuga County, 120 East Washington Street, Suite 928, Syracuse, New York 13202.

## ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Currently before the Court, in this civil rights action filed by Melvin Johnson ("Plaintiff") against defendants N.Y.S. Division of Parole ("Defendant NYS") and Cayuga County ("Defendant Cayuga") (collectively "Defendants"), is Defendant Cayuga's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 62.) In addition, Plaintiff filed a motion seeking the appointment of an attorney and expert. (Dkt. No. 66.) For the reasons set forth below, I recommend that Defendant Cayuga's motion to dismiss be denied, and order that Plaintiff's motion seeking appointment of an attorney and expert be denied without prejudice.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Plaintiff alleges that he is a paraplegic and requires use of a wheelchair. (Dkt. No. 46 at 3, 10.) Plaintiff asserts that on February 1, 2023, he attempted to climb the stairs to enter the Cayuga County Courthouse for his parole interview but fell and injured his head, left shoulder, and lower back. (*Id*. at 4, 10-11, 31-32.) Plaintiff asserts the following two claims: (1) a claim that Defendants violated the Americans with Disabilities Act ("ADA") related to Plaintiff's access to the Auburn Courthouse Annex in February 2023; and (2) a claim that Defendants violated the Rehabilitation Act ("RA") related to Plaintiff's access to the Auburn Courthouse Annex in February 2023. (*See* Dkt. Nos. 44, 46.)

### B. Procedural History

Plaintiff commenced this action on or about January 24, 2024, by the filing of a Complaint with the United States District Court for the Western District of New York. (Dkt. No. 1.)

On or about February 2, 2024, this action was transferred to the United States District Court for the Northern District of New York. (Dkt. Nos. 3, 4.) On February 7, 2024, United States District Judge Anne M. Nardacci administratively closed this action for failure to comply with the filing fee requirement. (Dkt. No. 5.)

On March 28, 2024, Judge Nardacci granted Plaintiff's motion for leave to proceed *in forma pauperis* and ordered that Plaintiff's ADA and RA claims against Defendant NYS survived initial review pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). (Dkt. No. 8.)

On January 2, 2025, Plaintiff filed a motion to amend the complaint. (Dkt. No. 31.) On February 12, 2025, the undersigned granted in part Plaintiff's motion to amend. (*See generally* Dkt. No. 44.) More specifically, Plaintiff's motion to amend was granted to the extent that it asserted (1) a claim pursuant to the ADA against Defendants, and (2) a claim pursuant to the RA against Defendants. (*Id*.) The undersigned rejected Plaintiff's request for punitive damages and noted that "punitive damages are not available under ADA and RA claims." (Dkt. No. 44 at 15.)

On May 16, 2025, Defendant Cayuga filed the pending motion to dismiss. (Dkt. No. 62.) On June 2, 2025, Plaintiff filed a response in opposition that included a motion for appointment of an attorney and expert. (Dkt. No. 66.) On June 10, 2025, Defendant Cayuga filed a reply in further support of its motion to dismiss. (Dkt. No. 67.)

### C. Parties' Briefing on the Motion to Dismiss

#### 1. Defendant Cayuga's Motion to Dismiss

**\*2** Generally, in support of its motion to dismiss, Defendant Cayuga asserts that the Cayuga County Courthouse has had a handicap accessible entrance and ramp since before Plaintiff's alleged injury and thus, Plaintiff fails to state a claim upon which relief may be granted.[1] (*See generally* Dkt. No. 62, Attach. 1.) More specifically, Defendant Cayuga asserts that the Cayuga County Courthouse's website lists ADA information including a picture of the handicapped accessible entrance and a grievance filed by Plaintiff reveals that he was advised of the handicapped wheelchair accessible area in the Cayuga County Courthouse. (Dkt. No. 62, Attach. 1 at 4, 8.) Thus, Defendant Cayuga argues that even if Plaintiff properly pleaded a Title II ADA claim, "it is patently untrue as the Courthouse has a handicapped accessible entrance." (*Id*. at 5-6.)

[1]     In the future, counsel for Defendant Cayuga is directed to comply with all Local Rules including N.D.N.Y. L.R. 7.1(b)(1), which requires that "[a]ll memoranda of law ... include a table of contents."

In addition, Defendant Cayuga argues that Plaintiff's claim for punitive damages should be dismissed because "punitive damages claims are not permitted against municipalities, nor under the ADA or Rehabilitation Act." (*Id*. at 8.)

#### 2. Plaintiff's Response

Generally, in opposition to Defendant Cayuga's motion to dismiss Plaintiff asserts the following two arguments: (1) to access the door that purports to be the handicapped accessible entrance does not have nearby accessible parking; (2) to the extent that one utilizes the handicapped accessible entrance to access parole, he must first obtain access through a locked door that deputies control, and then he must ring a buzzer to obtain access through a locked door that probation controls. (Dkt. No. 66 at 3.)

In addition, Plaintiff seeks appointment of "an ADA specialist [t]o show that the door in question is in fact not handicapped accessible." (*Id*. at 4.) Further, Plaintiff seeks appointment of counsel. (*Id*.) Finally, Plaintiff states that he is "not arguing that the County is financially liable.... [Plaintiff] argu[es] that all county buildings must be handicap accessible by the ADA guidelines." (*Id*.)

**3. Defendant Cayuga's Reply**

Generally, in support of further support of its motion to dismiss, Defendant Cayuga asserts the following six arguments: (1) Plaintiff's opposition improperly adds claims regarding parking that were not included in the Amended Complaint and should be disregarded; (2) Plaintiff's arguments regarding the buzzer that he must ring before entering were not in the Amended Complaint and should be disregarded; (3) Plaintiff is not entitled to funds for an expert; (4) Plaintiff is not entitled to a court appointed lawyer; (5) Plaintiff's claim for monetary damages should be dismissed; and (6) Plaintiff has failed to appear for two properly noticed depositions and this matter should be dismissed based on his failure to participate in discovery pursuant to Fed. R. Civ. P. 37. (*See generally* Dkt. No. 67.)

More specifically, Defendant Cayuga argues that Plaintiff's allegation of no handicapped parking is both new and untrue. (Dkt. No. 67 at 1-2.) Defendant Cayuga includes images from google street view to establish that there is on street handicapped parking adjacent to the Courthouse and a parking lot with handicapped parking near the handicapped accessible entrance. (*Id.* at 2.) Defendant Cayuga argues that thus, Plaintiff's Amended Complaint should be dismissed. (*Id.*)

In addition, Defendant Cayuga argues that the allegations surrounding the use of a buzzer are not contained in the Amended Complaint and must be disregarded. (Dkt. No. 67 at 2-3.) Moreover, Defendant Cayuga argues the existence of a buzzer—placed by the State—does not plausibly allege discrimination on behalf of Defendant Cayuga and Plaintiff's Amended Complaint should be dismissed. (*Id.* at 3.)

 **\*3**  Further, Defendant Cayuga argues that the original Complaint did not name Defendant Cayuga as a party and sought $750,000 in punitive damages and $1,250,000 in compensatory damages. (Dkt. No. 67 at 4.) Defendant Cayuga asserts that it was added as a party with the acceptance of Plaintiff's Amended Complaint but that the Amended Complaint does not state that Plaintiff is seeking monetary damages against it. (*Id.*) Defendant Cayuga asserts that Plaintiff's response states that he is not arguing that Defendant Cayuga is financially responsible and thus, Defendant Cayuga should not be held responsible for monetary damages. (*Id.*)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**
It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [2]

2    *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, C.J.).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

 **\*4**  As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the

2025 WL 4086755

following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [3] Moreover, "a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the extent those papers are consistent with the allegations in the complaint." *See Drake v. Delta Airlines, Inc.*, 147 F.3d 169, 170, n. 1 (2d Cir. 1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) ("In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Sharpe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004) (Hurd, J.).

3      *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consideration consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

## III. ANALYSIS

**\*5** After carefully considering the matter, I recommend that Defendant Cayuga's motion to dismiss be denied.

As an initial matter, the Court must determine what, if any, documents outside the four corners of the Amended Complaint that it will consider when deciding this motion pursuant to Fed. R. Civ. P. 12(b)(6). Defendant Cayuga presents the following four documents—which are outside the four corners of the Amended Complaint—in an attempt to refute Plaintiff's allegation that there is "no handicap access to the" Cayuga County Courthouse: (1) printed screen grabs from the New York State Courts website related to the Cayuga County Courthouse (Dkt. No. 62, Attachs. 8, 9; Dkt. No. 67, Attach. 4); (2) images from Google

2025 WL 4086755

Street View (Dkt. No. 67, Attachs. 5, 6); (3) an affirmation of Jonathan Anna, who is chairman of the Cayuga County Legislature (Dkt. No. 62, Attach. 8); and (4) a parolee grievance complaint form (Dkt. No. 62, Attach. 10). [4]

[4]    Counsel for Defendant Cayuga failed to set forth any argument regarding why consideration of the documents outside of the Amended Complaint is proper at this juncture.

Courts routinely take judicial notice of documents retrieved from official government websites. *Leger v. Kalitta*, 16-CV-6545, 2018 WL 2057142, at *3 (E.D.N.Y. Jan. 26, 2018) (internal quotation marks omitted) ("[T]he Court may take judicial notice of documents retrieved from official government websites or other government records from such websites."); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (citing *Am. Cas. Co. of Reading, P.A. v. Lee Brands, Inc.,* 05-CV-6701, 2010 WL 743839, at *4 (S.D.N.Y. Mar. 3, 2010) (corporate certificate of dissolution filed with California Secretary of State); *Chevron Corp. v. Salazar,* 807 F. Supp. 2d 189, 193 n. 5 (S.D.N.Y. 2011) (merger agreement filed with Delaware Secretary of State); *Big E. Entrn't, Inc. v. Zomba Enters., Inc.*, 453 F. Supp. 2d 788, 797 (S.D.N.Y. 2006) (judicial notice of lack of a required filing with the New York Secretary of State), *aff'd,* 259 F. App'x 413 (2d Cir. 2008) (summary order); *Coleman & Co. Sec. v. Giaquinto Family Trust,* 236 F. Supp. 2d 288, 308-09 (S.D.N.Y. 2002) (records in SEC database)). As a result, for purposes of this motion, the undersigned considered printed screen grabs from the New York State Courts website related to the Cayuga County Courthouse. (Dkt. No. 62, Attachs. 8, 9; Dkt. No. 67, Attach. 4.)

In addition, courts have regularly taken judicial notice of images on Google Street View. *See, e.g.*, *Vega v. Fox Building Grp., Inc.*, 24-CV-0785, 2025 WL 1811992, at *1 n.3 (N.D.N.Y. July 1, 2025) (Coombe, J.) (citing Fed. R. Civ. P. 201(b)(2); *S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*, 624 F. Supp. 3d 261, 268 n.5 (E.D.N.Y. 2022); *see Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 n.8 (2d Cir. 2022) (taking judicial notice of Google Maps)) ("The Court takes judicial notice that 1443 Weaver is a single-family residential dwelling according to Google Maps."); *Hernandez v. Caliber Bodyworks LLC*, 21-CV-5836, 2022 WL 1002450, at *4 (N.D. Cal. Apr. 4, 2022) (taking judicial notice of Google Maps Street View images of property where relevant events occurred); *United States v. Nettles*, 18-CR-1007, 2021 WL 3131658, at *5 n.9 (E.D. Mo. June 7, 2021) ("The undersigned may take judicial notice of historical map information located in Google Maps"). The Second Circuit, too, has relied on Google Maps in deciding cases. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 n.8 (2d Cir. 2022). As a result, for purposes of this motion, the undersigned considered the images from Google Street View. [5]

[5]    "The Second Circuit has clearly stated that arguments raised for the first time in reply papers or thereafter are properly ignored." *Colon v. City of New York*, 11-CV-0173, 2014 WL 1338730, at *9 (E.D.N.Y. Apr. 2, 2014) (citing *Watson v. Geithner*, 355 F. App'x 482, 483 (2d Cir. 2009); *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 97 n.12 (2d Cir. 2007); *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006)). Although, the images from Google Street View were presented for the first time in Defendant Cayuga's reply, the undersigned considered Defendant Cayuga's submission because there does not appear to be any question to its authenticity.

**\*6**  With respect to the affirmation of Mr. Anna (Dkt. No. 62, Attach. 8) and the parole grievance complaint form (Dkt. No. 62, Attach. 10) which are "matters outside the pleadings," I find that these documents do not fall into one of the four categories that the court may consider without converting a motion to dismiss for failure to state a claim to a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d). *See Bryant v. Ciminelli*, 267 F. Supp. 3d 467, 472-73 (W.D.N.Y. 2017) (rejecting the parties' request that the court consider additional facts or affidavits when weighing a motion to dismiss for failure to state a claim upon which relief may be granted); *Car-Freshener Corp. v. Getty Images, Inc.*, 822 F. Supp. 2d 167, 174-75 (N.D.N.Y. Sept. 28, 2011) (Suddaby, J.) ("the Court finds that it may not properly consider" the factual assertions contained in the affidavit of defense counsel "on a motion to dismiss for failure to state a claim.").

Next, the undersigned considers whether Plaintiff sufficiently alleged facts plausibly suggesting claims pursuant to Title II of the ADA and the RA.

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 20 of 105
Johnson v. N.Y.S. Division of Parole, Slip Copy (2025)
2025 WL 4086755

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citing 42 U.S.C. § 12132). Section 504 of the RA, "protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability." *Harrington v. Vadlamudi*, 13-CV-0795, 2014 WL 4829483, at *3 (N.D.N.Y. Sept. 29, 2014) (citing 29 U.S.C. § 749(a)). Although "there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003) (citation omitted); *see also Graham v. Watertown City Sch. Dist.*, 10-CV-0756, 2011 WL 1344149, *9 (N.D.N.Y. Apr. 8, 2011) ("The ADA and Rehabilitation Act causes of action for failure to accommodate will be considered together").

In order to establish a prima facie violation under these acts, a plaintiff must show that (1) he is a qualified individual with a disability; (2) the defendant is an entity subject to the acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities or defendants otherwise discriminated against him by reason of his disability. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

For purposes of this motion, Defendant Cayuga appears to concede that Plaintiff is a qualified individual with a disability and that it is an entity subject to the ADA and RA. (*See generally* Dkt. No. 62, Attach. 1 at 3-6; Dkt. No. 67 at 1-3.) Construing the allegations contained in Plaintiff's opposition as effectively amending the allegations of his Amended Complaint (to the extent those allegations are consistent with the allegations in the Amended Complaint), Plaintiff alleges that he was denied access to the Cayuga County Courthouse because its handicapped accessible entrance is inaccessible. (*See generally* Dkt. No. 66.) More specifically, Plaintiff alleges that there is inadequate nearby handicapped accessible parking and that, in any event, the handicapped accessible entrance does not grant entrance to the building because it requires admittance through two locked doors, which parole does not control. (*Id.*) Plaintiff alleges that Defendant Cayuga controls the first locked door. (Dkt. No. 66 at ¶ 4.)

 **\*7**  Construing these allegations in the light most favorable to Plaintiff and accepting Plaintiff's allegations as true, I find that Plaintiff alleges facts plausibly suggesting claims pursuant to the ADA and RA. Although Defendant Cayuga includes images from Google Street View, the Court is unable to ascertain the distance between the handicapped accessible parking spaces that are portrayed in the images, and the handicapped accessible entrance at issue. (*Compare* Dkt. No. 67, Attach. 4 at 3, *with*, Dkt. No. 67, Attach. 5 at 2, *and* Dkt. No. 67, Attach. 6 at 2.) In addition, Plaintiff alleges that there is another barrier that makes the handicapped accessible entranced inaccessible; namely, the two locked doors that he must obtain admittance through, at least one of which, is controlled by employees of Defendant Cayuga. (Dkt. No. 66 at ¶ 4.)

As a result, I recommend that Defendant Cayuga's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6), be denied. [6]

[6]  To the extent that Defendant Cayuga seeks dismissal of any claim for punitive damages, I recommend that it be denied as moot. This action does not have any claim for punitive damages against Defendant Cayuga. (Dkt. No. 44 at 15.) To the extent that Defendant Cayuga raised arguments for the first time in its reply papers with respect to (1) seeking dismissal of all monetary damages, and (2) seeking dismissal of the action because Plaintiff failed to appear for two properly noticed depositions, I recommend that those arguments be ignored. *Colon*, 2014 WL 1338730, at *9 (citing *Watson*, 355 F. App'x at 483; *ABN Amro Verzekeringen BV*, 485 F.3d at 97 n.12; *Clubside, Inc.*, 468 F.3d at 159 n.5) ("The Second Circuit has clearly stated that arguments raised for the first time in reply papers or thereafter are properly ignored.")

## IV. PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL

While there is no right to appointment of counsel in civil matters, *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994), a court may request an attorney to represent any person "unable to afford counsel." 28 U.S.C. § 1915(e)(1). In deciding whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance. *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986). If the claim meets this threshold requirement, the court should then consider a

2025 WL 4086755

number of factors in making its determination. *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (citation omitted). Among these are:

> [t]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be in the major proof presented to the factfinder, the indigent's ability to present the case, the complexity of the legal issues, and any special reason ... why appointment of counsel would be more likely to lead a just determination.

*Hodge*, 802 F.2d at 61. None of these factors is controlling, however, and each case should be decided on its own facts. *Id.*

Here, this action is still in its early stages, and without any evidence before the Court, the Court is unable to assess the threshold requirement of likely merit. *See Harmon v. Runyon*, 96-CV-6080, 1997 WL 118379, at *1 (S.D.N.Y. Mar. 17, 1997). Thus, the Court finds that Plaintiff's motion for appointment of counsel is premature and denies the motion without prejudice to renewal at some future time.

## V. PLAINTIFF'S MOTION FOR APPOINTMENT OF AN EXPERT

Rule 706 of the Federal Rules of Evidence allows the Court, on its own motion or on motion of another party, to appoint an expert witness. Fed. R. Evid. 706(a); *Pabon v. Goord,* 99-CV-5869, 2001 WL 856601, *1 (S.D.N.Y. 2001). The Court has broad discretion in determining whether to appoint an expert witness. *Pabon*, 2001 WL 856601, at *1. In deciding whether to appoint an expert witness, the Court considers "such factors as the complexity of the matters to be determined and the Court's need for a neutral, expert view." *Benitez v. Mailloux,* 05-CV-1160, 2007 WL 836873, *1 (N.D.N.Y. 2007) (Treece, M.J.) (citations and quotations omitted). The appointment of an expert witness pursuant to Rule 706 is not intended to aid litigants, but rather "to aid the Court, through the services of an impartial expert, in its assessment of technical issues." *Benitez*, 2007 WL 836873, at *1*; see also Reynolds v. Goord,* 98-CV-6722, 2000 WL 825690, *2 (S.D.N.Y. 2000) (quoting 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6304 (1997)) ("[t]he most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance").

**\*8** The Court should "bear in mind the substantial expense that defendants may have to bear if the Court appoints an expert in a case where ... one of the parties is indigent." *Muhammad v. Wright,* 08-CV-0473, 2009 WL 3246731, *1 (W.D.N.Y. 2009). Considering the large number of cases involving indigent litigants, and the substantial costs that may result, the Court's appointment of expert witnesses should be used sparingly. *Muhammad*, 2009 WL 3246731, at *1 (citing *Benitez,* 2007 WL 836873, at *2). "The enlistment of court-appointed expert assistance under Rule 706 is not commonplace," and courts appoint experts under Rule 706 "relatively infrequent[ly]." *In re Joint E. & S. Dists. Asbestos Litig.,* 830 F. Supp. 686, 693 (E.D.N.Y. 1993) (citations and quotations omitted). "[M]ost judges view the appointment of an expert as an extraordinary activity that is appropriate only in rare instances." *In re Joint E. & S. Dists. Asbestos Litig.,* 830 F. Supp. at 693 (citations and quotations omitted).

Here, the Court finds that a court-appointed expert witness is unnecessary at this time. Should the Court determine that there is a compelling need to appoint an expert witnesses, it will appoint one at that time. Accordingly, Plaintiff's motion for the appointment of expert witnesses is denied without prejudice.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendant Cayuga's motion to dismiss for failure to state a claim upon which relief may be granted (Dkt. No. 62) be **DENIED**; and it is further

2025 WL 4086755

**ORDERED** that Plaintiff's motion for appointment of counsel and an expert (Dkt. No. 66) is **DENIED** without prejudice; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [7]

[7]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

<u>NOTICE</u>: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. [8]  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

[8]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2025 WL 4086755

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 228423
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Melvin JOHNSON, Plaintiff,
v.
N.Y.S. DIVISION OF PAROLE, et al., Defendants.

9:24-cv-167 (ECC/ML)
|
Signed January 27, 2026

**Attorneys and Law Firms**

Melvin Johnson, Pro Se Plaintiff.

Susanna M. Klose, Asst. Att'y Gen., for Defendant N.Y.S. Division of Parole.

James A. Long, Esq., for Defendant Cayuga County.

## MEMORANDUM-DECISION AND ORDER

Elizabeth C. Coombe, United States District Judge:

**\*1** Plaintiff Melvin Johnson commenced this action pro se, asserting claims under 42 U.S.C. § 1983. Dkt. No. 1. On May 16, 2025, Defendant Cayuga County (the County) filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) seeking to dismiss the amended complaint. Dkt. No. 62. Plaintiff filed an opposition to the County's motion. Dkt. No. 66. This matter was assigned to United States Magistrate Judge Miroslav Lovric who, on September 25, 2025, issued a Report-Recommendation and Order recommending that the County's motion to dismiss be denied. Dkt. No. 81. Magistrate Judge Lovric advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report and that the failure to object to the report within fourteen days would preclude appellate review. Dkt. No. 81 at 17. No objections to the Report-Recommendation have been filed.

As no objection to the Report-Recommendation has been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment.

Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

**WHEREFORE,** it is hereby

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation, Dkt. No. 81, is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant Cayuga County's motion to dismiss, Dkt. No. 62, is **DENIED**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties.

**IT IS SO ORDERED.**

2026 WL 228423

**All Citations**

Slip Copy, 2026 WL 228423

---

**End of Document**　　　　　　　　　　　　　　　　　　　　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6202987
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marcos A. MANON, Jr., Plaintiff,

v.

ALBANY COUNTY, Defendant. [1]

[1]   By Decision and Order dated June 12, 2012, this Court substituted Albany County as the named defendant in place of Albany County Correctional Facility. Dkt. No. 10. In addition, the Court dismissed Manon's (1) First Amendment claim against Albany County that he was issued a false misbehavior report, (2) Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* claim against Weagler, and (3) Eighth Amendment conditions of confinement claims against Albany County and Weagler. *Id.*

No. 11–CV–1190 (GTS/CFH).
|
Oct. 9, 2012.

**Attorneys and Law Firms**

Marcos A. Manon, Jr., Lisbon, OH, pro se.

Thomas Marcelle, Esq., Albany County Attorney, Adam G. Giangreco, Esq., Assistant Albany County Attorney, of Counsel, Albany, NY, for Defendant.

# REPORT–RECOMMENDATION AND ORDER [2]

[2]   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

 **\*1**  Plaintiff pro se Marcos A. Manon, Jr. ("Manon"), formerly an inmate of the Albany County Correctional Facility ("ACCF"), brings this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* against Albany County. Compl. (Dkt. No. 1) at 8. Manon alleges that Albany County discriminated against him by placing him in segregated confinement because of his disability. *Id.* at 7. Presently pending is Albany County's motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6). Dkt. No. 23. Manon opposes the instant motion. Resp. in Opp. to Mot. to Dismiss (Dkt. No. 30). Albany County filed a reply to Manon's response on October 1, 2012. Reply (Dkt. No. 32). For the following reasons, it is recommended that Albany County's motion be granted and Manon's complaint be dismissed.

# I. Background

The facts are related in the light most favorable to Manon as the non-moving party. *See* subsection II(A) *infra.*

2012 WL 6202987

Manon, who was formerly an inmate at ACCF, commenced this action while he was in custody of the United States Marshal after entering a guilty plea, awaiting placement in a facility operated by the United States Bureau of Prisons. Compl. at 1; *see* Dkt. No. 10 n. 1. Manon specifically alleges that while in ACCF custody, Albany County discriminated against him by placing him in segregated confinement, twenty-three hours a day, because the liner of his prosthetic leg contained a metal screw. Compl. at 7–8. During his incarceration at ACCF, Manon swore at an ACCF staff member, resulting in his transfer to another unit pending his subsequent disciplinary hearing. Compl. at 6. Manon was confined to a cell for four days, twenty-four hours a day, before attending his disciplinary hearing where he was awarded time served. *Id.* at 6–7. Despite the hearing disposition, Manon remained continually confined on that unit in his cell for twenty-three hours a day. *Id* . at 7. During this confinement period, Manon asked a sergeant and a nurse for the underlying reason for his continued segregation, to which they replied that it was because the liner of his prosthetic leg contained a metal screw. Compl. at 7; Resp. in Opp. to Mot. to Dismiss at 7. Manon also asked a corrections officer for a plastic bag to cover his prosthetic leg in an attempt to avoid water damage. Resp. in Opp. to Mot. to Dismiss at 6. When the officer discovered Manon's disability, specifically that he had a prosthetic leg, the officer, along with another officer and surrounding inmates, began to ridicule Manon by calling him a "pirate" and "Captain Hook." *Id.*

Manon never filed a grievance concerning the alleged ADA violation. Compl. at 2. While another inmate advised Manon to ask about filing a grievance, advice which Manon followed, Manon's requests to the sergeants were repeatedly denied. *Id.* at 2–3; Resp. in Opp. to Mot. to Dismiss at 2, 7, 9–10. Manon acknowledges that ACCF believes the metal screw in his liner may be dangerous. Resp. in Opp. to Mot. to Dismiss at 8, 9.

 **\*2**  Manon's leg was amputated when he was five-years-old. Resp. in Opp. to Mot. to Dismiss at 7. He never used a wheelchair or crutches to move around. *Id.* at 8. Manon considers himself a self-reliant person and that his prosthetic leg has "never been an impediment for [him to] do what [he has] to do." *Id.* Nevertheless, Manon has "flash backs of the humiliation, rejection, and discrimination" that he felt from being placed in segregated confinement. Resp. in Opp. to Mot. to Dismiss at 2.

Manon filed a complaint on October 5, 2011 while he was housed at ACCF. Compl. at 1. Attached to the complaint was a cover letter in which Manon indicated that he may be transferring to a federal reception facility in Brooklyn, New York. Dkt. No. 1–1 at 1. On December 8, 2011, Manon filed a Notice of Change of Address, indicating that he is now an inmate at the Elkton Federal Correctional Institution in Ohio. Dkt. No. 5. This motion followed.

## II. Discussion

Manon contends that his ADA rights were violated when he was placed in segregated confinement because the liner used for his prosthetic leg contained a metal screw. As a result, he incurred emotional injuries. Resp. in Opp. to Mot. to Dismiss at 2, 6, 7, 9–10. However, Manon does not assert the specifics or nature of the relief sought. Albany County moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), contending that (1) Manon failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C.A. § 1997e, (2) Manon failed to allege a physical injury as required under the PLRA, (3) Manon lacks standing to bring this action, and that (4) Manon's claim is now moot. Dkt. No. 23.

### A. Legal Standard

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

2012 WL 6202987

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680. Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007).

**\*3** When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle,* 534 U.S. 516, 524 (2002). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Porter,* 534 U.S. at 524. Exhaustion must be proper, meaning that all agency requirements are timely complied with, as "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) (citing *Woodford v. Ngo,* 548 U.S. 81, 83, 90–91 (2006)). Courts in the Second Circuit have looked at the plain language of § 1997e(a) and concluded that "[t]he ADA falls within the rubric of 'any other federal law.' " *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 442 (S.D.N.Y.2004)). Thus, the exhaustion requirement under the PLRA is enforced against ADA claims. *Pacheco v. Zurlo,* No. 9:09–CV–1330 (TJM/ATB), 2011 WL 1103102, \*2 (N.D.N.Y.), *report and recommendation adopted by,* 2011 WL 1102769 (N.D.N.Y. Mar. 23, 2011);[3] *Alster v. Goord,* 745 F.Supp.2d 317, 332 (S.D.N.Y.2010); *but see, Parkinson v. Goord,* 116 F.Supp.2d 390, 398 (W.D.N.Y.2000) (opining that neither Title I or Title II of the ADA has an exhaustion of administrative remedies requirement).

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 28 of 105
Manon v. Albany County, Not Reported in F.Supp.2d (2012)
2012 WL 6202987

3      All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*4** As an initial matter, under the PLRA, failure to exhaust administrative remedies is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216 (2007). Thus, an inmate is "not required to specially plead or demonstrate exhaustion in [his] complaint," and a defendant must raise the issue of exhaustion and establish plaintiff's failure to demonstrate it in his responsive pleading. *Id.; Pacheco,* 2011 WL 1103102, at \*3. Because, Albany County raises exhaustion in its motion to dismiss, in response to Manon's complaint, this Court may appropriately consider this issue at this time.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero,* 467 F.3d at 175 (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). A court must conduct a three-part inquiry to determine if an inmate's failure to follow the applicable grievance procedures is fatal to his or her claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one, asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. *Id.* at 688. Estoppel occurs when "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible ... [as evidenced by] prison officials' threats, beatings, ... denials of grievance forms, or by other misconduct deterring [the inmate] from fulfilling the requisite procedure." *Kasiem v. Switz,* 756 F.Supp.2d 570, 577 (S.D.N.Y.2010) (internal quotation marks and citations omitted). If an inmate claims estoppel and continues to file complaints and grievances, the exception is inapplicable. *Id.* Special circumstances exist when an inmate's failure to comply can be justified. *Id.* (citations omitted). Justification is found "by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004) (citations omitted).

The ACCF maintained a three-step procedure for inmates to file grievances concerning the conditions of their confinement.[4] ACCF Rules & Regs. (Dkt. No. 24) at 26 (handbook given to inmates upon admission). First, an inmate must file a grievance with the Grievance Coordinator. *Id.* If dissatisfied with the Coordinator's determination, an inmate may then appeal to a Chief Administrative Officer within the facility. *Id.* If still dissatisfied, an inmate may then appeal to the State Commission on Correction. *Id.* This procedure requires that a grievance be filed in writing on a particular form to be provided to an inmate by the unit supervisor upon request of the inmate. *Id.*

4      The Court takes judicial notice of the ACCF Rules and Regulations that outlines ACCF's grievance procedures and various administrative remedies, a copy of which was filed by the defendant. Dkt. No. 24 at 4–27.

**\*5** Manon contends that his efforts to pursue administrative remedies were impeded by defendant's failure to provide him the necessary grievance form. Viewing the facts in the light most favorable to Manon, if proven, would constitute behavior excusing Manon's failure to exhaust. Compl. 2–3; Resp. in Opp. to Mot. to Dismiss at 2, 7, 9–10. The necessity for Manon to file his grievances on the form designated by ACCF is underscored by the ACCF inmate handbook. *See* ACCF Rules & Regs. at 26.

2012 WL 6202987

Thus, construing the facts in the light most favorable to Manon, Albany County's failure to provide the necessary form when requested by Manon reasonably prevented compliance with the procedures. *Id.* Repeated failures by defendant to provide an inmate with the form when requested would deter a similarly situated individual from attempting to pursue a grievance. Compl. at 2–3; Resp. in Opp. to Mot. to Dismiss at 2, 7, 9–10. Moreover, because Manon's assertions are devoid of any mention of the handbook and Manon was advised by an inmate to file a grievance concerning the segregated confinement, Compl. 2–3, it can be reasonably inferred that Manon did not receive a copy of the inmate's handbook, or was unaware of the grievance procedures or did not understand it.

Assuming their truth for purposes of this motion, Manon's assertions suffice to raise plausible factual allegations surrounding whether Manon received the inmate handbook or the requested grievance form. These allegations defeat defendants' motion on this ground. Accordingly, defendant's motion on this ground should be denied.

### C. Physical Injury Requirement

Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U .S.C. § 1997e(e). Because this physical injury requirement operates as "a limitation on recovery of damages for mental and emotional injury in the absence of a showing of physical injury, it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

The physical injury requirement equally applies to ADA claims. Some Circuits have expressly stated that § 1997e(e) precludes an inmate's ADA claim for an emotional injury if there is no prior showing of a physical injury. *See e.g., Cassidy v. Indiana Dep't of Corr.,* 199 F.3d 374, 376–77 (7th Cir.2004) (reasoning that the plain language of § 1997e(e) makes no exception for ADA claims); *Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (concluding that regardless of whether the alleged legal wrong is statutory or constitutional, § 1997e(e) bars claims for emotional injury without a prior physical injury). Courts in the Second Circuit have similarly deferred to the plain language of § 1997e(e), that the physical injury requirement applies to all federal civil actions. *Thompson,* 284 F.3d at 416.

**\*6** Manon does not allege that he suffered any physical injury as a result of Albany County's alleged discriminatory conduct. The only injuries that Manon asserts are the limited liberty that resulted from the segregated confinement and the humiliation caused by the defendant's ridiculing of his prosthetic leg. Compl. 6–8; Resp. in Opp. to Mot. to Dismiss at 6–7. Neither of these injuries constitutes a physical injury under the PLRA. Instead, Manon contends that he suffered emotional distress from flashbacks of the incidents at ACCF. Resp. in Opp. to Mot. to Dismiss at 2. Because Manon makes clear that he only suffered emotional injuries from the alleged misconduct without a prior physical injury, Manon is prevented from recovering compensatory damages for an actual injury.

Assuming Manon seeks an injunction or a declaratory judgment, he is prevented from such relief. When a prisoner is transferred to a different correctional facility, that prisoner's claim for injunctive relief against the transferor facility is generally considered moot. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Manon was transferred from ACCF, a correctional facility in New York State, to a correctional facility in Ohio. Dkt. No. 5. Manon contends that the maltreatment he endured was in the forms of continued segregation and humiliation. Because Manon does not allege that he is subjected to the same alleged misconduct in Ohio, and there is no reasonable expectation that the alleged misconduct is "capable of repetition, yet evading review," injunctive relief is not available to Manon, and declaratory relief would be meaningless. *Pugh v. Goord,* 571 F.Supp.2d 477, 488–89 (S.D.N.Y.2008) (citations omitted).

2012 WL 6202987

Finally, even though Manon is not required to allege a physical injury in order to recover nominal or punitive damages, *Thompson,* 284 F.3d at 416, the sufficiency of his assertions does not save this action from dismissal. *See* Subsection II(D) *infra.* Accordingly, defendant's motion on this ground should be granted.

### D. ADA Claim

Even if the Court assumes that Manon surpasses the PLRA requirements, Manon has failed to allege sufficient facts to state a claim under the ADA. Title II of the ADA is applicable to inmates in state prisons. *Allah v. Goord,* 405 F.Supp.2d 265, 274–75 (S.D .N.Y.2005). In order to state an ADA claim, 42 U.S.C. § 12132 requires an inmate to demonstrate that:

> (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity.

*Id.; see also Pennsylvania Dep't. of Corr. v. Yeskey,* 524 U.S. 206, 209 (1998).

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment ... substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

> **\*7** To determine if an individual meets any of the above criteria, courts apply a three part test ... First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

*Smith v. Masterson,* 538 F.Supp.2d 653, 657 (S.D.N.Y.2008) (internal citations omitted). Major life activities are defined as "caring for oneself, performing manual tasks, ... walking, standing, sitting, ... interacting with others, and working." 29 C.F.R. § 1630.2(i)(1).

Manon fails to plausibly demonstrate the first prong of the analysis, specifically, that he suffers from a qualifying disability that substantially limits a major life activity. To the contrary, Manon alleges that his disability "has never been an impediment for [him to] do what [he has] to do." Resp. in Opp. to Mot. to Dismiss at 7. Manon has not alleged, nor would the record support, any difficulties in ambulation, interaction, or working.

Manon also fails to establish the second prong of the analysis. Manon was placed in segregated confinement due to safety concerns as Manon acknowledges that ACCF believes the metal screw in his liner is dangerous. Resp. in Opp. to Mot. to Dismiss at 8, 9. Prison authorities should be accorded great deference with regards to the prison's programming and placement of inmates as they see fit "to preserve internal order and discipline and to maintain institutional security." *Allen v. Couglin,* 527 F.Supp. 1096, 1097 (N.D.N.Y.1981) (citing *Bell v. Wolfish,* 441 U.S. 520, 547 (1979)). There is nothing in the complaint indicating that the security concerns are unreasonable. Additionally, the ADA requires that an inmate cannot be excluded from beneficial services, programs, or activities. *Yeskey,* 524 U.S. at 209. Manon does not allege that he was denied access to beneficial services,

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 31 of 105
Manon v. Albany County, Not Reported in F.Supp.2d (2012)
2012 WL 6202987

programs, or activities. Moreover, there is nothing in the complaint suggesting that Manon was excluded from participation in, or denied the benefits of some service, program, or activity by reason of his disability.

Because a liberal reading of Manon's assertions does not suggest a legitimate ADA claim and Manon asserts only emotional injuries, granting Manon an opportunity amend his complaint would be futile. Cf. *Thompson,* 284 F.3d at 419 (granting plaintiff an opportunity to amend his complaint because plaintiff's allegations suggest he may have a legitimate claim of deliberate indifference to a serious medical condition and the court knew that plaintiff wanted damages despite its lack of knowledge of the nature of the damages). Accordingly, Manon's complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

### E. Standing and Mootness

Albany County also contends that Manon's claim should be dismissed because Manon lacks standing to bring this action and the claim is now moot. Article III, Section 2, Clause 1 of the United States Constitution limits the jurisdiction of federal courts to resolve "cases" or "controversies." U.S. Const. Article III, § 2, cl.1. An element of the case-or-controversy requirement is that a plaintiff bears the burden of establishing standing to sue. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). At an "irreducible constitutional minimum," Article III standing consists of three elements: (1) an "actual or imminent" injury-in-fact that is a "concrete and particularized" harm to a "legally protected interest"; (2) causation that acts as a "fairly traceable" connection between the injury-in-fact and the alleged unlawful conduct; and (3) redressability, which is a non-speculative likelihood that the injury can be remedied by the requested relief. *Id.* at 560–61, 564; *see also Allen v. Wright,* 468 U.S. 737, 751 (1984). Similarly, "the mootness doctrine ensures" that the plaintiff's "standing persists throughout the life of a lawsuit." *Amador v. Andrews,* 655 F.3d 89, 99–100 (2d Cir.2011) (citing *Comer v. Cisneros,* 37 F.3d 775, 798 (1994)).

**\*8** Because Manon sought no specific relief related to an identifiable harm, Manon's complaint should also be dismissed based on a lack of standing and mootness. Manon alleges that he suffered concrete and particularized emotional injuries, such as flashbacks, which are fairly traceable to Albany County's alleged discriminatory conduct. Resp. in Opp. to Mot. to Dismiss at 2. However, these injuries cannot be remedied by any relief sought in the present complaint as Manon has demanded none. As discussed, even if the Court construes Manon's complaint as a request for damages and relief, none of the exceptions under *Thompson* would survive and granting Manon a chance to amend his complaint would be futile. Accordingly, defendant's motion on these grounds should also be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Docket No. 23) be **GRANTED** and Manon's complaint be **DISMISSED** with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6202987

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6202984
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marcos A. MANON, Jr., Plaintiff,
v.
ALBANY COUNTY, Defendant.

No. 9:11–CV–1190 (GTS/CFH).
|
Dec. 12, 2012.

**Attorneys and Law Firms**

Marcos A. Manon, Jr., Lisbon, OH, pro se.

Albany County Attorney's Office, Adam G. Giangreco, Esq., Thomas Marcelle, Esq., of Counsel, Albany, NY, for Defendant.

*MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Marcos A. Manon, Jr. ("Plaintiff") against Albany County ("Defendant"), are the following: (1) Defendant's motion to dismiss Plaintiff's Complaint for failure to state a claim (Dkt. No. 22); (2) United States Magistrate Judge Christian F. Hummel's Report–Recommendation recommending that Defendant's motion be granted (Dkt. No. 34); (3) Plaintiff's Objection to the ReportRecommendation (Dkt. No. 40); and (4) Plaintiff's motion for preliminary injunction (Dkt. No. 35). For the reasons set forth below, the Report–Recommendation is accepted; Defendant's motion is granted; Plaintiff's Complaint is dismissed; and Plaintiff's motion is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**

Plaintiff filed his Complaint on October 5, 2011. (Dkt. No. 1.) Generally, construed with the utmost of liberality, Plaintiff's Complaint claims that Defendant discriminated against Plaintiff based on his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 120101 *et seq.* ("the ADA"), by wrongfully holding him in segregated confinement at Albany County Correctional Facility from some point in September 2011 through October 3, 2011 (beyond the expiration of a disciplinary sentence imposed on him for cursing at a correctional officer), because his prosthetic leg contained a metal screw. (*Id.*)

For a more detailed recitation of Plaintiff's claim and supporting factual allegations, the Court refers the reader to the Complaint in its entirety, as well as Part I of the Court's Decision and Order of June 12, 2012, and Part I of Magistrate Judge Hummel's Report–Recommendation, which accurately summarize that Complaint. (Dkt.Nos.1, 10, 34.)

**B. Defendant's Motion to Dismiss for Failure to State a Claim**

On August 7, 2012, Defendant filed a motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt.Nos.22–25.) Generally, in its motion, Defendant asserts the following three

alternative arguments: (1) Plaintiff's Complaint should be dismissed based on a lack of standing, given that Plaintiff does not allege facts plausibly suggesting that he has suffered an injury that is redressable by the Court; (2) in the alternative, Plaintiff's Complaint should be dismissed because Plaintiff has alleged facts plausibly suggesting that, before filing this action, he did not exhaust his available administrative remedies as required under the Prison Litigation Reform Act of 1997 ("PLRA"); (3) in the alternative, Plaintiff's Complaint should be dismissed because Plaintiff has failed to allege facts plausibly suggesting that he suffered a physical injury as required by the PLRA (and any injunction sought by Plaintiff is moot, given that he was transferred to a correctional facility in Ohio following the filing of this action). (Dkt. No. 23, Parts I and II.)

**\*2** In addition, in its reply, Defendant argues, *inter alia,* that, even if Plaintiff has satisfied the PLRA requirements, he has failed to allege facts plausibly suggesting that he is being excluded from participation in, or being denied the benefits of some service, program or activity, by reason of his disability. (Dkt. No. 32.)

### C. Magistrate Judge Hummel's Report–Recommendation

On October 9, 2012, Magistrate Judge Hummel issued a Report–Recommendation recommending that Defendant's motion be granted and that Plaintiff's Complaint be dismissed. (Dkt. No. 34.) More specifically, Magistrate Judge Hummel reported that, although he was not persuaded by Defendant's exhaustion argument, he was persuaded that Plaintiff's Complaint should be dismissed based on the following three alternative grounds: (1) Plaintiff has failed to allege facts plausibly suggesting that he suffered a physical injury as required by the PLRA (and he has failed to allege facts plausibly suggesting grounds for the award of either punitive damages or injunctive relief); (2) even if Plaintiff satisfied the PLRA requirements, he has failed to allege facts plausibly suggesting that (a) he is a qualified individual with a disability and (b) he is being excluded from participation in, or being denied the benefits of some service, program or activity, by reason of his disability (and the defects in his ADA claim are so substantive that granting Plaintiff leave to amend would be futile); and (3) in the alternative, Plaintiff's Complaint should be dismissed based on a lack of standing and mootness, given that his ADA claim seeks not specific relief related to an identifiable harm. (Dkt. No. 34, at Parts II.B. through II.E.)

### D. Plaintiff's Objection to the Report–Recommendation

On October 15, 2012, Plaintiff filed an Objection to the Report–Recommendation. (Dkt. No. 40.) Generally, even when construed with the utmost of liberality, Plaintiff's Objection either addresses matters wholly unrelated to the Report–Recommendation (e.g., events occurring before his incarceration at Albany County Correctional Facility, or at locations other than that Facility), or reiterates the same arguments that he presented in his opposition to Defendant's motion. (*Compare* Dkt. No. 40 *with* Dkt. No. 30.) Plaintiff's Objection does not specifically challenge any portion of Magistrate Judge Hummel's Report–Recommendation. (*Compare* Dkt. No. 40 *with* Dkt. No. 34.) The closest he comes to doing so is when (1) he argues that "the Court took side [sic] the defendant Albany County C[orrectional Facility]" because of "a conflict of interest," and (2) he argues that the requirement that an inmate suffer a physical injury before suing could cause an inmate to die before his estate can sue. (Dkt. No. 40, at 6–7.) However, those vague arguments do not specifically challenge any particular finding or conclusion rendered by Magistrate Judge Hummel in his Report–Recommendation.

### E. Plaintiff's Motion for a Preliminary Injunction

**\*3** On October 9, 2012, Plaintiff filed a motion for preliminary injunction. (Dkt. No. 35.) Generally, in his motion, Plaintiff asks that the Court intervene to prevent "thirsty lawyers from harassing me, by sending me a notification every time a new way of lie [sic] occurs to them. (*Id.*) Generally, in response to Plaintiff's motion, Defendant argues, *inter alia,* that (1) no likelihood of success exists because Plaintiff is trying to stop Defendant from merely fulfilling its duty of serving its motion papers on Plaintiff, and (2) no irreparable harm exists because Plaintiff alleges only emotional distress as a result of the service. (Dkt. No. 37.)

## II. APPLICABLE LEGAL STANDARDS

2012 WL 6202984

### A. Standard Governing Review of a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's reportrecommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2]

[1]   *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]   *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. [3] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [4] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [5]

[3]   *See also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

[4]   *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

2012 WL 6202984

5       *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion to Dismiss for Failure to State a Claim

Magistrate Judge Hummel accurately recites the legal standard governing a motion to dismiss for failure to state a claim. (Dkt. No. 34, at Part II.A.) As a result, this standard is incorporated by reference in this Decision and Order, which is intended primarily for the review of the parties.

### C. Standard Governing a Motion for a Preliminary Injunction

 **\*4**  Defendant accurately recites the legal standard governing a motion for a preliminary injunction. (Dkt. No. 37, at Part I.) As a result, this standard is incorporated by reference in this Decision and Order, which (again) is intended primarily for the review of the parties.

## III. ANALYSIS

### A. Defendant's Motion to Dismiss for Failure to State a Claim

As explained above in Part I.D. of this Decision and Order, even when construed with the utmost of liberality, Plaintiff's Objection either addresses matters wholly unrelated to the Report–Recommendation (e.g., events occurring before his incarceration at Albany County Correctional Facility, or at locations other than that Facility), or reiterates the same arguments that he presented in his opposition to Defendant's motion. (*Compare* Dkt. No. 40 *with* Dkt. No. 30.) Furthermore, as explained in Part II.A. above of this Decision and Order, when an objection merely reiterates the same arguments made by the objecting party in its original papers, the Court subjects the Report–Recommendation to only a clearerror review.

Here, after carefully reviewing all of the papers in this action, including Magistrate Judge Hummel's Report–Recommendation, the Court concludes that the Report–Recommendation is correct in all respects. (Dkt. No. 34.) Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Court adopts the Report–Recommendation in its entirety for the reasons stated therein. (*Id.*) The Court would add only that Magistrate Judge Hummel's thorough Report–Recommendation would survive even a *de novo* review.

### B. Plaintiff's Motion for a Preliminary Injunction

After carefully considering the matter, the Court denies Plaintiff's motion for a preliminary injunction for each of the alternative reasons offered by Defendant in its opposition memorandum of law. (Dkt. No. 37; *see also, supra,* Part I.E. of this Decision and Order [summarizing reasons].) The Court would add only that Plaintiff's motion is denied on the additional grounds that (1) the relief sought in the motion is unrelated to the allegations contained in the Complaint,[6] and (2) in any event, the motion is moot given that his Complaint has been dismissed.

6       "[T]he relief that Plaintiff seeks by way of injunction [must] relate to the allegations contained in the ... complaint...." *Gordon v. Watts,* 06–CV–0450, 2008 WL 717689, at *1 (N.D.N.Y. Mar. 17, 2008) (Kahn, J.); *accord, Williams v. Goord,* 05–CV–247, 2007 WL 703202, at *2 (N.D.N.Y. Mar. 2, 2007) (Scullin, S.J.); *Allen v. Brown,* 96–CV–1599, 1998 WL 214418, at *4 (N.D.N.Y. Apr. 28, 1998) (Pooler, J., adopting Report–Recommendation of DiBianco, M.J.); *Candelaria v. Greifinger,* 96–CV–0017, 1997 WL 176314, at *11 (N.D.N.Y. Apr. 9, 1997) (Pooler, J., adopting Report–

2012 WL 6202984

Recommendation of Scanlon, M.J.); *Chapdelaine v. Keller,* 95–CV–1126, 1996 WL 597848, at *4 (N.D.N.Y. Oct. 16, 1996) (Pooler, J.).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Hummel's Report–Recommendation (Dkt. No. 34) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss for failure to state a claim (Dkt. No. 22) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED;* and it is further

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 35) is *DENIED.*

The Clerk's Office is directed to close this action.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6202984

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 37 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)

2023 WL 6318919

2023 WL 6318919
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Taej'on VEGA, Plaintiff,
v.
BROOME COUNTY, Richard Hrebin, Corey Fowler, and Daniel Weir, Defendants.

9:21-cv-788 (BKS/DJS)
|
Signed September 28, 2023

**Attorneys and Law Firms**

For Plaintiff: Joshua T. Cotter, Samuel C. Young, Legal Services of Central New York, 221 South Warren Street, Suite 300, Syracuse, New York 13202.

For Defendants: Robert G. Behnke, Broome County Attorney, Jennifer L. Church, Joshua T. Terrell, Assistant County Attorneys II, Broome County Attorney's Office, P.O. Box 1766, 60 Hawley Street, Binghamton, New York 13902.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

## I. INTRODUCTION

**\*1** Plaintiff Taej'on Vega brings this action under 42 U.S.C. § 1983 and New York law against Defendants Broome County, Richard Hrebin, Corey Fowler, and Daniel Weir asserting violations stemming from an alleged use of excessive force and unreasonable search on February 10, 2020, when Plaintiff was a pre-trial detainee at Broome County Correctional Facility (the "Facility"). (Dkt. No. 1.) The complaint contains six causes of action: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; (2) unreasonable search in violation of the Fourth Amendment against Defendants Hrebin, Fowler, and Weir; (3) state-law battery against all Defendants; (4) state-law assault against all Defendants; (5) state-law intentional infliction of emotional distress against all Defendants; and (6) negligent supervision and training against Defendant Broome County. (*Id.* ¶¶ 40–63.) Presently before the Court are Plaintiff's motion for sanctions for spoliation of evidence, (Dkt. No. 30), and Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, (Dkt. No. 31). Each motion is fully briefed, (Dkt. Nos. 32, 33, 34, 36), and Defendants submitted a supplemental letter-brief at the direction of the Court to address issues raised by Plaintiff's motion for sanctions, (Dkt. No. 40). For the reasons that follow, Plaintiff's motion for sanctions is granted in part and denied in part and Defendants' motion for summary judgment is granted in part and denied in part.

## II. FACTS

### A. The February 10, 2020, Incident [1]

[1] These facts and the facts relevant to Plaintiff's grievance are drawn from Defendants' Statement of Undisputed Material Facts, (Dkt. No. 31-6), Plaintiff's Response to Defendants' Statement of Material Facts, (Dkt. No. 33-1), and Plaintiff's Counterstatement of Additional Material Facts, (*id.*), to the extent they are well-supported by pinpoint citations, as well as exhibits attached thereto. The Court will not consider exhibits attached to Plaintiff's motion for sanctions, (Dkt. No. 30), or Defendants' opposition to Plaintiff's motion for sanctions, (Dkt. No. 32), in connection with Defendants'

2023 WL 6318919

motion for summary judgment. The facts are undisputed unless otherwise noted. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). The Court limits its consideration of Defendants' motion for summary judgment to these facts and, to the extent they are relevant, considers these facts in deciding Plaintiff's motion for sanctions.

On February 10, 2020, Plaintiff was incarcerated at the Facility. (Dkt. No. 31-10, at 33–34.) At approximately 5:30 p.m., Facility personnel conducted a planned housing unit search known as a "SERT shakedown." (Dkt. No. 33-1, ¶ 25.) The goal of a SERT shakedown is to locate contraband in housing units. (*Id.*) As part of a SERT shakedown, every inmate is told to get on the ground, handcuffed, and brought to his cell to be strip searched and for the cell to be searched. (*Id.*) During the SERT shakedown on February 10, 2020, Plaintiff admitted he talked with inmates, made sarcastic remarks, and laughed at officers and continued to do so even after officers repeatedly ordered him to be quiet during the SERT shakedown. (*Id.* ¶ 28.) The parties dispute whether Plaintiff resisted being handcuffed. [2] Defendants Hrebin and Fowler testified that Plaintiff refused to "give up his hands" to be handcuffed. (Dkt. No. 31-6, ¶ 31; Dkt. No. 31-12, at 33; Dkt. No. 31-13, at 22.) Plaintiff testified that he did not refuse to give up his hands to be handcuffed. (Dkt. No. 33-1, ¶ 31; Dkt. No. 31-10, at 45; Dkt. No. 35, ex. B at 7:45–8:02.) Capt. Stanton and Grievance Officer Valls also stated that Plaintiff "tried to move away ... by sliding his face back and forth on the carpet." (Dkt. No. 31-4, ¶ 8; Dkt. No. 31-5, ¶ 6.) Plaintiff denies this. (Dkt. No. 35, ex. B at 9:50–10:57.) Defendant Hrebin handcuffed Plaintiff with his hands behind his back while both Defendant Hrebin and Defendant Fowler applied a "mandibular pressure point." (Dkt. No. 33-1, ¶ 33; Dkt. No. 31-12, at 33–34; Dkt. No. 31-13, at 22–23.) After Plaintiff was handcuffed, and at the instruction of Defendant Weir, Defendants Hrebin and Fowler escorted Plaintiff to his cell. (Dkt. No. 31-12, at 34–35; Dkt. No. 31-13, at 24; Dkt. No. 31-11, at 27.)

[2]     Plaintiff argues that under the "best evidence rule," Grievance Officer Adam Valls and Captain David Stanton's descriptions, in their affidavits, of videos from Defendant Weir's body camera, a handheld SERT camera, and housing unit surveillance cameras allegedly showing Plaintiff's noncompliance during the shakedown "cannot be used to prove the contents of the videos." (Dkt. No. 33-2, ¶ 55 (citing Fed. R. Evid. 1002).) The Court agrees. Federal Rule of Evidence 1002 requires "[a]n original ... recording ... in order to prove its content" unless the original was destroyed or another Rule of Evidence provides otherwise. *See Fed. R. Evid.* 1002, 1004; *see also Gaft v. Mitsubishi Motor Credit of Am.*, No. 07-cv-527, 2009 WL 3148764, at *4, 2009 U.S. Dist. LEXIS 91052 (E.D.N.Y. Sept. 29, 2009) (disregarding statements made in the defendant's counsel's affidavit, submitted in support of a motion for summary judgment, concerning the content of a report because the statements were inadmissible evidence barred by Rule 1002); *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000) (disregarding, a witness's affidavit, submitted in support of a motion for summary judgment, concerning the contents of certain letters "because the letters themselves are the best evidence of their contents"). As discussed below with respect to Plaintiff's motion for sanctions, the Court will not consider evidence related to the spoliated body-camera video. *See infra* Section III. Furthermore, the handheld SERT video and the surveillance videos were not unavailable; in fact, both parties were in possession of them. (Dkt. No. 32, ¶ 3.) Thus, the Court disregards the SERT camera video and housing unit surveillance from February 10, 2020 and statements made by Capt. Carlson about the content of the handheld SERT video and the surveillance videos in deciding Defendants' motion for summary judgment. Neither will the Court consider Capt. Carlson's statement about the recording of a video call between Plaintiff and his mother on February 12, 2020, Dkt. No. 31-4, because that video is not in the record and Defendants have not shown that that video is unavailable. *See Fed R. Evid.* 1002, 1004; *see also Gaft*, 2009 WL 3148764, at *4 n.4, 2009 U.S. Dist. LEXIS 91052. And while Defendants did ultimately submit the handheld SERT video and the surveillance videos in reply to Plaintiff's opposition to Defendants' motion for summary judgment, (Dkt. No. 36, ¶¶ 2, 4; Dkt. No. 37), "[i]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden," *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) (collecting cases). In any event, there are, as discussed below, genuine issues of material fact as to Plaintiff's alleged noncompliance and the events that took place in Plaintiff's cell that the videos would not resolve.

**\*2** Before Plaintiff entered his cell, he did not have any visible injuries, (Dkt. No. 31-12, at 33; Dkt. No. 31-13, at 26–27), though Plaintiff hit the top of his head on the door of his cell while entering the cell, (Dkt. No. 31-9, at 27; Dkt. No. 31-4, ¶

Case 9:24-cv-00109-ECC-CBF Document 76 Filed 03/11/26 Page 39 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

9; Dkt. No. 31-5, ¶ 7). Both Defendant Hrebin and Defendant Fowler were present with Plaintiff in Plaintiff's cell, (Dkt. No. 31-12, at 35; Dkt. No. 31-13, at 24), and Plaintiff was compliant with Defendants Hrebin and Fowler while in the cell, (Dkt. No. 33-1, ¶ 42). Defendants Hrebin and Fowler searched Plaintiff's cell and Defendant Hrebin conducted a strip search of Plaintiff. (*Id.* ¶ 37; Dkt. No. 31-12, at 36–37; Dkt. No. 31-13, at 24–25.)

The remainder of the events in Plaintiff's cell are disputed: Plaintiff testified that, while he was handcuffed, Defendants Hrebin and Fowler hit him in the ribs and face, slapped him, threw him on the bed, punched him in the back, grabbed his chest, choked him, and called him racial slurs. (Dkt. No. 31-9, at 27–28; Dkt. No. 31-10, at 50–5, 55–56; Dkt. No. 31-15, at 1; Dkt. No. 35, ex. B at 12:10–21:00.) Plaintiff testified that he sustained scratches and bruises as a result of the incident. (Dkt. No. 31-9, at 52–54; Dkt. No. 31-10, at 79–80.) Defendants Hrebin and Fowler deny using any force on Plaintiff while in his cell. (Dkt. No. 31-12, at 38; Dkt. No. 31-13, at 26–27; Dkt. No. 31-2, ¶ 4; Dkt. No. 31-3, ¶ 4.)

Defendant Weir, who was wearing a body camera for the duration of the SERT shakedown, testified that he stopped by Plaintiff's cell and "observed [Plaintiff] facing the wall while they were searching his cell." (Dkt. No. 31-11, at 29.) Defendant Weir testified that Plaintiff "wasn't complaining" or "saying anything," so Defendant Weir "waited for a moment and continued on with [his] duties." (*Id.* at 29–31, 33–34.) The parties dispute whether any noise of distress came from Plaintiff's cell while he and Defendants Hrebin and Fowler were in it with Plaintiff. Defendant Weir testified that he did not hear any noises coming from Plaintiff's cell when Defendant Weir was in the middle of the housing unit. (Dkt. No. 31-11, at 28-29.) Plaintiff submitted statements from two inmates: one inmate stated that he heard "crys [sic] of agony" from Plaintiff's cell and "contact sounds that sounded like punches"; another inmate stated that he "heard what sounded like the officers beating on" Plaintiff. (Dkt. No. 33-3, at 2–4.) Plaintiff testified that the time between the time he got off the floor until the time all Defendants left his cell was approximately five to six minutes. (Dkt. No. 33-1, ¶ 49.)

Plaintiff has submitted a video call between Plaintiff and his mother in which bruises or scratches are visible on Plaintiff's face, neck, arms, chest, and back at about 8:30 p.m. the night of the incident. (Dkt. No. 35, ex. C.) Plaintiff did not tell anyone in the Facility about the incident until around 11:30 p.m. on the night of incident. (Dkt. No. 31-9, at 46.) Plaintiff admits that he told a corrections officer about either "coughing up blood" or "urinating blood" in order be seen by Facility medical personnel. (*Id.* at 46–47; Dkt. No. 31-1, at 71.) The medical records from about 8:00 a.m. the next day state that Plaintiff had "multiple linear abrasions" on his chest and the right side of his neck, a "circular abrasion and slight bruising" on the left side of his face, and "two circular superficial abrasions on mid thoracic back." (Dkt. No. 31-15, at 7.) Medical records from approximately 1:30 p.m. that same day note the scratches were "in a very odd pattern" and were "questionable [as if] self inflicted." (*Id.* at 8.) The medical records note that the scratches appeared to be from fingernails, (*id.*), and Defendants Hrebin and Fowler were wearing gloves during the incident, (Dkt. No. 31-10, at 43, 63). The medical records reflect that Plaintiff pointed to "a bruise approximately 1 inch on the right temple which [wa]s not swollen and blueish/brown." (Dkt. No. 31-15, at 8.)

### B. Plaintiff's Grievance

**\*3** Plaintiff received "an inmate handbook" when he entered the Facility, (Dkt. No. 31-6, ¶ 53; Dkt. No. 31-10, at 34), and filed a grievance about the incident on February 12, 2020, two days after the incident, (Dkt. No. 31-15, at 1, 12). Plaintiff wrote in the grievance that two corrections officers "took me in my cell ... handcuffed and closed the door behind them and said rac[ia]l slurs and ass[au]lted me and I have bruises on my body." (*Id.* at 1.) Plaintiff requested an investigation, including an interview of Plaintiff, and indicated he had a lawyer to file a lawsuit. (*Id.*) The grievance coordinator reviewed "video of the incident," supplementary reports from Defendants Hrebin, Fowler, and Weir, and a medical log. (*Id.* at 5.) The grievance coordinator issued a written determination denying the grievance on the merits on February 14, 2020. (*Id.* at 1–9, 12.) Plaintiff appealed this determination to the Chief Administrative Officer on February 14, 2020. (*Id.* at 10, 12.) Plaintiff was interviewed on February 19, 2020. (Dkt. No. 35, ex. B at 0:10–0:26.) The Chief Administrative Officer issued a determination on February 20, 2020, noting that he "accepted the requested action." (Dkt. No. 31-15, at 10–12.) The Chief Administrative Officer noted that Plaintiff's "request for an investigation has been granted and one is ongoing ... You have been interviewed by the supervisor of the investigation unit. No further action at this time." On February 21, 2020, Plaintiff "agree[d] to accept the decision." (*Id.*) Plaintiff filed this action on July 10, 2021. (Dkt. No. 1.)

2023 WL 6318919

**C. The Body-Camera Video** [3]

[3]    These facts are drawn from exhibits attached to Plaintiff's motion for sanctions, (Dkt. No. 30), and Defendants' opposition to Plaintiff's motion for sanctions, (Dkt. No. 32), as well as exhibits attached to Defendants' motion for summary judgment, (Dkt. No. 31), Plaintiff's opposition to Defendants' motion for summary judgment, (Dkt. No. 33), and Defendants' reply, (Dkt. No. 36). The Court considers these facts in deciding Plaintiff's motion for sanctions but not in deciding Defendants' motion for summary judgment.

Sergeants at the Facility wear body cameras during SERT shakedowns. (Dkt. No. 31-11, at 20–21.) The body cameras are activated for the SERT shakedowns. (*Id.* at 22.) Defendant Weir, as a sergeant, wore a body camera during the SERT shakedown on February 10, 2020. (*Id.* at 21–22, 29.) His role was to oversee the SERT shakedown. (*Id.* at 20.) Defendant Weir can be seen patrolling all areas of the housing unit during the SERT shakedown. (Dkt. No. 37, ex. A, at 17:19:37–17:54:33.) Shortly after Defendants Hrebin and Fowler brought Plaintiff to his cell, Defendant Weir walked to the door of the cell and used the body camera to record the inside of the cell for approximately eight seconds while Plaintiff and Defendants Hrebin and Fowler were in it. (Dkt. No. 31-11, at 29–31; Dkt. No. 37, ex. A at 17:23:20–17:23:28.) Defendant Weir submitted the body-camera video to an online storage system, Evidence.com, by docking his body camera after his shift, and the body-camera video was uploaded to the system that day. (Dkt. No. 32-3, at 1; Dkt. No. 32-4, at 9; Dkt. No. 31-11, at 23.)

The body-camera video was not preserved, but testimony and affidavits provided by Defendants do not provide a clear picture of how exactly the video was deleted. On February 11, 2020, the Broome County body-camera supervisor, Captain Paul Carlson, (Dkt. No. 32-1, ¶ 2), viewed the body-camera video and subsequently added then, seconds later, removed a "marker" from the online storage system. [4] (Dkt. No. 32-1, ¶ 3; Dkt. No. 32-3, at 1–2.) Capt. Carlson was aware that the body-camera video was relevant to the Facility's investigation into Plaintiff's grievance. (Dkt. No. 32-1, ¶ 9.) Grievance Officer Valls also claims to have viewed the body-camera video at some point before denying Plaintiff's grievance on February 14, 2020, Dkt. No. 31-5, although the Evidence.com audit log shows no indication that Grievance Officer Valls viewed the body-camera video, and up to that point, no one had attempted to download it, (Dkt. No. 32-3). Capt. Carlson initiated a download of the body-camera video to his computer on February 19, 2020, and attempted to save the body-camera video to the H-drive of his computer. (Dkt. No. 32-1; Dkt. No. 32-3, at 2–3.)

[4]    The record does not indicate what a "marker" is or the significance of Capt. Carlson adding and removing a "marker."

**\*4**  Based on affidavits from Karen Andrews, Assistant Director of the Broome County Department of Information and Technology, and Lt. Benjamin Harting, the system administrator of Evidence.com for the Broome County Sheriff's Office: Patrol Division, the body-camera video could not have been downloaded from the online storage system to the location to which Capt. Carlson asserts he downloaded it—the "H-drive"— because "[a]ny data being downloaded from Evidence.com cannot be downloaded to ... a network drive; it will only download to a hard drive of a computer," and the "H: drive is a network share ... as opposed to the individual computer's hard drive." (Dkt. No. 30-11, ¶ 6; Dkt. No. 32-1, ¶ 8; Dkt. No. 32-2, ¶ 5.) Capt. Carlson claims, however, that he did download the video to the "H-drive of [his] personal computer," and Lt. Harting similarly states that the body-camera video "was in fact downloaded to [Capt. Carlson's] computer on February 19, 2020." (Dkt. No. 32-2, ¶ 8; Dkt. No. 32-3, ¶ 11.)

Capt. Carlson states that he "was completely unaware" that data stored on the H-drive "would be automatically overwritten and deleted by the network after 30 days." (Dkt. No. 32-1, ¶ 13.) There is, however, no factual support in this record for the contention that data saved on the H-drive was automatically overwritten and deleted by the network after thirty days. Rather, data saved on the H-drive was "backed up nightly in a rolling 30-day fashion ... [so] all backup copies would be deleted and unrecoverable" after thirty days. (Dkt. No. 30-11, ¶ 6.) That is, backups of the data saved on the H-drive, not the data itself, were automatically overwritten and deleted by the network after thirty days. (*Id.*) Capt. Carlson admits, however, that he "inadvertently[ ] never copied the video over to the Broome County Sheriff's Office K-drive, the main server." (Dkt. No. 32-1, ¶ 8.)

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 41 of 105
Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

Lt. Harting's duties included "[p]eriodically, at least twice a year, ... conduct[ing] a purge of all footage in Evidence.com." (Dkt. No. 32-2, ¶ 10.) "Law Enforcement personnel are required to add the appropriate retention categories and the Captain assigned to Corrections will remove any footage they require[;] [a]fter verification, all footage is removed," and Lt. Harting "set[s] all Corrections generated footage for deletion." (*Id.*) The body-camera video was deleted from the online storage system on July 15, 2020, (*id.* ¶ 12; Dkt. No. 32-2, ¶ 9; Dkt. No. 32-3, at 3), in accordance with Lt. Harting's assignment of a thirty-day "retention category." (Dkt. No. 32-2, ¶ 6.) The body-camera video was originally "uncategorized," meaning it would be retained indefinitely. (*Id.* ¶ 5.) When Lt. Harting added the thirty-day categorization to the body-camera video on July 8, 2020, thirty days had already elapsed, so the body-camera video was immediately deleted from Evidence.com. (*Id.* ¶ 6.)

Capt. Carlson did not know that the body-camera video was not on the H-drive after he had attempted to download it, and Capt. Carlson's personal computer was subsequently replaced "for purposes of upgrading equipment" in Capt. Carlson's office, though Capt. Carlson did not recall the date his computer was replaced. (Dkt. No. 32-1, ¶¶ 10, 13, 15). Lt. Harting and Capt. Carlson attempted to locate the body-camera video on Capt. Carlson's computer in August 2021, after the Broome County Attorney's Office requested it, (Dkt. No. 30-11, at 12), but the body-camera video could not be recovered from Capt. Carlson's computer; Capt. Carlson "continued to look for the video on his 'H drive' and external thumb drive/hard drive." (Dkt. No. 32-2, ¶ 9.)

When counsel for Defendants requested the body-camera video around August 2021, (Dkt. No. 30-11, at 12), Capt. Carlson became aware that the video could not be recovered. (Dkt. No. 32-1, ¶¶ 11–13.) Neither Defendant Broome County nor the Facility had a formal retention policy for body-camera video footage during the time period at issue. (Dkt. No. 30-12, at 2; Dkt. No. 32-2, ¶ 8.)

## III. PLAINTIFF'S MOTION FOR SANCTIONS

**\*5** In recognition of the fact that spoliation sanctions can impact a summary judgment analysis, *see Williams v. Lane*, No. 13-cv-965, 2016 WL 4275738, at \*5, 2016 U.S. Dist. LEXIS 107939 (N.D.N.Y. Aug. 15, 2016) ("In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001))), the Court turns first to Plaintiff's motion for sanctions.

### A. Standard of Review

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Historically, a party seeking sanctions based on the destruction of evidence was required to establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie*, 243 F.3d at 107–12). But in 2015, the Federal Rules of Civil Procedure were amended to address spoliation of electronically stored information ("ESI"). *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 425 (W.D.N.Y. 2017). Spoliation of ESI is now governed by Rule 37(e) of the Federal Rules of Civil Procedure and is subject to a slightly different analysis as compared to spoliation of tangible evidence. *See Matthews v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 17-cv-503, 2023 WL 2664418, at \*12, 2023 U.S. Dist. LEXIS 52318 (N.D.N.Y. Mar. 28, 2023). Under Rule 37(e), where a court finds that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may, upon a finding of prejudice to a party, order measures no greater than necessary to cure the prejudice, or, only upon a finding of intent to deprive another party of the ESI, presume that the ESI was unfavorable to the spoliating party; instruct the jury that it may or must presume the ESI was unfavorable to the spoliating party; or dismiss the action or enter a default judgment.

2023 WL 6318919

"Aside from modifying the state of mind required of a spoliator, the 2015 amendments to Rule 37(e) did not significantly alter the elements required at common law for sanctions to issue." *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018), *aff'd*, No. 21-1384, 2022 WL 10219749, 2022 U.S. App. LEXIS 28812 (2d Cir. Oct. 18, 2022) (summary order). The party requesting spoliation sanctions "must still establish that the evidence 'should have been preserved in the anticipation or conduct of litigation,' i.e., that the spoliator had a duty to preserve the evidence, and that the evidence was 'lost because a party failed to take reasonable steps to preserve it,' i.e., that such a duty was breached." *Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19-cv-10857, 2021 WL 3863396, at *5, 2021 U.S. Dist. LEXIS 163849 (S.D.N.Y. Aug. 27, 2021) (quoting Fed. R. Civ. P. 37(e)). "Furthermore, the movant must be prejudiced by the absence of the spoliated evidence to be entitled to sanctions under Rule 37(e)(1) ...." *Id.*, 2021 WL 3863396, at *5, 2021 U.S. Dist. LEXIS 163849 (citing *Ungar*, 329 F.R.D. at 13). [5]

[5] Sanctions under Rule 37(e)(2), however, do not require the court to find prejudice to the party deprived of the information "because the finding of intent required by [Rule 37(e)(2)] can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

**\*6** While in general "[t]he party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence," *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008), Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other ... [but rather] leaves judges with discretion to determine how best to assess prejudice in particular cases," *Ungar*, 329 F.R.D. at 16 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Upon a finding of prejudice, a court "is tasked with determining the 'least harsh sanction that can provide an adequate remedy.' " *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175 (S.D.N.Y. 2022) (quoting *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014)).

### B. Discussion

Plaintiff moves for sanctions for Defendants' spoliation of relevant ESI, namely the body-camera video from the body camera worn by Defendant Weir during the SERT shakedown of Plaintiff's housing unit on February 10, 2020. (Dkt. No. 30-13, at 3.) Specifically, Plaintiff seeks sanctions in the form of an adverse inference instruction, preclusion of evidence related to the spoliated body-camera video, and costs and fees associated with the motion for sanctions. (*Id.* at 3, 18.) Defendants argue that sanctions are not warranted because (1) Defendants were not under a duty to preserve when the body-camera video was destroyed; (2) the body-camera video was not destroyed with the requisite state of mind; and (3) Plaintiff cannot demonstrate that the body-camera video would have corroborated his claims. (Dkt. No. 32-4, at 5–10.) In their supplemental letter-brief, Defendants also argue that (1) Defendants took reasonable steps to preserve the body-camera video; (2) Plaintiff was not prejudiced by the loss of the body-camera video; and (3) Defendants did not act with the intent to deprive Plaintiff of the body-camera video. (Dkt. No. 40, at 2–6.)

As an initial matter, neither party originally premised its argument fully on the Rule 37(e) standard, which is applicable to spoliation of ESI and which, as discussed above, differs from the common-law standard applicable to tangible evidence. While Plaintiff refers to the common-law spoliation standard, he also cites Rule 37(e) and correctly notes that Rule 37(e) requires proof of intent to deprive in order to justify imposition of an adverse inference instruction. (Dkt. No. 30-13, at 13; Dkt. No. 34, at 5.) Defendants, meanwhile, did not cite Rule 37(e) at all in their opposition to Plaintiff's motion and relied entirely on the common-law standard. However, at the Court's direction, (Dkt. No. 39), Defendants submitted a supplemental letter-brief in which they agree that the body-camera video constitutes ESI but argue that sanctions under Rule 37(e) should not be imposed. (Dkt. No. 40.)

The Court agrees with the parties that the body-camera video, which was stored and viewed electronically, (Dkt. No. 32-1, ¶¶ 3, 7–8; Dkt. No. 32-2, ¶¶ 4–5, 8; Dkt. No. 32-3; Dkt. No. 31-11, at 23), constitutes ESI. *See Stanbro*, 2021 WL 3863396, at *9–10, 2021 U.S. Dist. LEXIS 163849 (holding that digital footage from a handheld video camera, even when stored on a DVD, constitutes ESI); *see also Ungar*, 329 F.R.D. at 14 (applying the Rule 37(e) standard to destruction of surveillance video footage); *Thomas v. Butkiewicus*, No. 13-cv-747, 2016 WL 1718368, at *7 n.11, 2016 U.S. Dist. LEXIS 57163 (D. Conn. Apr.

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 43 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

29, 2016) ("There does not appear to be a question that the surveillance video footage at issue ... falls within the definition of 'electronically stored information' under Rule 37(e)."). Accordingly, the Court will analyze Plaintiff's motion under the standard imposed by Rule 37(e).

### 1. Duty to Preserve ESI

**\*7** Plaintiff argues that Defendants had a duty to preserve the body-camera video beginning on February 12, 2020, the day Plaintiff filed a grievance about the February 10, 2020, incident. (Dkt. No. 30-13, at 6–7.) Defendants argue that they were not on notice to preserve the body-camera video because Plaintiff's grievance did not request the preservation of any video evidence and the body-camera video was destroyed before Defendants received a notice of claim. (Dkt. No. 32-4, at 5–6.) Defendants also argue that because the underlying incident "was nothing of note" and "in the absence of physical injury" to Plaintiff, Defendants had no duty to preserve the body-camera video. (Dkt. No. 40, at 2–3.)

"Identifying the boundaries of the duty to preserve [ESI] involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" *Europe*, 592 F. Supp. 3d at 176 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). The duty to preserve attaches "when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *See id.* (quoting *Fujitsu Ltd. v. Fed Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). For the purposes of the duty to preserve, " 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.' " *Orbit One Commc'ns v. Numerex Corp.*, 271 F.R.D. 429, 436–37 (S.D.N.Y. 2010). "[A] litigant has the duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Europe*, 592 F. Supp. 3d at 176 (alteration in original) (quoting *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015)).

Here, Plaintiff filed a grievance on February 12, 2020, which provided his version of the relevant events of February 10, 2020. (Dkt. No. 30-13, at 4–5.) In his grievance, Plaintiff said, "I got a lawyer to file a lawsuit." (Dkt. No. 31-15, at 1.) There is no dispute that the deleted body-camera video constituted evidence relevant to Plaintiff's potential lawsuit. Defendant Weir uploaded the body-camera video to the online storage system, and the body-camera video was one of the items that Facility personnel relied on to respond to Plaintiff's grievance. (Dkt. No. 32-1, ¶ 9; Dkt. No. 31-5, ¶ 3; Dkt. No. 31-15, at 5, 9.) At that point, the Facility "should have known" that the body camera video "may be relevant to future litigation," and the Facility had an obligation to preserve it. *See Castro v. Smith*, No. 16-cv-8147, 2023 WL 5371311, at \*8, 2023 U.S. Dist. LEXIS 149515 (S.D.N.Y. Aug. 22, 2023) (quoting *Zubulake*, 220 F.R.D. at 216).

Defendants rely *Williams v. Lane* in arguing that they were not put on notice to preserve evidence relevant to future litigation when Plaintiff filed his grievance. (Dkt. No. 32-4, at 5–6.) But *Williams* is plainly distinguishable. *Williams* involved a claim of interference with non-legal mail in violation of the First Amendment. *See* 2016 WL 4275738, at \*2, 2016 U.S. Dist. LEXIS 107939. Establishing a claim for mail interference with non-legal mail requires a showing of "a pattern and practice of interference that is not justified by a legitimate penological concern," *Id.* (citation omitted). Thus, in attempt to establish such a pattern or practice, the plaintiff had filed a grievance alleging that malfeasance had been occurring "for months." *Id.* The plaintiff argued that a video recording that had been destroyed would have captured a defendant's alleged verbal admission that he had been interfering with the plaintiff's mail; in rejecting the spoilation claim the Court first noted that any such videotaped admission would not have raised a material issue of fact. *See id.*, 2016 WL 4275738, at \*6, 2016 U.S. Dist. LEXIS 107939. While the court then proceeded to discuss and reject the spoilation argument, there is no indication that the grievance in *Williams* provided the defendants in that action with notice that the video recording in question "may be relevant to future litigation" or that the defendants in *Williams* were aware of a need to preserve any specific video footage. *See id.*, 2016 WL 4275738, at \*2, \*6, 2016 U.S. Dist. LEXIS 107939.

**\*8**  Accordingly, the Court concludes that the Facility was under a duty to preserve relevant evidence at the time the body-camera video was deleted. [6]

[6]    Even if Plaintiff's grievance did not put the Facility on notice to preserve relevant evidence, Defendants' argument that the video was destroyed before they received a notice of claim is entirely unavailing because Defendants concede that the Broome County Attorney's Office received a notice of claim on April 27, 2020, (Dkt. No. 31-8; Dkt. No. 32-4, at 3, 5), and the video was not destroyed until July 15, 2020, (Dkt. No. 32-3, at 3). Thus, Facility personnel were unquestionably under a duty to preserve the video from April 27, 2020, onward. *See Hughes v. City of N.Y.*, No. 18-cv-9380, 2021 WL 4295209, at \*11, 2021 U.S. Dist. LEXIS 180064 (S.D.N.Y. Sept. 21, 2021) ("Upon receipt of the Notice of Claim, Defendants should have known that [evidence related to the underlying incident] may be relevant to anticipated litigation.").

### a. Defendants' Control Over the Body-Camera Video

Defendants briefly argue that Defendants Hrebin, Fowler, and Weir cannot have culpability attributed to them because they did not have control of the body-camera video. (Dkt. No. 32-4, at 8–9.) The Court has found that the Facility was under a duty to preserve relevant evidence at the time the body-camera video was deleted, but the Court will next examine whether it is appropriate the impute that duty to Defendants Hrebin, Fowler, and Weir.

"Implicit in a party's duty to preserve evidence is the assumption that the party against whom sanctions are sought had 'control' over the missing evidence." *Stanbro*, 2021 WL 3863396, at \*11, 2021 U.S. Dist. LEXIS 163849 (citations omitted). "[E]ven where a party ... lacks actual physical possession or custody of requested documents ... such party may nevertheless be found to have control of the documents ... if the party is legally entitled to the documents or has the practical ability to acquire the documents from a third-party ...." *Richard v. Dignean*, No. 11-cv-6013, 2021 WL 5782106, at \*3, 2021 U.S. Dist. LEXIS 234419 (W.D.N.Y. Dec. 7, 2021) (alterations in original) (quoting *Gross v. Lunduski*, 304 F.R.D. 136, 142 (W.D.N.Y. 2014)). In assessing whether a party had the practical ability to acquire evidence from a third party, "courts look at the interrelatedness of the relationship between the party against whom sanctions are sought and the entity with custody of the evidence." *See Stanbro*, 2021 WL 3863396, at \*12, 2021 U.S. Dist. LEXIS 163849 (citing *Guillory v. Skelly*, No. 12-cv-847, 2014 WL 4542468, at \*8, 2014 U.S. Dist. LEXIS 128178 (W.D.N.Y. Sept. 11, 2014)). Of note, "[c]ourts in this circuit addressing the issue [of control of evidence] have routinely found that 'in suits against individual corrections officers employed by [New York State Department of Corrections and Community Supervision ("DOCCS")] ..., a sufficiently close relationship ... exists to impute DOCCS's control over evidence to the individual officers.' " *Id.*, 2021 WL 3863396, at \*12, 2021 U.S. Dist. LEXIS 163849 (collecting cases); *see also Castro*, 2023 WL 5371311, at \*6, 2023 U.S. Dist. LEXIS 149515 ("[C]ourts in myriad circuits have found there to be a 'special relationship' between correctional departments and individual officers, holding that the departments 'ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners, and so their failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice' to litigants who are or were incarcerated." (quoting *Johns v. Gwinn*, 503 F. Supp. 3d 452, 463 (W.D. Va. 2020))).

**\*9**  The Court sees no reason for this principle to differ when applied instead to a county-level correctional facility. [7] It is not disputed that Defendant Broome County had possession of the body-camera video. Furthermore, the relationship between, on the one hand, Defendants Hrebin, Fowler, and Weir and, on the other, Defendant Broome County is sufficiently interrelated such that Defendants Hrebin, Fowler, and Weir "had the practical ability to obtain" the body-camera video from Defendant Broome County. *See Stanbro*, 2021 WL 3863396, at \*12, 2021 U.S. Dist. LEXIS 163849. Indeed, the Broome County Attorney's Office represents—and attempted to obtain the body-camera video from various sources on behalf of—all Defendants. (Dkt. No. 30-11, at 12; Dkt. No. 32, ¶¶ 8–9); *see Stanbro*, 2021 WL 3863396, at \*12, 2021 U.S. Dist. LEXIS 163849 (citing *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007)). [8] Counsel for Defendants also produced other evidence that was in Defendant Broome County's possession, including the surveillance footage and the handheld SERT video. (Dkt. No. 32, ¶ 3.) This relationship gave Defendants Hrebin, Fowler, and Weir the practical ability to acquire the body-camera video and, therefore,

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 45 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

control of the body-camera video. *See id.*; *see also Castro*, 2023 WL 5371311, at *6–7, 2023 U.S. Dist. LEXIS 149515 (imputing the New York City Department of Corrections' spoliation of video evidence to individual defendant corrections officers where the Department and officers were represented by the same counsel; their counsel had produced evidence in the litigation; counsel produced a declaration attempting to explain the spoliation; and the individuals were likely entitled to indemnification).

7       The Court notes that several courts have also "denied requests for sanctions against defendant corrections officers who 'had no control over the recordings, had no duty to maintain them, and were not in any way involved in the failure to preserve the evidence.' " *See Barnes v. Harling*, 368 F. Supp. 3d 573, 609 (W.D.N.Y. 2019) (quoting *Thousand v. Corrigan*, No. 15-cv-1025, 2017 WL 4480185, at *3, 2017 U.S. Dist. LEXIS 166198 (N.D.N.Y. Oct. 6, 2017)). In such cases, unlike the instant case, the party with control of the evidence at issue is generally not a party to the action. *See Barnes*, 368 F. Supp. 3d at 609; *Thousand*, 2017 WL 4480185, at *3, 2017 U.S. Dist. LEXIS 166198; *Braham v. Lantz*, No. 08-cv-1564, 2014 WL 1270096, at *7, 2014 U.S. Dist. LEXIS 40572 (D. Conn. Mar. 27, 2014); *Grant v. Salius*, No. 09-cv-21, 2011 WL 5826041, at *3, 2011 U.S. Dist. LEXIS 133248 (D. Conn. Nov. 18, 2011). And in any case, in determining that Defendants Hrebin, Fowler, and Weir had control over the body-camera video, the Court does not endorse a bright-line rule that a county's spoliation of evidence should be imputed to its corrections officers. *See Stanbro*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849. Rather, the Court considers "the purposes of a spoliation sanction" and the case-specific "factors for determining whether one should be imposed here." *See id.*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849 (quoting *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012)).

8       Defendants' arguments based on *Stanbro* are misplaced. (Dkt. No. 40, at 3.) In *Stanbro*, the court refused to levy sanctions against defendants who did not have direct control of video evidence that was ultimately destroyed. *See Stanbro*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849. Crucial to that conclusion, however, was the court's determination that the absence of the spoliated video did not prejudice the plaintiff's claims against those defendants because the spoliated video, which was taken hours after the incident at issue, was not "at the heart" of the plaintiff's claims against those defendants. *See id.* Here, however, the body-camera video would have been at the heart of Plaintiff's claims, as it was contemporaneous evidence demonstrating what happened in Plaintiff's cell for a portion of the relevant time. Furthermore, the court in *Stanbro* undertook a case-specific inquiry that did not rely on finding that the defendants lacked control. *See id.* Thus, the particular conclusion in *Stanbro* to which Defendants point is inapposite and does not support the conclusion that Defendants Hrebin, Fowler, and Weir lacked control of the body-camera video.

### 2. Reasonable Steps to Preserve ESI

**\*10** The parties dispute whether reasonable steps were taken to preserve the body-camera video. (Dkt. No. 30-13, at 14; Dkt. No. 34, at 5–6; Dkt. No. 40, at 4.) Specifically, Defendants point to Defendant Weir successfully docking his body camera, which then uploaded the body-camera video to Evidence.com, and Capt. Carlson manually downloading the video to his H-drive and "believ[ing] the video would be protected" there as the reasonable steps taken. (*Id.*)

"Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take 'reasonable steps' to preserve it." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020) (quoting Fed. R. Civ. P. 37(e)). This obligation "requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation.' " *Europe*, 592 F. Supp. 3d at 177 (quoting *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015)). In general, a party must "identify[ ] all sources of potentially relevant evidence and implement[ ] a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." *Europe*, 592 F. Supp. 3d at 177 (quoting *Skyline Steel*, 101 F. Supp. 3d at 40). "Counsel is 'obligated to "oversee compliance with [a] litigation hold, monitoring the party's efforts to retain and produce the relevant documents," and to "become fully familiar with [their] client's document retention policies, as well as the client's data retention architecture." ' " *Hughes*, 2021 WL 4295209, at *11, 2021 U.S. Dist. LEXIS 180064 (quoting *Lokai Holdings, LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055, at *8, 2018 U.S. Dist. LEXIS 46578 (S.D.N.Y. Mar. 12, 2018)). "Where a party fails to timely institute 'a formal litigation

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 46 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

hold and ... otherwise informally preserve ESI,' [a] [c]ourt can conclude that it did not undertake reasonable steps to preserve ESI." *Charlestown Cap. Advisors*, 337 F.R.D. at 61 (quoting *Capricorn Mgmt. Sys., Inc. v. Gov't. Employees Ins. Co.*, No. 15-cv-2926, 2019 WL 5694256, at *10, 2019 U.S. Dist. LEXIS 123723 (E.D.N.Y. July 22, 2019), *report and recommendation adopted*, 2020 WL 1242616, 2020 U.S. Dist. LEXIS 45301 (E.D.N.Y. Mar. 16, 2020)). "The 'reasonable steps' inquiry has been equated to 'roughly a negligence standard.' " *id.* (quoting *Leidig v. Buzzfeed, Inc.*, No. 16-cv-542, 2017 WL 6512353, at *10, 2017 U.S. Dist. LEXIS 208756 (S.D.N.Y. Dec. 19, 2017)); *see also Stanbro*, 2021 WL 3863396, at *13, 2021 U.S. Dist. LEXIS 163849 ("In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding.") (quoting *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418–19 (S.D.N.Y. 2010)).

Here, Defendant Weir fulfilled his obligation to properly submit the body-camera video to the online storage system by docking his body camera. (Dkt. No. 32-4, at 9; Dkt. No. 31-11, at 23.) And the body-camera video was, in fact, uploaded to that storage system. (Dkt. No. 32-3, at 1.) However, at the relevant time, Defendants did not have a formal retention policy for body-camera video. (Dkt. No. 30-12, at 2; Dkt. No. 32-2, ¶ 8.) Furthermore, although the Broome County Attorney's Office received notice of the Plaintiff's claim on April 27, 2020, there is no evidence before the Court that the Broome County Attorney's Office took steps to preserve the body-camera video until August 2021. (Dkt. No. 30-11, at 12); *see Hughes*, 2021 WL 4295209, at *10, 2021 U.S. Dist. LEXIS 180064 ("[T]he preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.") (quoting *Herman v. City of N.Y.*, 334 F.R.D. 377, 385 (E.D.N.Y. 2020)). Nor is there evidence before the Court that the Broome County Attorney's Office instituted any sort of formal litigation hold related to the incident at issue. Though Capt. Carlson attempted unsuccessfully to informally preserve the body-camera video by downloading it, (Dkt. No. 32-1, ¶ 7–8; Dkt. No. 32-3, at 2–3), it was nevertheless lost—either because Capt. Carlson never successfully downloaded it to his H-drive or because he failed to transfer it to the Broome County Sheriff's Office K-drive—and it was deleted from the online storage system on July 15, 2020, (Dkt. No. 32-1, ¶ 12; Dkt. No. 32-2, ¶ 9; Dkt. No. 32-3, at 3). [9] Thus, Defendants and their counsel failed to take reasonable steps to preserve the video. *See Sosa v. Carnival Corp.*, No. 18-cv-20957, 2018 WL 6335178, at *19, 2018 U.S. Dist. LEXIS 204933 (S.D. Fla. Dec. 4, 2018) (finding that attempting but failing to successfully download a video to a computer drive amounts to failing to "act 'reasonably' to preserve" it). There is no dispute that the body-camera video cannot be replaced. Accordingly, the Court concludes that Defendants and their counsel failed to take reasonable steps to preserve the body-camera video and thereby breached their duty to preserve.

9     Defendants argue that Capt. Carlson did download the body-camera video to his H-drive but that it was "automatically overwritten and destroyed." (Dkt. No. 32-4, at 5–6.) As the Court previously noted, there is no support in the record for the contention that data on the H-drive is ever "automatically overwritten." Rather, data saved on the H-drive is "backed up nightly in a rolling 30-day fashion," and "all backup copies would be deleted and unrecoverable" after thirty days. (Dkt. No. 30-11, ¶ 6.) That is, backups of the data saved on the H-drive, not the data itself, are automatically overwritten and deleted by the network after thirty days. (*Id.*)

### 3. Prejudice

**\*11** Plaintiff argues that destruction of the body-camera video was highly prejudicial to his case because "the footage was the only objective direct evidence to support his claim," and Plaintiff further argues that evidence that Plaintiff lacked observable injuries before entering his cell and had observable injuries upon leaving his cell supports his position. (Dkt. No. 30-13, at 7–9.) Plaintiff also submitted, in connection with his opposition to Defendants' motion for summary judgment, two statements from inmates who were present in Plaintiff's housing unit during the incident, both of whom stated they heard sounds of an assault occurring. (Dkt. No. 33-3, at 2–4.) Defendants argue that Plaintiff has failed to corroborate his claims with other evidence. (Dkt. No. 32-4, at 9–10.) Specifically, Defendants argue that other video evidence does not show that any assault occurred, (*id.* at 10), and submit an affidavit from Capt. Carlson, who viewed the body-camera video, (Dkt. No. 32-1, ¶ 3; Dkt. No. 32-3, at 1–2), and stated that the body-camera video "showed Defendants Hrebin and Fowler searching the Plaintiff's cell on through the

window of the closed door to Plaintiff's cell ... without incident" before "divert[ing] away from the door as Defendants Hrebin and Fowler begin strip searching Plaintiff which prompted Defendant Weir to turn away from the door for privacy reasons and then proceed down the stairs," (Dkt. No. 32-1, ¶¶ 4–6). Capt. Carlson further stated that the body-camera video "clearly showed our officers did not assault Mr. Vega"; that "no sounds can be heard" from Plaintiff; and that he "believe[s] the body camera video would have been entirely favorable to the defense of this action." (*Id.* ¶¶ 6, 9, 16.) Additionally, Capt. Stanton, who was also present during the SERT shakedown, "did not witness any assault of the Plaintiff ... and did not hear any calls of distress or yelling from Plaintiff's cell." (Dkt. No. 31-4, ¶ 4.)

Rule 37(e) permits a court to impose sanctions under subdivision (e)(1) "upon finding prejudice to another party from the loss of the information." But the "precise definition of prejudice for the purposes of Rule 37(e) is not clear." *Stanbro*, 2021 WL 3863396, at *14, 2021 U.S. Dist. LEXIS 163849. "The Advisory Committee Note to the 2015 Amendment merely provides that '[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation.' " *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Thus, "[t]wo different views of 'prejudice' may be hypothesized": (1) " 'prejudice' may be taken to mean merely that the evidence is probative, similar to the concept of relevance under Fed. R. Evid. 401"; or (2) "prejudice may require proof that the evidence was not only probative, but that it would affirmatively support the movant's claim." *Ungar*, 329 F.R.D. at 15. However, "[c]ourts in this Circuit generally require some proof of prejudice in the latter sense before sanctions will issue." *Id.*

But Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other." *Ungar*, 329 F.R.D. at 16 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Rather, Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases," *id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment), though "the Second Circuit has cautioned district courts against 'holding the prejudiced party to too strict a standard of proof regarding the likely contents of ... destroyed evidence,' " *Moody*, 271 F. Supp. 3d at 430 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)); *see also Taylor v. City of N.Y.*, 293 F.R.D. 601, 614 (S.D.N.Y. 2013) (citing *Residential Funding Corp.*, 306 F.3d at 109; *Kronisch*, 150 F.3d at 130). Courts have noted that proof that destroyed ESI "would affirmatively support the movant's claim" may not be "categorically necessary in all instances" for spoliation sanctions to be warranted. *See Ungar*, 329 F.R.D. at 15.

Here, given the broad discretion provided by Rule 37(e), *see Ungar*, 329 F.R.D. at 16, the importance of the body-camera video to the litigation, *see Stanbro*, 2021 WL 3863396, at *14, 2021 U.S. Dist. LEXIS 163849, and Defendants' negligent destruction of the body-camera video, the Court finds that Plaintiff must establish that "existing evidence plausibly 'suggests' that the spoliated ESI could support" his case. *See Karsch v. Blink Health Ltd.*, No. 17-cv-3880, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971 (S.D.N.Y. June 20, 2019) (collecting cases). This burden is appropriate given the Court's "recogni[tion] that [a] negligent party has no right to benefit from its negligence." *See Europe*, 592 F. Supp. 3d at 178 (citing *Ungar*, 329 F.R.D. at 16).

**\*12** The Court finds that, for the purposes of Rule 37(e), Plaintiff has demonstrated that existing evidence plausibly suggests that the body-camera video could have supported his claims. Plaintiff testified that he sustained injuries as a result of the incident. (Dkt. No. 31-9, at 52–54; Dkt. No. 31-10, at 79–80.) Defendant Hrebin testified that he did not recall any bruises or scratches on Plaintiff before the incident. (Dkt. No. 31-12, at 33.) Defendant Fowler testified the same. (Dkt. No. 31-13, at 26–27.) But the Facility's medical records objectively demonstrate that Plaintiff had injuries after the incident, (Dkt. No. 31-15, at 7–8), and there is video evidence demonstrating bruises and scratches on Plaintiff after the incident, (Dkt. No. 35, ex. C). Furthermore, Plaintiff has submitted statements from inmates who were present in Plaintiff's housing unit during the incident, both of whom stated they heard sounds of an assault occurring. (Dkt. No. 33-3, at 2–4.)[10] The body-camera video was therefore very important to Plaintiff's case: it was the only objective evidence of what occurred in Plaintiff's cell, and, in light of the existing evidence to which Plaintiff points, it is plausible that it could have supported Plaintiff's claims. Thus, the destruction of the body-camera video "deprived [P]laintiff of relevant, non-cumulative, and potentially powerful evidence," *see Ransom v. Andrews*, No. 21-cv-6343, 2022 WL 16555362, at *5, 2022 U.S. Dist. LEXIS 197852 (S.D.N.Y. Oct. 31, 2022), and

2023 WL 6318919

Plaintiff has "plausibly 'suggest[ed]' " that the body-camera video "could [have] support[ed] [his] case," *see Karsch*, 2019 WL 2708125, at \*21, 2019 U.S. Dist. LEXIS 106971.

10      Defendants make the cursory observation that these statements are hearsay. (Dkt. No. 32-4, at 10.) But "[h]earsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007) (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam)), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (summary order); *see also Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (summary order) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment." (quoting *Santos*, 243 F.3d at 683)). Here, it is possible the other inmates will testify at trial, *see Auz v. Century Carpet, Inc.*, No. 12-cv-417, 2014 WL 199511, at \*1 n.1, 2014 U.S. Dist. LEXIS 6751 (S.D.N.Y. Jan. 17, 2014). Thus, the Court finds no basis to disregard the inmates' statements in consideration of Plaintiff's motion for sanctions or Defendants' motion for summary judgment.

This conclusion is supported by the characterization that Facility personnel seek to make regarding the body-camera video and other video evidence. Capt. Carlson states that the body-camera video "clearly showed our officers did not assault" Plaintiff. (Dkt. No. 32-1, ¶ 9.) Capt. Stanton similarly states that the body-camera video, the handheld SERT video, and the surveillance footage "show[ ] Plaintiff being noncompliant with officers during the SERT shakedown ... [and] subsequently show[ ] Plaintiff being escorted into his cell by Defendants Hrebin and Fowler where Defendants Hrebin and Fowler conducted a search of Plaintiff's cell and of Plaintiff's person without incident." (Dkt. No. 31-4, ¶ 5.) Grievance Officer Valls almost identically states that the body-camera video "shows Plaintiff being noncompliant with officers during the SERT shakedown ... [and] subsequently shows Plaintiff being escorted into his cell by Defendants Hrebin and Fowler where Defendants Hrebin and Fowler conducted a search of Plaintiff's cell and of Plaintiff's person without incident." (Dkt. No. 31-5, ¶ 3.) The Court's review of existing video evidence, however, demonstrates that neither the handheld SERT video nor the surveillance footage shows the interaction between Plaintiff and Defendants Hrebin and Fowler in Plaintiff's cell. (Dkt. No. 37, exs. A, B.) And the body-camera video would have shown eight seconds of the five- to six-minute interaction. (*Id.* ex. A at 17:23:20–17:23:28.) Thus, even if the body-camera video did not show any use of force, it would not "clearly" support the conclusion that Defendants Hrebin and Fowler "did not assault" Plaintiff, (Dkt. No. 32-1, ¶ 9), or that the interaction between Defendants Hrebin and Fowler and Plaintiff proceeded "without incident," (Dkt. No. 31-4, ¶ 5; Dkt. No. 31-5, ¶ 3). Allowing such testimony in the absence of the body-camera itself would allow "the negligent party ... to benefit from its negligence," *see Europe*, 592 F. Supp. 3d at 178, and would further prejudice Plaintiff where Plaintiff has produced some evidence supporting his allegations.

 \*13  Defendants argue that the other video footage, which the Court previously discussed, demonstrates that the body-camera video would not have supported Plaintiff's claims, (Dkt. No. 32-4, at 10), but the Court is unpersuaded. Surveillance footage, which Defendants imply shows no inmates looking toward Plaintiff's cell, shows inmates looking around in all directions, (Dkt. No. 37, ex. A), including at Plaintiff's cell during the relevant time, (*id.* at 17:22:40–43, 17:23:07–17, 17:24:42–47). The handheld camera footage, which Defendants claim includes no sounds of yelling or slapping, does not include clear enough audio for the Court to reach the same conclusion. (*Id.* ex. B.)

Defendants also argue that the lapse in time between the incident in Plaintiff's cell and the video call between Plaintiff and his mother gave Plaintiff time to "inflict those injuries upon himself," (Dkt. No. 32-4, at 10), and the Facility's medical records do reflect that scratches on Plaintiff were "in a very odd pattern" and were "questionable [as if] self inflicted," (Dkt. No. 31-15, at 8). But requiring Plaintiff to provide more evidence of what happened between the incident in his cell and the video call with his mother than he has already provided would be holding Plaintiff to too strict a standard of proof in light of the fact that Plaintiff has already plausibly suggested that the body-camera video could have supported his claims and that Defendants failed to take reasonable steps to preserve the apparently sole piece of evidence that would have objectively shown, at least in part, what occurred during that period. *See Moody*, 271 F. Supp. 3d at 430; *Taylor*, 293 F.R.D. at 614. Thus, Defendants' argument is unpersuasive.

The Court therefore concludes that Plaintiff has demonstrated that existing evidence plausibly suggests the body-camera video could have supported Plaintiff's case. *See Karsch*, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971. This is especially true given that the Court will not "hold[ ] [Plaintiff] to too strict a standard of proof regarding the likely contents of" the body-camera video. *See Moody*, 271 F. Supp. 3d at 430 (quoting *Kronisch*, 150 F.3d at 128). Accordingly, the Court finds, to the extent necessary for the purposes of Rule 37(e), that Plaintiff has established prejudice from the destruction of the body-camera video.

### 4. Intent to Deprive

Plaintiff seeks an adverse inference instruction and argues that Defendants exhibited the requisite intent to deprive Plaintiff of use of the body-camera video because the body-camera video was crucial to, if not dispositive of, Plaintiff's case, and Defendants "intentionally did not take reasonable steps to preserve" the body-camera video. (Dkt. No. 30-13, at 13–14.) Defendants argue that "the record is devoid of bad faith or a showing that a conscious effort was made to suppress the same as evidence in this matter" and that "nothing from the record suggests that the video was deliberately destroyed with the intention to deprive the Plaintiff." (Dkt. No. 32-4, at 7, 9; *see also* Dkt. No. 40, at 5–6)

An adverse inference instruction is a sanction available only under Rule 37(e)(2) when ESI is at issue. The sanctions available under Rule 37(e)(2) require a finding that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Stanbro*, 2021 WL 3863396, at *15, 2021 U.S. Dist. LEXIS 163849 (quoting *Charlestown Cap. Advisors*, 337 F.R.D. at 66). "This intent standard is 'stringent' and 'does not parallel other discovery standards.' " *Moody*, 271 F. Supp. 3d at 431 (quoting *Jenkins v. Woody*, No. 15-cv-355, 2017 WL 362475, at *17, 2017 U.S. Dist. LEXIS 9581 (E.D. Va. Jan. 21, 2017)). "Courts are 'divided with respect to the appropriate standard of proof to apply to a claim of spoliation;' some courts require a showing of intent to deprive by a preponderance of the evidence, while others require clear and convincing evidence." *Id.* (quoting *Resnik v. Coulson*, 17-cv-676, 2019 WL 2256762, at *6, 2019 U.S. Dist. LEXIS 92159 (E.D.N.Y. Jan. 4, 2019)). The Court need not resolve this issue, however, because even under the less onerous preponderance of the evidence standard, Plaintiff has not demonstrated that Defendants acted with the intent to deprive him of use of the body-camera video in this action.

**\*14**  Plaintiff premises his first argument—that where destroyed evidence was crucial to a party's case, courts have found intent has been shown—on *Moody v. CSX Transportation.* (Dkt. No. 30-13, at 14.) But in that case, "the affirmative act causing the loss [of ESI] [could not] be credibly explained as not involving bad faith by the reason proffered by the spoliator." *See Moody*, 271 F. Supp. 3d at 431 (quoting *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017)). Here, however, Defendants' proffered reason for the destruction of the body-camera video can be credibly explained as not involving bad faith. The record indicates that Capt. Carlson tried to download the body-camera video to preserve it. (Dkt. No. 32-1, ¶¶ 7–8; Dkt. No. 32-3, at 2–3.) Capt. Carlson states that he did not know that the body-camera video was not on his computer after he attempted to download it. (Dkt. No. 32-1, ¶¶ 13, 15.) Upon realizing that the body-camera video was not on his computer, Capt. Carlson contacted the Broome County IT Department, on August 25, 2021, to attempt to recover it. (Dkt. No. 30-11, at 12.) Either Capt. Carlson's unawareness as to how to download data from Evidence.com or his inadvertent failure to copy the body-camera video to the necessary shared computer drive after downloading it is the reason for the loss of the body-camera video, and Capt. Carlson's statements to IT personnel demonstrate that he lacked the intent to deprive any party of the body-camera video. (Dkt. No. 30-11, at 5 ("There is no way I would have deleted [the body-camera video] as it protects my staff and contradicts the inmates claims."), 9 ("It is imperative that the [body-camera] video is recovered ...."), 12 ("I know I downloaded and saved [the body-camera video].").) Plaintiff, for his part, has not put forth any support for the contention that Capt. Carlson's confusion or inadvertent oversight amounted to bad faith, let alone an intent to deprive Plaintiff of the body-camera video.

Plaintiff's second argument—that "[a] party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2),' " (Dkt. No. 30-13, at 13 (quoting *Ungar*, 329 F.R.D. at 13))—is similarly misplaced. This argument relies on the proposition

Vega v. Broome County, Not Reported in Fed. Supp. (2023)

2023 WL 6318919

that Plaintiff "intentionally did not take reasonable steps to preserve the" body-camera video. (Dkt. No. 30-13, at 14.) But only if Defendants "did not intentionally take *any* steps to preserve" the body-camera video would Plaintiff's argument hold water. *See Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (emphasis added). Plaintiff ignores the fact that Capt. Carlson did, in fact, attempt to preserve the video by downloading it. Thus, while the Court has found that Defendants and their counsel failed to take reasonable steps to ensure that the body-camera video was preserved, Plaintiff has not demonstrated that Defendants acted with the intent to deprive him of use of the body-camera video in this action. Accordingly, sanctions authorized by Rule 37(e)(2), which include an adverse inference instruction, are unavailable.

### 5. Appropriate Sanctions

Plaintiff argues that, aside from an adverse inference instruction, preclusion of any evidence related to the body-camera video and attorney's fees associated with Plaintiff's motion for sanctions are appropriate. (Dkt. No. 30-13, at 16–17.) Defendants do not specifically argue that these sanctions are inappropriate.

Plaintiff has established that the body-camera video should have been preserved in the anticipation of litigation; the body-camera video was lost because Defendants and their counsel failed to take reasonable steps to preserve it; the body-camera video cannot be restored or replaced through additional discovery; and Plaintiff was prejudiced as a result of the destruction of the body-camera video. Thus, under Rule 37(e)(1), the Court may order measures no greater than necessary to cure the prejudice.

The Court finds that precluding any party from introducing evidence related to the spoliated body-camera video, including evidence of the existence of the body-camera video and testimony from Capt. Carlson or any other witness about what body-camera video showed, is appropriate and necessary to cure the prejudice caused by Defendants' spoliation of the body-camera video. *See Europe*, 592 F. Supp. 3d at 180 (ordering preclusion of arguments based on the content of spoliated electronic documents to "ensure[ ] that [the spoliating party] does not benefit from its negligence"); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016) (ordering preclusion of evidence related to spoliated emails to "adequately protect[ ] the [non-spoliating party] against any legal prejudice arising from the [spoliating party's] conduct"). This preclusion order does not, however, include testimony from Defendant Weir related to his observations that day. Relatedly, the Court will not consider evidence related to the spoliated body-camera video in disposition of Defendants' motion for summary judgment.

**\*15** Furthermore, Defendant Broome County and the Broome County Attorney's Office shall jointly and severally bear the reasonable attorney's fees and costs Plaintiff and his counsel incurred in connection with the spoliation of the body-camera video. *See Hughes*, 2021 WL 4295209, at \*14, 2021 U.S. Dist. LEXIS 180064; *CAT3, LLC*, 164 F. Supp. 3d at 501–02. [11] Defendants, for their part, do not specifically address Plaintiff's request for fees and costs at all. (Dkt. Nos. 32, 40.) "It is well-established that 'misconduct that causes a party to incur additional expenses is a form of prejudice that supports an award of sanctions pursuant to Rule 37(e).' " *Hughes*, 2021 WL 4295209, at \*14, 2021 U.S. Dist. LEXIS 180064 (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2021 WL 1172265, at \*5, 2021 U.S. Dist. LEXIS 59661 (S.D.N.Y. Mar. 29, 2021)). Though Plaintiff is represented by attorneys from Legal Services of Central New York, and therefore has presumably not himself incurred additional expenses, his attorneys nevertheless "have been put to the burden and expense of ferreting out the malfeasance and seeking relief from the Court." *See id.* (quoting *CAT3, LLC*, 164 F. Supp. 3d at 501). Awarding fees against Defendant Broome County and the Broome County Attorney's Office "serve[s] to 'enforce compliance with the discovery rules,' " *see Charlestown Cap. Advisors*, 337 F.R.D. at 68 (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1367 (2d Cir. 1991)) and "also serves as a deterrent to future spoliation," *see CAT3, LLC*, 164 F. Supp. 3d at 502, as it should alert Broome County and the Broome County Attorney's Office to a need to reevaluate their policies and procedures involving the storage and preservation of body-camera video footage and other electronically stored information that may be relevant to future litigation.

[11]     While the Court has imputed control over the spoliated evidence to all Defendants, the Court has "wide discretion to apportion Rule 37 monetary sanctions." *See Charlestown Cap. Advisors*, 337 F.R.D. at 69 n.19 (quoting *Joint Stock*

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 51 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

*Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-cv-1318, 2017 WL 3671036, at *20, 2017 U.S. Dist. LEXIS 165702 (S.D.N.Y. July 18, 2017)); *see also Hughes*, 2021 WL 4295209, at *14–15, 2021 U.S. Dist. LEXIS 180064 (awarding attorney's fees and costs against the City of New York and its law department but not individual defendants). The Court imposes the monetary sanction against only Defendant Broome County and the Broome County Attorney's Office in recognition of the fact that Defendants Hrebin, Fowler, and Weir did not personally cause the destruction of the body-camera video and because levying the monetary sanction against Defendant Broome County and the Broome County Attorney's Office serves the purpose of sanctioning those primarily responsible for failing to ensure that Defendants' preservation obligations were met. *See id.*, 2021 WL 4295209, at *14, 2021 U.S. Dist. LEXIS 180064 (holding that where the New York City Law Department "fail[ed] to take effective steps to ensure that ... ESI would be preserved," apportioning sanctions between the defendant City of New York and the Law Department was appropriate). The Court finds that "sanctioning [Defendant Broome County and the Broome County Attorney's Office] 'is necessary both to deter such conduct in the future as well as to compensate for the expenses [Plaintiff's counsel] w[as] forced to incur by [Defendant Broome County and the Broome County Attorney's Office's] ... disregard in ensuring that [evidence preservation] obligations were being met.' " *See id. (*fourth, fifth, and eighth alterations in original) (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2019 WL 6838672, at *9, 2019 U.S. Dist. LEXIS 218286 (S.D.N.Y. Dec. 16, 2019)).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Plaintiff's claims, (Dkt. No. 31, at 1; Dkt. No. 31-7, at 16), and argue that they are entitled to summary judgment because Plaintiff failed to exhaust administrative remedies and Defendants are entitled to qualified immunity, (Dkt. No. 31-7, at 4–5, 15–16). Aside from these arguments, Defendants include specific arguments only as to Plaintiff's claims for: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; (2) unreasonable search in violation of the Fourth Amendment against Defendants Hrebin, Fowler, and Weir; (3) negligent supervision and training against Defendant Broome County; and (4) state-law battery, assault, and intentional infliction of emotional distress under the theory of respondeat superior against Defendant Broome County. (Dkt. No. 31-7, at 6–15.) Plaintiff opposes Defendants' motion, arguing that he exhausted available administrative remedies and Defendants are not entitled to qualified immunity, (Dkt. No. 33, at 5–8, 10–11), and that Defendants are not entitled to summary judgment with regard to the following claims: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; and (2) state-law battery, assault, and intentional infliction of emotional distress under the theory of respondeat superior against Defendant Broome County, (*id.* at 8–12). [12]

[12] Plaintiff states that he "does not challenge Defendant[s'] summary judgment motion for the dismissal of his Fourth Amendment strip search claims and state law negligent hiring and supervision claim." (Dkt. No. 33, at 5 n.2.) Accordingly, the Court finds that Plaintiff has explicitly abandoned these claims, *see Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."), and Plaintiff's Fourth Amendment unreasonable search claim against Defendants Hrebin, Fowler, and Weir and state-law negligent hiring and supervision claim against Defendant Broome County are dismissed with prejudice. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing claims that were abandoned on summary judgment); *Leavitt v. Ethicon, Inc.*, 524 F. Supp. 3d 360, 367 (D. Vt. 2021) (granting motion for summary judgment in light of the plaintiffs' "unequivocal abandonment of certain claims").

### A. Standard of Review

**\*16** Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005)

Case 9:24-cv-00109-ECC-CBF Document 76 Filed 03/11/26 Page 52 of 105
Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

(citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to " 'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B. Discussion

### 1. Exhaustion of Administrative Remedies

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because Plaintiff failed to exhaust his administrative remedies with regard to these claims. (Dkt. No. 31-7, at 4–5.) Specifically, Defendants argue that Plaintiff, after appealing a grievance officer's denial of Plaintiff's grievance, failed to further appeal the Chief Administrative Officer's decision to the Citizen's Policy and Complaint Review Council. (*Id.* at 5.) Plaintiff argues that by timely filing a grievance and appealing a first-level denial to the Chief Administrative Officer, who "accepted" his grievance, Plaintiff had no further available administrative remedies. (Dkt. No. 33, at 6–7.) Plaintiff also argues that, because he received a favorable outcome, he was not required under the PLRA to appeal further. (*Id.* at 7.)

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, prescribes limitations on an inmate's ability to bring civil actions with respect to prison conditions. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)), *abrogated on other grounds by Ross v. Blake*, 578 U.S. 632, 639–42, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016).

**\*17** Proper exhaustion of administrative remedies is dependent on the rules and regulations of the prison in which the grievance is filed; that is, an inmate of a county-level correctional facility must satisfy the requirements, including procedural and substantive requirements, specifically applicable to such facilities. *See Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020)

2023 WL 6318919

("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." (alteration in original) (quoting *Jones v. Bock*, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007))).

Failure to exhaust available administrative remedies is an affirmative defense that must be raised by the defendants. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910. Therefore, the defendants "bear the initial burden of establishing the affirmative defense of non-exhaustion 'by pointing to "legally sufficient sources" such as statutes, regulations, or grievance procedures' which demonstrate that 'a grievance process exists and applies to the underlying dispute.' " *Williams v. Correction Officer Priatno*, 829 F.3d 118, 126 n.6 (2d Cir. 2016) (quoting *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59 (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds by Ross*, 578 U.S. at 639–42, 136 S.Ct. 1850).

The regulations governing grievance procedures at county-level correctional facilities in New York provide that "the chief administrative officer of each local correctional facility shall establish, implement and maintain a formal inmate grievance program," which "shall include," among other things, "a detailed description of grievance program operations including steps, timeliness, investigative processes and available internal and external appeal procedures," N.Y. Comp. Codes R. & Regs. tit. 9, §§ 7032.1, 7032.3(b). Under any facility's program, an inmate must "file a grievance within five days of the date of the act or occurrence giving rise to the grievance." *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, *id.* § 7032.4(e), and the regulations provide that the chief administrative officer or designee shall "ensure that each grievance is investigated to the fullest extent necessary by an impartial person who was not personally involved in the circumstances giving rise to the grievance," *id.* § 7032.4(f). Within five business days of receipt, the "grievance coordinator shall issue a written determination." *Id.* § 7032.4(i). The inmate has two business days after receipt of the grievance coordinator's determination to appeal to the chief administrative officer, *id.* § 7032.4(j), after which the chief administrative officer has five business days to issue a determination, *id.* § 7032.4(k). For "any grievance denied by the facility administrator," the inmate has three business days to indicate to the grievance coordinator that he seeks to appeal to the State Commission of Correction, and the grievance coordinator then has three business days to submit the appeal to the Commission's Citizens' Policy and Complaint Review Council ("CPCRC"). *Id.* § 7032.5.

As an initial matter, Defendants have failed to submit any evidence of the actual grievance program that the Facility has implemented. *See Hubbs*, 788 F.3d at 62 ("The burden ... is on the defendant to establish at the outset that an administrative remedy ... existed and covered the dispute at hand."). While it is undisputed that Plaintiff received "an inmate handbook" when he entered the Facility, (Dkt. No. 31-6, ¶ 53; Dkt. No. 31-10, at 34), which presumably included the Facility's grievance procedures, Defendants do not include any indication of what those procedures were. Nor do Defendants cite any " 'statutes [or] regulations ...' which demonstrate that 'a grievance process exist[ed] and applie[d] to the underlying dispute.' " *See Williams*, 829 F.3d at 126 n.6 (2d Cir. 2016) (quoting *Hubbs*, 788 F.3d at 59). "Title 9 provides only the 'Minimum Standards and Regulations' that a county facility must implement in adopting a formal grievance program." *Dickinson v. York*, 828 F. App'x 780, 783 n.3 (2d Cir. 2020) (summary order); *see also* N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.3. Thus, it is possible that the Facility's procedures are not coextensive with the Title 9 regulations. However, by failing to put forth any evidence of the Facility's specific regulations, Defendants have forfeited any argument based on those regulations. *See Dickinson*, 828 F. App'x at 783 n.3 (citing *Hemphill*, 380 F.3d at 686, 688–89). The Court will instead consider the issue of exhaustion in light of the Title 9 regulations alone. *See id.*

**\*18** Here, it is undisputed that Plaintiff timely filed a grievance regarding the February 10, 2020 incident and timely appealed the initial denial of that grievance to the Chief Administrative Officer. (Dkt. No. 31-15, at 1, 10.) On February 20, 2020, the Chief Administrative Officer issued a determination on an inmate grievance form, checking a box that stated "Grievance Accepted." (*Id.* at 10–12.) The Chief Administrative Officer wrote that he "accepted the requested action," noting that Plaintiff's request for an investigation "has been granted and one is ongoing," Plaintiff "may call [his] lawyer at any time," and Plaintiff was interviewed regarding the incident. (*Id.*). Plaintiff "agree[d] to accept the decision." (*Id.*)

Defendants argue, however, that Plaintiff's acceptance of the Chief Administrative Officer's decision and failure to appeal the decision to CPCRC means that Plaintiff "failed to use all the steps of the Facility's grievance policy which resulted in his failure to exhaust his administrative remedies." (Dkt. No. 31-7, at 5.) But the governing regulations provide for an appeal of grievances *denied* by the facility administrator. The relevant regulation states that "[w]ithin three business days of the receipt of the chief administrative officer's determination, any grievant may appeal any grievance *denied* by the facility administrator in whole or in part" to the CPCRC. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.5(a) (emphasis added). [13] The form on which the determination of the Chief Administrative Officer was issued similarly states that, "[p]ursuant to 9 NYCRR § 7032.5(a), any grievant may appeal any grievance DENIED by the facility administrator, in whole or in part, to the State Commission of Correction." (Dkt. No. 31-15, at 10 (emphasis in original).) The form further states that "a grievance accepted in its entirety by the Chief Administrative Officer ... may not be appealed." (Dkt. No. 31-15, at 10).

[13]    The grievance form provided, as an alternative to "Grievance Accepted," a determination of "Grievance Accepted in part/Denied in part." (Dkt. No. 31-15, at 10.)

Defendants do not cite any support for their assertion that, even though Plaintiff followed applicable regulations by timely filing a grievance, timely appealing a denial to the Chief Administrative Officer, and ultimately having his grievance "accepted" by the Chief Administrative Officer, Plaintiff was nevertheless required to appeal that outcome to the CPCRC. *Cf. Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (finding that "[o]nce [a DOCCS grievant] receive[s] a favorable ruling ..., no further administrative proceedings [are] available to propel him out of stasis," and "[c]onsequently, there [is] no further 'possibility of some relief' for [the grievant]." (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001))). Defendants have not identified an available administrative remedy; under the language of the relevant regulation, Plaintiff was not permitted to appeal the "grievance accepted" determination ruling to the CPCRC.

In sum, because Plaintiff "complete[d] the administrative review process in accordance with the applicable procedural rules," which is "all that is required by the PLRA to 'properly exhaust,' " *see Jones*, 549 U.S. at 218, 127 S.Ct. 910 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)), Plaintiff did not fail to exhaust available administrative remedies. Accordingly, Defendants' motion for summary judgment is denied to the extent it is premised on the argument that Plaintiff failed to exhaust administrative remedies.

### 2. Excessive Force

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claim against Defendants Hrebin and Fowler because (1) any force used by Defendants Hrebin or Fowler while Plaintiff was being handcuffed was objectively reasonable due to Plaintiff's noncompliance, (2) Defendants Hrebin and Fowler did not use force on Plaintiff while he was in his cell, and (3) Plaintiff had not had any prior interactions with Defendants Hrebin and Fowler, and therefore, neither Defendant Hrebin nor Defendant Fowler had a motive to use excessive force. (Dkt. No. 31-7, at 6–8.) Plaintiff argues that Defendants' motion should be denied with respect to Plaintiff's excessive force claim against Defendants Hrebin and Fowler because (1) there exist factual disputes about the alleged use of force, and (2) familiarity with an alleged attacker is not an element of a Fourteenth Amendment excessive force claim. (Dkt. No. 33, at 8–10.)

**\*19** The parties agree that, at the time of the events at issue, Plaintiff was a pretrial detainee at the Facility. (Dkt. No. 31-7, at 6; Dkt. No. 33, at 8.) "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). To succeed on a Fourteenth Amendment excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). That is, a plaintiff must first show that the defendant used force "purposefully, knowingly, or (perhaps) recklessly." *See Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018) (citing *Kingsley*, 576 U.S. at 395–96, 135 S.Ct. 2466). Then, the plaintiff must demonstrate that the force was objectively unreasonable in light of "such factors as 'the relationship between the need

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 55 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)
2023 WL 6318919

for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.' " *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466). "These non-exhaustive considerations 'inform the ultimate Fourteenth Amendment inquiry: whether the governmental action was rationally related to a legitimate governmental objective.' " *Ransom v. Banks*, No. 20-cv-10232, 2022 WL 769344, at *3, 2022 U.S. Dist. LEXIS 45005 (S.D.N.Y. Mar. 14, 2022) (quoting *Edrei*, 892 F.3d at 536).

Because whether a use of force was objectively unreasonable is a fact-intensive inquiry that often involves assessments of credibility and choices between conflicting versions of events—questions that must often be left for a jury to decide—"granting summary judgment against plaintiffs on excessive force claims is rarely appropriate." *See Taylor v. Quayyum*, No. 16-cv-1143, 2023 WL 5293383, at *7, 2023 U.S. Dist. LEXIS 146503 (S.D.N.Y. Aug. 17, 2023) (quoting *Anderson v. City of N.Y.*, No. 16-cv-2583, 2019 WL 1426723, at *8, 2019 U.S. Dist. LEXIS 54126 (S.D.N.Y. Mar. 28, 2019)).

Here, there exist issues of material fact that preclude summary judgment. Plaintiff claims he did not resist during the initiation of the SERT shakedown or while Defendants Hrebin and Fowler handcuffed him. (Dkt. No. 33-1, ¶¶ 31, 33; Dkt. No. 31-10, at 45.) Defendants, meanwhile, claim that Plaintiff refused to "give up his hands to be handcuffed." (Dkt. No. 31-6, ¶¶ 31, 33; Dkt. No. 33-12, at 33–34; Dkt. No. 33-13, at 22.) Furthermore, Plaintiff claims that, while he was handcuffed in his cell, Defendants Hrebin and Fowler assaulted him. (Dkt. No. 33-1, ¶ 72; Dkt. No. 31-10, at 49–52.) Defendants claim no force was used in Plaintiff's cell. (Dkt. No. 31-6, ¶ 43; Dkt. No. 31-2, ¶ 4; Dkt. No. 31-3, ¶ 4; Dkt. No. 31-12, at 38; Dkt. No. 31-13, at 25–26.)

Whether Plaintiff was resisting at the onset of the SERT shakedown, in addition to itself being a factor relevant to the objective reasonableness of an alleged use of force, also bears on the severity of the security problem at issue and the threat reasonably perceived by Defendants Hrebin and Fowler at that point, *see Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. Such a factual dispute is an issue to be decided at trial, not on a motion for summary judgment. *See Wright*, 554 F.3d at 266; *Taylor*, 2023 WL 5293383, at *7, 2023 U.S. Dist. LEXIS 146503. And determining what occurred in Plaintiff's cell, which is wholly dependent on "assessments of credibility and choices between conflicting versions of the events," is a matter "for the jury, not for the [C]ourt on summary judgment." *See Simpson v. City of N. Y.*, 793 F.3d 259, 265 (2d Cir. 2015) (quoting *Jeffreys*, 426 F.3d at 553). Defendants' argument relying on Plaintiff's lack of "prior interactions with any Defendant or any reason to fear any Defendant" is unavailing; neither a preexisting relationship nor motive is an element of a Fourteenth Amendment excessive force claim. *See Kingsley*, 576 U.S. at 396–97, 135 S.Ct. 2466; *Edrei*, 892 F.3d at 534.

Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiff's Fourteenth Amendment excessive force claim against Defendants Hrebin and Fowler.

### 3. Qualified Immunity

 **\*20** Defendants argue that summary judgment with respect to Plaintiff's Fourteenth Amendment excessive force claim is appropriate because they are entitled to qualified immunity. (Dkt. No. 31-7, at 15–16.) Specifically, Defendants argue that no Defendant violated any clearly established law. (*Id.* at 16.) Plaintiff argues that Defendants are not entitled to qualified immunity because "factual disputes remain as to the reasonableness of [the force used]." (Dkt. No. 33, at 10–11 (alteration in original) (quoting *Smith v. Sawyer*, 435 F. Supp. 3d 417, 435 (N.D.N.Y. 2020)).)

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). On a motion for summary judgment, the court evaluates claims of qualified immunity using a two-part inquiry: (1) "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right,' " and (2) "whether the right in question was 'clearly established' at the time of the violation," *Tolan v. Cotton*, 572 U.S. 650, 655–56, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (alterations in original) (first quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), and then quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122

S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "Courts have discretion to decide the order in which to engage these two prongs." *Id.* at 656, 134 S.Ct. 1861 (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted).Here, as previously discussed, material factual disputes remain as to both the reasonableness of Defendants Hrebin and Fowler's use of force while handcuffing Plaintiff and whether Defendants Hrebin and Fowler used force while in Plaintiff's cell. Because these material factual disputes remain, deciding the issue of qualified immunity is inappropriate. *See Smith*, 435 F. Supp. 3d at 442; *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004))); *Hemphill v. Schott*, 141 F.3d 412, 417–18 (2d Cir. 1998) (reversing the district court's finding of qualified immunity where there were factual disputes as to movements made by the plaintiff prior to the use of force and explaining that "summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010) ("[I]t is impossible to 'determine whether [the defendant] reasonably believed that ... force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded.' " (first, fourth, fifth, and sixth alterations in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999))). Accordingly, Defendants' motion for summary judgment on the basis of qualified immunity is denied.

### 4. Battery, Assault, and Intentional Infliction of Emotional Distress

Despite seeking "an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the Complaint," (Dkt. No. 31, at 1; *see also* Dkt. No. 31-7, at 16), Defendants include no argument about Plaintiff's claims for battery, assault, or intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir in their memorandum of law in support of their motion for summary judgment. (Dkt. No. 31-7.) To the extent Defendants seek summary judgment on these claims on the grounds relied on in support of their motion with regard to Plaintiff's excessive force claim, the Court denies Defendants' motion for the reasons given above—namely, the existence of numerous issues of material fact. Otherwise, the Court construes Defendants' motion as not seeking summary judgment on Plaintiff's claims for battery, assault, or intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir. *See 59th St. Assocs. v. Reliance Mediaworks Ltd.*, No. 14-cv-7435, 2016 WL 861212, at *1 n.1, 2016 U.S. Dist. LEXIS 28876 (S.D.N.Y. Mar. 4, 2016) ("None of the submissions in fact state on which counts 59th Street seeks summary judgment, but 59th Street makes no argument regarding Count Two. As we received no briefing on this claim, we assume that 59th Street does not seek judgment on it."); *Tubbs v. Venettozzi*, No. 19-cv-126, 2022 WL 7274397, at *2 n.6, 2022 U.S. Dist. LEXIS 128771 (N.D.N.Y. July 20, 2022) ("Defendant makes no argument as to why [the deliberate indifference] claim should be dismissed and so summary judgment should be denied as to it."), *report and recommendation adopted*, 2022 WL 4545542, 2022 U.S. Dist. LEXIS 176685 (N.D.N.Y. Sept. 29, 2022).

**\*21** Defendants do, however, argue that Defendant Broome County cannot be liable under the theory of respondeat superior for Plaintiff's claims of battery, assault, and intentional infliction of emotional distress and that summary judgment on these claims against Defendant Broome County is therefore warranted. (Dkt. No. 31-7, at 13–15; Dkt. No. 36-1, at 5–7.) Specifically, Defendants argue that Defendant Broome County "is not liable for the acts of its correctional officers or sergeants" because "Broome County has not adopted a local law expressly assuming responsibility for the actions of its correctional officers or sergeants." (Dkt. No. 31-7, at 13.) Plaintiff argues that Defendant Broome County is liable for these claims under the doctrine of respondeat superior. (Dkt. No. 33, at 11–12.) [14]

14      Defendants also argue that "any § 1983 claims asserted against the County should be dismissed" because Plaintiff has failed to establish Broome County's *Monell* liability. (Dkt. No. 31-7, at 13–15.) Plaintiff notes in response that he has "not brought any Section 1983 claims" against Broome County, (Dkt. No. 33, at 5 n.2), and the Court therefore does not address Defendants' argument about *Monell* liability. *See Jackson v. Cnty. of Ulster*, No. 22-cv-148, 2022 WL 2954370,

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 57 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)

2023 WL 6318919

at \*10, 2022 U.S. Dist. LEXIS 132123 (N.D.N.Y. July 26, 2022) ("The only [federal] claim in the [complaint] is against [an individual defendant] .... Thus, there is no reason for the Court to determine whether a *Monell* liability claim could be sustained against the County ....").

"New York law is clear that 'counties are generally not liable for tortious acts other than negligence committed by a Sheriff or his or her deputies without a legislative assumption of liability.' " *Casiano v. Ashley*, 515 F. Supp. 3d 19, 28 (W.D.N.Y. 2021) (quoting *Nolan v. Cnty. of Erie*, No. 19-cv-1245, 2021 WL 51004, at \*7, 2020 U.S. Dist. LEXIS 246418 (W.D.N.Y. Jan. 6, 2021)); *see also Barr v. Albany Cnty.*, 50 N.Y.2d 247, 257, 428 N.Y.S.2d 665, 406 N.E.2d 481 (1980) ("[A] county may, by legislative enactment, assume responsibility for the tortious acts of its Deputy Sheriffs as distinguished from the acts of the Sheriff himself."). Plaintiff suggests that Defendants Hrebin, Fowler, and Weir are employees of Broome County and not employees of the Broome County Sheriff. (Dkt. No. 33, at 12.) But he provides no factual support for this proposition. [15] And the caselaw Plaintiff cites does not support the proposition that corrections officers employed by a county sheriff are not agents of the sheriff. *See Smelts v. Meloni*, 306 A.D.2d 872, 762 N.Y.S.2d 467, 467–68 (2003) (finding that sheriff's deputies are not "employees" of the county for the purposes of respondeat superior liability.) In fact, the Charter and Code of the County of Broome [16] ("Broome County Code") makes clear that the Broome County Sheriff "appoint[s] corrections officers ... as may be necessary to operate the County jail facilities," Broome County Code § A2304(D), thus rendering corrections officers, as with deputies, agents of the Broome County Sheriff, *see Douglas v. Cnty. of Oswego*, 151 Misc.2d 239, 573 N.Y.S.2d 236, 237 (Sup. Ct. 1991) ("A county's immunity from vicarious liability for the negligent acts of a sheriff is extended to the negligent acts of deputy sheriffs acting in the course of their duties as well as to the employees and jail personnel employed by the sheriff ...." (citations omitted)); *cf. Wilson v. Sponable*, 81 A.D.2d 1, 439 N.Y.S.2d 549, 555 (App. Div. 1981) (explaining that, historically, "sheriff's deputies were agents of the sheriff and had no independent common law agency relationship with the county" and that that relationship formed the basis of the "effective[ ] immuniz[ation] [of] the counties from the negligent acts of the Deputy Sheriffs as well as those of the Sheriff"). Thus, Defendant Broome County could be liable for the tortious acts of Defendants Hrebin, Fowler, and Weir only if it "assume[d] responsibility for the[ir] tortious acts" by express "legislative enactment." *See Barr*, 50 N.Y.2d at 257, 428 N.Y.S.2d 665, 406 N.E.2d 481; *see also Nichols v. Rensselaer Cnty.*, 129 A.D.2d 167, 517 N.Y.S.2d 315, 317 (App. Div. 1987) ("[T]he Court of Appeals [in *Barr*] instructs us that the key factor in determining whether a county has waived its immunity for tortious acts of its Deputy Sheriffs is the county's express willingness to assume responsibility for those acts.").

[15]    In fact, the record demonstrates that each of these Defendants testified that he is employed by the Broome County Sheriff's Office. (Dkt. No. 31-2, ¶ 1; Dkt. No. 31-3, ¶ 1; Dkt. No. 31-11, at 9; Dkt. No. 31-12, at 14–15; Dkt. No. 31-13, at 11,13.)

[16]    Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Charter and Code of the County of Broome, available at https://www.gobroomecounty.com/sites/default/files/dept/legis/Charter% 20and% 20Code/ Broome% 20County% 20Code_v13.pdf. *See Morris Motel, LLC v. DeChance*, No. 20-cv-3350, 2023 WL 2682937, at \*1 n.2, 2023 U.S. Dist. LEXIS 54101 (E.D.N.Y. Mar. 29, 2023) (collecting cases and taking judicial notice of the online version of a town code in deciding a motion for summary judgment).

 **\*22**  Plaintiff argues that Defendant Broome County has done so through its "Liability and Casualty Fund," (Dkt. No. 33, at 12,) which provides payments for judgments, settlements, and expert or professional services rendered in connection with "claims ... that arise out of acts and omissions of ... employees ... of the County of Broome or the Broome County Sheriff," Broome County Code §§ 130-1, 130-4. But indemnification alone, absent an explicit waiver of immunity, is insufficient to impose liability on Defendant Broome County for the acts of Defendants Hrebin, Fowler, and Weir. *See Nichols*, 517 N.Y.S.2d at 317 ("We are unable to find any [express] assumption of responsibility [by Rensselaer County] in the instant case. Indeed, [local law] simply provides for the indemnification of County employees for the amount of judgments against them or for the amount of any settlement." (citations omitted)); *see also Saleh v. Savage*, No. 12-cv-468S, 2015 WL 1608839, at \*7–8, 2015 U.S. Dist. LEXIS 47166 (W.D.N.Y. Apr. 10, 2015) (dismissing state-law claims against a county defendant where a local law "provid[ed] for the indemnification of its employees for actions taken in the course of their employment" but the record lacked any indication that the county had "expressly assume[d] liability for the acts of its sheriff and deputies"); *cf. Barr*, 50 N.Y.2d

Case 9:24-cv-00109-ECC-CBF   Document 76   Filed 03/11/26   Page 58 of 105

Vega v. Broome County, Not Reported in Fed. Supp. (2023)

2023 WL 6318919

at 256, 428 N.Y.S.2d 665, 406 N.E.2d 481 (finding a county had expressly assumed liability for the acts of sheriff's deputies where local law provided that "[a]ny act or omission of any employee of the county in the office of the sheriff, done or made in the performance of an official duty shall be the act or omission of the county").

Accordingly, summary judgment as to Plaintiff's claims of battery, assault, and intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir is denied, and summary judgment as to Plaintiff's claims of battery, assault, and intentional infliction of emotional distress against Defendant Broome County is granted.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for sanctions, (Dkt. No. 30), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the parties are precluded from introducing evidence related to the spoliated body-camera video; and it is further

**ORDERED** that Defendant Broome County and the Broome County Attorney's Office shall jointly and severally bear the reasonable attorney's fees and costs Plaintiff and his counsel incurred in connection with the spoliation of the body-camera video; and it is further

**ORDERED** that Plaintiff shall submit, by October 19, 2023, a declaration detailing the attorney's fees and costs associated with Plaintiff's motion for sanctions for which Plaintiff seeks recovery, a memorandum of law, not to exceed 15 pages, supporting Plaintiff's request, and any supporting documentation; Defendants may submit, by November 2, 2023, objections to Plaintiff's request; and it is further

**ORDERED** that Plaintiff's motion for sanctions is otherwise **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 31), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's Fourth Amendment unreasonable search claim against Defendants Hrebin, Fowler, and Weir and state-law claims for negligent hiring and supervision, battery, assault, and intentional infliction of emotional distress against Defendant Broome County are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk is respectfully directed to terminate Defendant Broome as a party to this action; and it is further

**ORDERED** that Defendants' motion for summary judgment is otherwise **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6318919

---

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 59 of 105

Rodriguez v. Heit, Not Reported in Fed. Supp. (2018)

2018 WL 3121626

2018 WL 3121626
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Angel RODRIGUEZ, Plaintiff,

v.

HEIT, et al., Defendants.

9:16-CV-706 (GTS/ATB)
|
Signed 03/30/2018

**Attorneys and Law Firms**

ANGEL RODRIGUEZ, pro se.

GREGG T. JOHNSON, ESQ., Attorney for Defendants.

APRIL J. LAWS, ESQ., Attorney for Defendants.

## ORDER and REPORT and RECOMMENDATION

Hon. Andrew T. Baxter, U.S. Magistrate Judge

## I. Background and Procedural History

 **\*1**  In this civil rights complaint, plaintiff alleges that defendant Heit, a nurse at Clinton County Jail ("CCJ") violated plaintiff's right to privacy when she discussed his medical impairment in front of a corrections officer, while he was incarcerated at CCJ as a pre-trial detainee. (Complaint ("Compl.") ¶ 6 at p.1-3) (Dkt. No. 1). [1]  Plaintiff also alleges that Clinton County has discriminated against him because of his "disability," in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (*Id.*)

[1]    Plaintiff has attached numbered pages to the factual statement of his form-complaint. The first page is the type-written form, numbered "1," and the next two inserted pages are numbered "2," and "3."

Plaintiff's complaint contained three causes of action. (Compl. ¶ 7). Plaintiff's first cause of action alleged violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") against Nurse Heit. (First Cause of Action). Plaintiff's second and third causes of action alleged ADA violations, including discrimination and retaliation. (*Id.*)

On July 20, 2016, Chief Judge Suddaby reviewed the complaint and found that "[c]onstruing the allegations in plaintiff's complaint with the utmost leniency," the complaint contained four claims (1) defendant Heit violated plaintiff's Fourteenth Amendment right to privacy and HIPAA when she revealed private and sensitive private personal information to non-medical staff members and openly discussed plaintiff's medical status with non-essential and non-authorized personnel; (2) First Amendment retaliation claims; (3) defendants violated Title II of the ADA when they excluded plaintiff from work programs due to his disability; and (4) defendants retaliated against plaintiff in violation of Title V of the ADA. (Dkt. No. 4 at 5).

In his analysis of plaintiff's claims, Chief Judge Suddaby found that plaintiff's Fourteenth Amendment privacy claim against defendant Heit survived initial review. (Dkt. No. 4 at 8). However, the court dismissed any claims based on HIPAA. (*Id.*) The court dismissed any First Amendment retaliation claims. (Dkt. No. 4 at 9-10). The court found that plaintiff's discrimination

claim under Title II of the ADA against Clinton County survived initial review. Finally, the court dismissed plaintiff's Title V retaliation claim against CCJ for failure to state a claim. (Dkt. No. 4 at 12-13).

Plaintiff's surviving claims are his (1) Fourteenth Amendment claims against Nurse Heit related to the First/Fourteenth Amendment right of privacy; and (2) Title II ADA claims against Clinton County based upon exclusion from the work program. (Dkt. No. 4 at 14). Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 74). Plaintiff has responded in opposition to the motion.[2] (Dkt. No. 83). Plaintiff has also requested a two month extension "to respond" to defendants' motion. (Dkt. No. 86). Defendant have opposed this motion. (Dkt. No. 89). Plaintiff has also filed a copy of a letter that he wrote to defense counsel regarding his deposition transcript and further discovery. (Dkt. No. 87). For the following reasons, this court agrees with defendants, will deny plaintiff's request for a further extension, and will recommend dismissal of the complaint.

[2]     Plaintiff's response is labeled a cross-motion, but has been docketed as plaintiff's "response" in opposition to defendants' motion. To the extent that the document can be interpreted as a cross-motion for summary judgment, this court will recommend its denial based on the findings herein.

## II. Summary Judgment

**\*2**  Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g.*, *Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

2018 WL 3121626

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378. Constitutional as well as claims under the ADA must be exhausted before filing suit in federal court. *See Crichlow v. Crowley*, No. 13-CV-6624, 2015 WL 1808626, at *5 (W.D.N.Y. Apr. 21, 2015) (citing *Arce v. O'Connell*, 427 F.Supp.2d 435, 440 (S.D.N.Y. 2006); *Alster v. Goord*, 745 F.Supp.2d 317, 332 (S.D.N.Y. 2010) ).

 **\*3** Grievance programs and procedures in *county* facilities are contained in the regulations governing the New York State Commission of Correction, appearing in the chapter entitled "Minimum Standards and Regulations for Management of County Jails and Penitentiaries," in the part specifically entitled "Grievance Program." N.Y. CODE RULES & REGS. tit.9, §§ 7032.1-7032.11. These regulations specifically provide that the chief administrative officer of the correctional facility shall establish and maintain a formal inmate grievance procedure. *Id.* § 7032.1. The regulations provide that the facility shall maintain grievance forms for the inmates to use and shall make those forms readily available to inmates. *Id.* §§ 7032.4(d), 7032.6. The regulations also provide that instructions for filing a grievance shall be included in the facility rules and regulations as required by section 7002.9(a)(15), and that "[e]ach inmate at any facility shall be advised in writing as to the availability of grievance forms upon admission." *Id.* § 7032.4(b), (c).

An inmate must file his grievance within five days of the date of the conduct giving rise to the complaint. *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, and the regulations provide that each grievance shall be fully investigated by an individual who was not personally involved in the circumstances giving rise to the grievance. *Id.* § 7032.4(e), (f). The regulations specify minimum requirements for the type of information that must be gathered during the investigation of the inmate's grievance. *Id.* § 7032.4 (g)(1)-(g)(4).

The grievance coordinator must issue a written decision within five business days, containing the "facts and reasons underlying the coordinator's determination," and a copy of the determination must be provided to the inmate. *Id.* at 7032.4(i). The plaintiff may appeal an adverse determination to the chief administrative officer or his designee within two business days of receiving the adverse determination. *Id.* § 7032.4 (j). The chief administrative officer renders a decision within five business days, and if the inmate is still not satisfied, he may appeal the adverse decision directly to the Commission of Correction within three business days. *Id.* §§ 7032.4(k), 7032.5.

Within three business days after receiving the appeal from the inmate, the chief administrative officer of the facility must mail the appeal to the Commission's Citizens Policy and Complaint Review Council (CPCRC), and the grievance coordinator must provide the inmate with a receipt of mailing. *Id.* § 7032.5(c). The CPCRC has forty-five days within which to issue a written decision. *Id.* § 7032.5(d). In certain circumstances, inmates will be provided assistance at any stage of the proceedings. *Id.* § 7032.9. The chief administrative officer of the facility must keep a centralized record of all grievances, and facility employees are given an orientation on the grievance procedures.[3] *Id.* §§ 7032.10, 7032.11.

3      The regulations also provide that if an inmate is released or transferred to another facility prior to the resolution of a grievance, the chief administrative officer "shall cause a determination to be made on such grievance ...", and if the grievance is denied, the chief administrative officer "shall submit the grievance to the [CPCRC] as set forth in section 7032.5 of this Part." 9 NYCRR § 7032.7.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Rodriguez v. Heit, Not Reported in Fed. Supp. (2018)

2018 WL 3121626

**\*4** The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1857, 195 L.Ed.2d 117 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, ––– U.S. ––––, 136 S.Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel—are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ––– U.S. ––––, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 656 F. App'x at 580. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

### B. Application

In this case, defendants concede that plaintiff brought a grievance regarding the issue of defendant Heit's alleged disclosure of private health information in violation of HIPAA. However, defendants argue that plaintiff did not wait for the CPCRC's decision before filed this federal civil rights complaint. This complaint was filed on June 16, 2016, but plaintiff's CPCRC denial was not dated until July 14, 2016. (Pl.'s Ex. A; Dkt. No. 83-1 at CM/ECF p.11). It is less clear that he included his ADA claim[4] in the grievance, but the court will assume for purposes of this motion that plaintiff brought his discrimination claim in his grievance.

[4]      While plaintiff's privacy claim dealt with Nurse Heit revealing plaintiff's medical information to Officer Duprey, plaintiff's ADA claim against the County involved which individuals were allowed to work in certain areas of the facility. The claims are related, but not the same.

To the extent a civil rights claims must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by highest level of decision-maker, must be completed ***before*** an action asserting that claim may be initially filed. *See, e.g.*, *Grant v. Condon*, No. 14-CV-6514, 2018 WL 1256224, at \*2 (W.D.N.Y. Mar. 12, 2018) (exhaustion must be completed before suit is filed); *Casey v. Brockley*, No. 9:13-CV-1271 (DNH/TWD), 2015 WL 8008728, at \*5 (N.D.N.Y. Nov. 9, 2015) (Rep't-Rec.), *adopted*, 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015) ("receiving a decision from CORC after commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds, Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ); *Guillory v. Haywood*, No. 9:13-CV-1564 (MAD/TWD), 2015 WL 268933, at \*12 (N.D.N.Y. Jan. 21, 2015); *Rodriguez v. Rosner*, No. 12-CV-958 (TJM/ATB), 2012 WL 7160117, at \*5 (N.D.N.Y. Dec. 5, 2012) (Rep't-Rec.), *adopted*, 2013 WL 614360 (N.D.N.Y. Feb. 19, 2013). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, at \*11 (N.D.N.Y. Jan. 21, 2015) (citing, *inter alia*, *Neal v. Goord*, 267 F.3d at 122) ).

In this case, it is clear that although plaintiff ultimately exhausted his administrative remedies with respect to his complaint against defendant Heit as well as his complaint against the County for discrimination, he did not complete the exhaustion process until ***after*** he filed this action.[5] Thus, plaintiff has failed to exhaust his administrative remedies as to both of his claims, and this court must recommend dismissal of the entire complaint for failure to exhaust. Because a dismissal for failure to exhaust is generally without prejudice, the court has also considered the merits of plaintiff's claims. The court finds that, even if plaintiff had exhausted his claims, they would still be subject to dismissal as discussed below.

[5]      In support of their motion for summary judgment, defendants have submitted the affidavit of Lieutenant Kevin Laurin, whose duties include overseeing the grievance program at CCJ. (Laurin Aff. ¶ 3) (Dkt. No. 74-8). Lt. Lauren states that plaintiff filed one grievance on May 25, 2016, regarding "his request to be in the inmate worker program and an issue with Nurse Heit regarding his medical condition." (Lauren Aff. ¶ 5). Lt. Lauren states that, upon his review of the

2018 WL 3121626

grievance, he determined that the only available positions at the time were in the kitchen, and plaintiff was not medically cleared to work in the kitchen. (*Id.* ¶ 6). Plaintiff appealed the denial of his grievance "all the way up to the CPCRC, which upheld the actions of the facility in their **July 14, 2016** decision." (*Id.* ¶ 7) (emphasis added). Lt. Lauren also states that, "while plaintiff submitted other grievances during his incarceration at the CCJ, at no point did he submit any other grievances directed at Nurse Heit or regarding his ability to work in the inmate worker program." (*Id.* ¶ 9).

## IV. Privacy

### A. Legal Standards

**\*5** The Second Circuit has recognized a constitutional right, protected by the First Amendment, to " 'maintain the confidentiality of previously undisclosed medical information.' " *Mendez v. Quiros*, No. 3:16-CV-2097, 2017 WL 374462, at \*3 (D. Conn. Jan. 25, 2017) (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) ). Prison officials may only "disclose medical information to the extent that disclosure relates to a 'legitimate penological interest.' " *Id.* " 'The gratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is not reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy.' " *Id.*

The degree of protection afforded to an inmate's medical condition varies with the "sensitive" nature of the condition. *Id.* (citing *Powell*, 175 F.3d at 111). In order to state a claim for violation of the right to keep medical information confidential, the plaintiff must show that he suffers from an "unusual or sensitive medical condition that, if disclosed, would expose him to ridicule, discrimination or even violence, particularly when the word of the condition is likely to spread through 'humor or gossip[.]' " *Id.* (quoting *Powell*, 175 F.3d at 112; citing *Rodriguez v. Ames*, 287 F.Supp.2d 213, 220 (W.D.N.Y. 2003) (dismissing case because plaintiff did not have an "unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence"); *Webb v. Goldstein*, 117 F.Supp.2d 289, 298-99 (E.D.N.Y. 2000) (dismissing a Fourteenth Amendment claim because the prisoner did not claim that he had the requisite medical condition) ).

### B. Application

Plaintiff claims that defendant Heit mentioned plaintiff's medical condition in front of the Corrections Officer ("C.O.") who escorted plaintiff to the infirmary on May 19, 2016, where plaintiff was scheduled to be evaluated for clearance as an inmate worker. The court will assume that plaintiff's HIV positive status rises to the level of a sufficiently "sensitive" condition. As stated by defendants, it is undisputed that inmates are escorted throughout the facility by C.O.s who remain with the inmates so that they may be transported back to their housing units. (Duprey Aff. ¶ 4). There are obvious security reasons for this procedure. (*Id.* ¶¶ 4-5). Plaintiff does not question that Officer Duprey was authorized and required to escort plaintiff to his medical appointment and required to stay in plaintiff's presence throughout the appointment.

Plaintiff alleges that defendant Heit told plaintiff, in the presence of Officer Duprey, that plaintiff could not work in the kitchen because of his HIV status. Both defendant Heit and Officer Duprey state in their affidavits that the conversation did not occur as plaintiff claims. (*See generally* Duprey Aff., Heit Aff.) (Dkt. Nos. 74-5, 74-6). CO Duprey states that, on May 19, 2016, plaintiff was assessed by defendant Heit regarding plaintiff's ability to work in the "inmate worker program." (Duprey Aff. ¶ 7). CO Duprey states that he was the only other person in the room with plaintiff and Nurse Heit. (*Id.*) Nurse Heit told plaintiff that "people with his condition" typically did not get cleared to work in the kitchen, but he could be cleared to work "the floors and laundry." (*Id.*)

Officer Duprey states that plaintiff became agitated and informed Nurse Heit that he had sued another County Jail for discrimination and won. (Duprey Aff. ¶ 8). Defendant Heit told plaintiff that she would consult with her supervisor regarding any existing policies which would explain why plaintiff could not work in the kitchen "due to his condition." (*Id.* ¶ 9). However, Nurse Heit never stated what that "condition" was, other than referring to it as " 'your condition.' " (*Id.*)

**\*6** Defendant Heit states that she is a Registered Nurse ("RN"), who works for CCJ, and whose responsibilities include distributing medications to inmates, completing the "medical intake" for inmates at CCJ, addressing inmate health

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 64 of 105

Rodriguez v. Heit, Not Reported in Fed. Supp. (2018)
2018 WL 3121626

issues, responding to emergencies, responding to inmate "sick calls," distributing vaccinations, conducting inmate medical examinations, and "clearing inmates who seek to work in the inmate worker program." (Heit Aff. ¶ 4). Defendant Heit states that, for security purposes, when inmates seek medical attention and when they are being evaluated, it is CCJ policy to have a CO accompany the inmate. (*Id.* ¶ 5). The CO who accompanies the inmate to the examination will "take a position near the open doorway of the exam room." (*Id.* ¶ 6). The CO does not necessarily stand next to the inmate during the medical interaction, but keeps the inmate in the CO's field of vision so that the officer may "immediately respond to any behavioral or verbal incident." (*Id.*)

After reviewing the relevant records, defendant Heit states that she remembers seeing plaintiff on May 19, 2016, regarding his request to be cleared as an inmate worker. CO Duprey accompanied plaintiff to the examination. (Heit Aff. ¶ 7). Defendant Heit states that during the examination she told plaintiff that he could not work in the kitchen due to his "condition," but did not disclose the condition itself. (*Id.* ¶ 8). Defendant Heit states that plaintiff became angry and wanted to see something in writing as to why he could not work in the kitchen area. (*Id.* ¶ 9). Defendant Heit states that she informed plaintiff that she would ask her supervisor—Nurse Kinter, who issued a memorandum stating that plaintiff could work in any area of the facility "except for the kitchen pursuant to minimum standards section 7009.5(b)." (*Id.*)

Defendant Heit also states that when she evaluates inmates to determine whether they can work in the inmate worker program, she can only give her recommendation. She has no control or authority over which inmates get placed in any particular job. (*Id.* ¶ 10). Defendant Heit states that she has never spoken to any other medical officials or Corrections Officers about plaintiff's condition "outside of the requirements of my job as RN." (*Id.* ¶ 11). Defendant Heit also does not speak to other inmates about her patients' medical conditions. (*Id.* ¶ 12).

Defendants have also filed excerpts from the plaintiff's deposition in this case. (Def.s' Ex. C) (Pl.'s Dep.) (Dkt. No. 74-4). Plaintiff testified that prior to the encounter with defendant Heit, he had spoken with other inmates at CCJ about his HIV status. (Pl.'s Dep. at 43-44). [6] Plaintiff also discussed his HIV status with officers at the facility. (Pl.'s Dep. at 44, 45). Plaintiff stated that no one else except defendant Heit and CO Duprey was in the room when plaintiff went for his inmate worker evaluation. (*Id.* at 65). Plaintiff conceded that he was also aware that CO Duprey already knew about plaintiff's condition prior to the evaluation. (*Id.* at 65-66). Plaintiff stated that he spoke to CO Duprey "years ago" about his "health issues." (*Id.* at 65). Plaintiff stated that CO Duprey had also done plaintiff's "intake" at the jail, so he would have to know about his health information. (*Id.* at 66).

[6]     Defendants have only filed excerpts of the plaintiff's deposition. The pages are not sequentially numbered, so the court will cite to the page of the deposition that appears at the top right corner of the page, not to the CM/ECF numbered page.

Thus, it is clear from plaintiff's own statements that his medical condition was not "previously undisclosed" to CO Duprey. Officer Duprey's presence and defendant Heit's statements [7] were not in violation of plaintiff's First Amendment privacy rights. In addition, CO Duprey's presence in the examination room was reasonably related to the valid security concern of protecting the Nurses' safety during an inmate's examination. [8] Thus, Nurse Heit did not violate plaintiff's First Amendment right to privacy during the May 19, 2016 examination.

[7]     This is true even if defendant Heit did mention HIV, which she claims, and CO Duprey confirms is not the case.

[8]     A regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing Turner v. Safely, 482 U.S. 78, 89 (1987) ).

## V. ADA Claim

### A. Legal Standards

2018 WL 3121626

**\*7**  The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord*, 405 F.Supp.2d 265, 274 (S.D.N.Y. 2005) (both the ADA and the Rehabilitation Act are applicable to inmates). Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord*, 405 F.Supp.2d 265, 274 (S.D.N.Y. 2005).

In order to establish a claim under the ADA, the plaintiff must first show that he has a disability. *Farid v. Bouey*, 554 F.Supp.2d 301, 326 (N.D.N.Y. 2008). Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002); *Doe v. Goord*, No. 04-CV-570, 2004 WL 2829876 at \*17, 2004 U.S. Dist. LEXIS 24808 (S.D.N.Y. Dec. 10, 2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B) ). Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel*, 287 F.3d at 147.

Major life activities include, among others, caring for oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A). Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B). A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

### B. Application

It has been held that HIV infection qualifies as a disability under the ADA. *Doe v. Deer Mountain Day Camp*, 682 F.Supp.2d 324, 341 (S.D.N.Y. 2010) (citing inter alia *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ). There is also no dispute the CCJ is a public entity. However, plaintiff cannot meet the third requirement for establishing an ADA violation. Plaintiff was not excluded from participation in, nor was he denied the benefits of some service, program or activity by reason of his or her disability. The "program" of which plaintiff complains is the "inmate worker program." Plaintiff was eligible to participate in the program and work in many other jobs throughout the facility. On May 20, 2016, he was cleared to "work in any other part of the correctional facility at this time." (Def.s' Ex. A at 11) (Dkt. No. 74-2). Kitchen workers are required to be free of "communicable diseases." (*Id.* & Pl.'s Ex. A at 15 (Dkt. No. 83-1 at 15). [9] HIV was only one of the conditions listed that would have prevented plaintiff from being assigned to work in the kitchen. [10] During his deposition, plaintiff testified that he worked in the inmate worker program at CCJ "a lot of times ... 11, 12 times." (Def.'s Ex. C at 33). In fact, plaintiff testified that he was aware of the kitchen restriction and did not even "apply for that job." [11] (*Id.* at 26, 35, 62). Thus, plaintiff was not denied any benefit of the inmate worker program "due to his disability," and his complaint may be dismissed in its entirety.

[9]    9 N.Y.C.R.R. § 7417.6(b) (regulations regarding food service personnel).

[10]    Other communicable diseases listed include chickenpox, Lyme Disease, Shingles, HIV/AIDS, Hepatitis, Meningitis, Strep, Syphilis, Influenza, Staph, Tuberculosis, and "All Other STD's." (Pl.s' Ex. B at CM/ECF p.25).

[11]    Oddly, in plaintiff's response to the defendants' motion, he now states that he was told by a sergeant that he was "wanted" as a kitchen worker, and that he got his "hopes up," but that he was "stopped right in [his] tracks" during the medical clearance. (Dkt. No. 83 at 4). This statement is completely contradicted by plaintiff's deposition testimony, during which he says he knew he was not allowed to work in the kitchen, and he was not even applying for that job. (Pl.'s Dep. at 26, 35, 62). At one point plaintiff stated "never once I said I would like to work in a kitchen because I know my health status." (Pl.'s Dep. at 26).

## VI. Request for Extension of Time and Discovery Request

Rodriguez v. Heit, Not Reported in Fed. Supp. (2018)

2018 WL 3121626

### A. Extension Request

 **\*8** Plaintiff has filed a letter-motion requesting an two-month extension of time to "respond" to the defendants' motion. Defense counsel has opposed the motion. Plaintiff has already responded in opposition to the motion. (Dkt. No. 83). In the present letter-request, plaintiff asks for a two-month extension because he states that "new evidence" from the World Health Organization ("WHO") was delivered to him "about a month ago," which is "important to [his] motion." (Dkt. No. 86).

Plaintiff does not explain what this new information is or why it is important to his "motion," and this court finds that an extension of time to allow plaintiff to make further submissions at this time is not appropriate. The primary basis for this recommendation of dismissal is plaintiff's failure to exhaust his administrative remedies before this action was filed. Plaintiff's information from the WHO would not have any impact on his failure to exhaust.

Even with respect to the merits of plaintiff's claim, the information from the WHO would likely not be pertinent. Although it is unclear what plaintiff intends to argue, this court has assumed that HIV is a disability for purposes of the ADA. Thus, support for such a claim is unnecessary. In addition, plaintiff has already submitted information from the Centers for Disease Control ("CDC") indicating that one cannot contract HIV from consuming food handled by an HIV-infected person. (Dkt. No. 83-1 at 19). Presumably, plaintiff would argue that there should be no prohibition based on HIV from plaintiff working in the kitchen. Once again, even assuming that this statement is true, at his deposition, plaintiff stated that he was not applying for a kitchen job. [12]

[12]     The court assumes that plaintiff made this statement to support his claim that defendant Heit spontaneously and maliciously stated that plaintiff could not work in the kitchen due to his HIV status—even though he had not applied for the position. Plaintiff cannot have it both ways.

In addition, plaintiff was not prevented from participating in the inmate work program "due to his disability." At worst, he was ineligible to work in the kitchen according to state regulations which prevent anyone with *any* communicable disease from working in the kitchen. As he admitted during his deposition, he participated in many other jobs in the inmate worker program. Thus, whether plaintiff could or could not work safely in the kitchen is not at issue in this case. In any event, if plaintiff believes that his new evidence should change the outcome of the court's decision, he may include the evidence in his objections to this recommendation.

### B. Discovery

The court will strike plaintiff's letter as it relates to discovery, first because the deadline for completion of discovery has passed, [13] and second, even if the deadline had not passed, requests for discovery are not filed with the court in the first instance. [14]

[13]     As defendants point out in their opposition letter, the deadline for discovery expired on October 29, 2017, and plaintiff has never asked the court for an extension of time for further discovery. Defendants also claim that, contrary to plaintiff's allegation in his letter, defense counsel did send plaintiff a complete transcript of his deposition, The court does note that counsel only filed excerpts of plaintiff's deposition in support of the summary judgment motion. A party is not required to file a complete transcript of the deposition in support of a motion if the rest of the testimony is not relevant to the arguments in the motion. *See* Fed. R. Civ. P. 56(c)(1)(A) (party may cite to particular "parts" of materials in the record, including depositions). If plaintiff believed that other portions of the deposition were relevant, he was free to file them in support of his response in opposition. Finally, the court notes that plaintiff continues to claim that his English is not good. However, as I stated in my order denying counsel, plaintiff's intake form indicates that he was born in the United States and is a high school graduate. In addition, a review of the excerpts of the deposition transcript filed by defendant does not indicate that plaintiff had difficulty understanding or speaking English.

2018 WL 3121626

14      The letter is not addressed to the court.

**\*9  WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's request for an extension of time to respond to the defendants' motion for summary judgment (Dkt. No. 86) is **DENIED**, and it is

**ORDERED**, that plaintiff's letter to defense counsel regarding discovery (Dkt. No. 87) is **STRICKEN FROM THE RECORD**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 74) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**, and it is

**RECOMMENDED**, that to the extent that plaintiff's response to the defendants' motion (Dkt. No. 83) can be considered a cross-motion, it be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121626

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Casey v. Brockley, Not Reported in Fed. Supp. (2015)

2015 WL 8008728

2015 WL 8008728
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eric CASEY, Plaintiff,

v.

M. BROCKLEY, Correctional Officer, Great Meadow Correctional Facility; H. Colvin, Correctional Officer,
Great Meadow Correctional Facility; A. Mayo, Correctional Officer, Great Meadow Correctional Facility;
C. Goodrich, Correctional Officer, Great Meadow Correctional Facility; Wanninger, Correctional Officer,
Great Meadow Correctional Facility; H. Clapper, Registered Nurse, Great Meadow Correctional Facility; T.
Hermance, Registered Nurse, Great Meadow Correctional Facility; Boyce, Registered Nurse, Great Meadow
Correctional Facility; and S. Racette, Superintendent, Great Meadow Correctional Facility, Defendants.

9:13-CV-01271 (DNH/TWD)
|
Signed 11/09/2015

**Attorneys and Law Firms**

Eric Casey, 1881 Pitkin Avenue, Apt. 1C, Brooklyn, NY 11212, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, The Capitol, Ryan E. Manley, Esq., of Counsel, Albany, NY 12224, for Defendants.

*ORDER AND REPORT-RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

 **\*1**  This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation on the issue of exhaustion of administrative remedies by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). (Dkt. No. 49.) Plaintiff Eric Casey asserts the following claims: (1) Eighth Amendment claim resulting from excessive force used against him in violation of his right to be free from cruel and unusual punishment; and (2) Eighth Amendment violation resulting from the failure to provide adequate medical care. (Dkt. No. 1 at 10–13. [1] )

[1]     Page numbers in citations to the amended complaint refer to the page numbers assigned by the Court's electronic filing system rather than to page numbers in the original document.

Currently pending before the Court is Defendants' motion to dismiss for failure to exhaust administrative remedies, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 37.) For the reasons that follow, the Court recommends that Defendants' motion to dismiss be granted without prejudice as to all defendants.

**II. BACKGROUND**

At the time this action was commenced Plaintiff was a prison inmate in Department of Corrections and Community Supervision ("DOCCS") custody being held at Great Meadow Correctional Facility ("GMCF"). (Dkt. No. 1 at 5.) On May 22, 2013, at approximately 5:00 p.m., Plaintiff claims that he was returning to his cell and was "hit from behind in the back of [his] head

2015 WL 8008728

with a hard object" as he entered the stairwell area. (Dkt. No. 1 at 7.) Plaintiff claims that he "fell to the floor and was brutally beaten" by Defendant correctional officers M. Brockley ("Brockley"), H. Colvin ("Colvin"), A. Mayo ("Mayo"), C. Goodrich ("Goodrich"), and Wanninger. (Dkt. No. 1 at 7.) Plaintiff claims that he was "kicked, stomped, sexually humiliated, and beat[en] with sticks all over [his] body...." (Dkt. No. 1 at 7.) Plaintiff claims that he was referred to as " 'Rodney King' and other racial and sexual slurs" while the beating took place. (Dkt. No. 1 at 7.) Specifically, Plaintiff makes the following claims: Colvin and Goodrich held Plaintiff's legs open so Brockley could kick him the groin; Wanninger struck Plaintiff multiple times with her baton; and Mayo beat Plaintiff's knees, shins, and ribs with a cudgel. (Dkt. No. 1 at 8.) Plaintiff claims that the beating lasted approximately five minutes. (Dkt. No. 1 at 8.)

Plaintiff was taken to a facility hospital and was treated by Defendant Registered Nurses Boyce ("Boyce") and Clapper ("Clapper"). (Dkt. No. 1 at 8.) Clapper prepared an injury report that indicated Plaintiff had only "superficial abrasions." (Dkt. No. 1 at 30.) Plaintiff claims that Clapper and Boyce "intentionally downplayed the severity of [his] injuries while disregarding the more serious ones ..." since they were not mentioned in the injury report. (Dkt. No. 1 at 8.) Plaintiff claims that Clapper only "questioned [him] from afar" and that Boyce only "electronically check[ed][his] vital signs." (Dkt. No. 1 at 9.) Plaintiff claims that Defendant Registered Nurse Hermance "utilized her time falsifying business records ..." to indicate that Colvin, Mayo, and Brockley suffered injuries rather than providing medical care. (Dkt. No. 1 at 8.) Photographs of Plaintiff were taken prior to leaving the hospital. (Dkt. No. 1 at 33–39.)

**\*2** Plaintiff claims that, in addition to what was indicated on the injury report, he suffered the following injuries: (1) swelling above his left eye; (2) three linear-shaped abrasions above left eye swelling; (3) bruise on the left side of his face; (4) swelling to the left side of his face; (5) swelling above his right eye; (6) swelling to his upper right forehead; (7) swelling near the center of his back; (8) linear-shaped laceration on his left shin; (9) left shin bone injury; (10) right knee injury; (11) left pinky bone injury; and (12) left rib injury. (Dkt. No. 1 at 10.)

On June 3, 2013, Plaintiff filed Inmate Grievance Complaint GM–55615–13, alleging "cruel and unusual punishment, excessive force, and inadequate medical care." (Dkt. No. 1 at 18–19.) After receiving no response from then GMCF superintendent Defendant S. Racette ("Racette"), within the allotted twenty-five day time period, Plaintiff appealed to the Central Office Review Committee ("CORC"). (Dkt. No. 1 at 4.) On July 22, 2013, S. Pelo ("Pelo"), the grievance supervisor, asked Plaintiff for an extension to the investigation period "to allow for a proper investigation." (Dkt. No. 1 at 22.) Pelo also informed Plaintiff that "CORC will still have to wait for the investigation [to be completed] before they can render a decision." (Dkt. No. 1 at 22.) Plaintiff denied Pelo's extension request citing his "statutory right to appeal." (Dkt. No. 1 at 4.) On August 7, 2013, Pelo confirmed that the appeal had been submitted to CORC and notified Plaintiff that a decision was forthcoming. (Dkt. No. 1 at 23.) On October 15, 2013, after not receiving a response from CORC within the allotted thirty day time period, Plaintiff commenced this action.[2] (Dkt. No. 1 at 4.)

2       The Court is unaware whether CORC has issued a response to Plaintiff's grievance.

## III. APPLICABLE LEGAL STANDARDS

### A. Rule 12(b)(6) motion

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere

2015 WL 8008728

possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

A complaint may be dismissed, pursuant to Rule 12(b)(6), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombley*. 550 U.S. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id*. (citation omitted).

**\*3** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe pro se complaints liberally even after *Twombly* ).

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

### B. The Prison Litigation Reform Act of 1996
As succinctly outlined by my colleague, Magistrate Judge David E. Peebles:

> The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action.... Proper exhaustion requires a plaintiff to procedurally exhaust his or her claims by complying with the system's critical procedural rules. Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken.

*Bailey v. Fortier*, 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at \*4, 2012 U.S. Dist. LEXIS 185178, at \*11–13 (N.D.N.Y. Oct. 4, 2012) (citations and punctuation omitted).[3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

2015 WL 8008728

institution in which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies.[4] *Woodford*, 548 U.S. at 93.

3    The Court will provide Plaintiff with copies of all unpublished decisions cited in this Order in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

4    "[A]n inmate would be well advised to take advantage of internal prison procedures for resolving inmate grievances. When those procedures produce results, they will typically do so faster than judicial processes can. And even when they do not ..., the inmate's task in court will obviously be much easier." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

### C. Inmate Grievance Program

**\*4** Exhaustion for a prison inmate in DOCCS custody is normally achieved through the Inmate Grievance Program ("IGP"). 7 N.Y. COMP. CODES. R. & REGS. tit. 7, § 701.1 (2012). The IGP involves a three-step process. *Id.* at § 701.5. First, the prison inmate must submit a grievance to the clerk within twenty-one days of the alleged action. *Id.* at § 701.5(a)(1). The Inmate Grievance Program Committee ("IGPC") must hold a hearing within sixteen days and issue a written decision within two days of the hearing. *Id.* at §§ 701.5(b)(2)(i), (ii). Second, the prison inmate may appeal the IGPC's decision, within seven days of receipt, to the facility superintendent. *Id.* at § 701.5(c)(1). Third and finally, the prison inmate may appeal the facility superintendent's decision to CORC, within seven days of receipt. *Id.* at §§ 701.5(d)(i), (ii). CORC has thirty days to review the appeal and issue a decision. *Id.* at § 701.5(d)(2)(ii).

### D. *Hemphill v. State of New York*

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at \*4, 2010 U.S. Dist. LEXIS 32014, at \*16 (N.D.N.Y. Mar. 31, 2010); *Bailey*, 2012 WL 6935254, at \*6 (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence); *see also Andrews v. Whitman*, No. 06–2447–LAB (NLS), 2009 WL 857604, at \*6, 2009 U.S. Dist. LEXIS 30017, at \*16 (S.D.Cal. Mar. 27, 2009) (defendant must prove non-exhaustion of administrative remedies by a preponderance of the evidence).

If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray*, 2010 WL 1235591, at \*4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill*, the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill*, 380 F.3d at 688. Courts have found administrative grievance procedures unavailable where an inmate was prevented from filing a grievance. *See, e.g.*, *Sandlin v. Poole*, 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals ... effectively rendered the grievance appeal process unavailable to him.").

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray*, 2010 WL 1235591, at \*5 & n.26 (collecting cases); *McCloud v. Tureglio*, No. 07–CV–0650, 2008 WL 1772305, at \*12, 2008 U.S. Dist. LEXIS 124388, at

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 72 of 105

Casey v. Brockley, Not Reported in Fed. Supp. (2015)
2015 WL 8008728

*44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question.").

**\*5** Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [5] *Hemphill*, 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of the applicable grievance process or failing to file a grievance in the precise manner prescribed by the process as a result of threats. *See, e.g.*, *Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

[5]      Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo*, 548 U.S. 81 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id*. at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" – "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id*. at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g.*, *Amador v. Andrews*, 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

## IV. ANALYSIS

### A. Plaintiff Failed to Properly Exhaust Administrative Remedies

If a prison inmate fails to follow each of the applicable steps prior to commencing litigation, he has failed to properly exhaust his administrative remedies. *Woodford*, 548 U.S. at 90 (the PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly so that the agency addressed the issues on the merits"). Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice. *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir.2001), *overruled on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002). Because Plaintiff commenced this action before CORC issued a decision on his appeal, the Court finds that he failed to exhaust his administrative remedies.

### B. *Hemphill* Analysis

As noted above, an exhaustion review does not end when, as in this case, defendants are found to have met the burden of establishing a plaintiff's failure to exhaust because the Court must still undertake an analysis of the *Hemphill* factors. *See Hemphill*, 380 F.3d at 686

Here, there is no dispute that at all relevant times, DOCCS had the IGP available for Plaintiff and other prison inmates. *See* 7 N.Y. COMP. CODES. R. & REGS. tit. 7, § 701.1 (2012); *Taylor v. Chalom*, No. 9:10–CV–1494 (NAM/DEP), 2011 WL 6942891, at \*4, 2011 U.S. Dist. LEXIS 150512, at \*12 (N.D.N.Y. Dec. 13, 2011) (The IGP is "recognized as an 'available' remedy for purposes of the PLRA."). Plaintiff undoubtedly had administrative remedies available to him since, on June 3, 2013, he filed Inmate Grievance Complaint GM–55615–13 alleging "cruel and unusual punishment, excessive force, and inadequate medical care." (Dkt. No. 1 at 18–19.) Plaintiff does not allege that his failure to properly exhaust available administrative remedies was due to administrative remedies being unavailable to him. (Dkt. No. 39.) Plaintiff also does not allege that the named Defendants prevented him from properly exhausting available administrative remedies and should thus be estopped from asserting the defense. (Dkt. No. 39.)

**\*6** Finally, there are no special circumstances that would justify Plaintiff's failure to properly exhaust available administrative remedies. (Dkt. No. 39.) Plaintiff argued that his administrative remedies were sufficiently exhausted because his CORC appeal was not decided in a timely manner. Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." *Giano*, 380 F.3d at 678. As noted above, generally, the "special circumstances" doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process. *Id.* at 676. CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust. *See Ford v. Smith*, No. 9:12–CV–1109 (TJM/TWD), 2014 WL 652933, at \*3, 2014 U.S. Dist. LEXIS 20581, at \*8–9 (N.D.N.Y. Jan. 16, 2014) (citations omitted). *Rodriguez v. Rosner*, No. 9:12–CV–958, 2012 WL 7160117, 2012 U.S. Dist. LEXIS 186228 (N.D.N.Y. Dec. 5, 2012) (dismissing complaint for failure to exhaust where prisoner filed appeal with CORC on May 4, filed federal civil rights complaint on June 10, and received CORC response dated September 26).

## V. CONCLUSION

The Second Circuit "has recognized that failure to exhaust administrative remedies is usually a 'curable procedural flaw' that can be fixed by exhausting those remedies and then reinstituting suit." *Neal*, 267 F.3d at 123 (citing *Snider v. Melindez*, 199 F3d 108, 11–12 (2d Cir.1999)). The Court finds dismissal without prejudice for failure to exhaust to be proper in this case.

The parties have not provided information to the Court regarding if and when CORC issued a decision on Plaintiff's appeal. If CORC issued a response to Plaintiff's grievance subsequent to the commencement of this action on October 15, 2013, the Court recommends that the complaint be dismissed without prejudice for failure to exhaust and that Plaintiff be granted leave to refile his complaint upon the filing of a Decision and Order by the District Court on this Court's Report and Recommendation. If CORC has not as yet issued a response, the Court recommends that the complaint be dismissed without prejudice, that CORC be directed to render a decision on Plaintiff's pending grievance appeal within thirty days of the filing of the District Court's Decision and Order on this Report–Recommendation, and that upon CORC's failure to do so, Plaintiff's administrative remedies be deemed unavailable to him and he be allowed to refile this suit indicating such.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss Plaintiff's complaint (Dkt. No. 37) in this action be **GRANTED**, and that the complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE**, based upon Plaintiff's failure to fully exhaust his administrative remedies; and it is further

**RECOMMENDED** that: (1) in the event CORC has rendered a decision on Plaintiff's appeal on Inmate Grievance Complaint GM–55615–13, Plaintiff be granted leave to refile this suit upon the filing of a Decision and Order by the District court on this Court's Report–Recommendation; and (2) in the event CORC has not rendered a decision on Plaintiff's appeal, that CORC be directed to render a decision on Plaintiff's pending grievance within thirty days of the filing of the District Court's Decision and Order on this Report–Recommendation; and (3) if Plaintiff does not receive a decision from CORC within that time, administrative remedies may be deemed unavailable to him and he may therefore be excused from exhausting his administrative remedies and may refile this suit indicating such; and it is

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report–Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW***. *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 8008728

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Casey v. Brockley, Not Reported in Fed. Supp. (2015)**

2015 WL 7864161

2015 WL 7864161
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eric CASEY, Plaintiff,

v.

M. BROCKLEY, Correctional Officer, Great Meadow Correctional Facility; H. Colvin, Correctional Officer, Great Meadow Correctional Facility; A. Mayo, Correctional Officer, Great Meadow Correctional Facility; C. Goodrich, Correctional Officer, Great Meadow Correctional Facility; Wanninger, Correctional Officer, Great Meadow Correctional Facility; H. Clapper, Registered Nurse, Great Meadow Correctional Facility; T. Hermance, Registered Nurse, Great Meadow Correctional Facility; Boyce, Registered Nurse, Great Meadow Correctional Facility; and S. Racette, Superintendent, Great Meadow Correctional Facility, Defendants.

9:13-CV-01271 (DNH/TWD)
|
Signed December 2, 2015
|
Filed 12/03/2015

**Attorneys and Law Firms**

Eric Casey, Plaintiff pro se, Brooklyn, NY.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Attorneys for Defendants, The Capitol, Ryan E. Manley, Esq., Ass't Attorney General, Albany, NY.

### <u>DECISION and ORDER</u>

DAVID N. HURD, United States District Judge

 **\*1** Pro se plaintiff Eric Casey brought this action pursuant to 42 U.S.C. § 1983. On November 9, 2015, the Honorable Thérèse Wiley Dancks, United States Magistrate Judge, advised by Report-Recommendation that defendants' motion pursuant to Federal Rule of Civil Procedure 12(b)(6) be granted and that plaintiff's complaint be dismissed without prejudice. The Report-Recommendation was predicated upon the fact that neither party provided information regarding if and when Central Office Review Committee ("CORC") had issued a decision on plaintiff's appeal. No objections to the Report-Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report-Recommendation is accepted in whole. <u>See</u> 28 U.S.C. § 636(b)(1).

Therefore it is

ORDERED that

1. Defendants' motion is GRANTED;

2. Plaintiff's complaint is DISMISSED without prejudice in its entirety;

3. In the event CORC has rendered a decision on plaintiff's appeal, plaintiff is granted thirty (30) days from the filing of this Decision and Order to refile this suit indicating the outcome of the appeal;

4. However, if within thirty (30) days of the filing of this Decision and Order CORC has not issued a decision, plaintiff's administrative remedies will be deemed unavailable to him and he will be allowed to refile this suit. Plaintiff will have sixty (60) days from the filing of this Decision and Order to file an amended complaint indicating such; and

5. The Clerk of the Court is directed to serve a copy of this Decision and Order on the parties in accordance with the Local Rules. The Clerk is further directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7864161

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:24-cv-00109-ECC-CBF Document 76 Filed 03/11/26 Page 77 of 105

2012 WL 7160117
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jesus RODRIGUEZ, Plaintiff,

v.

David ROSNER, Medical Doctor, Watertown Correctional Facility, Defendant.

No. 9:12–CV–958 (TJM/ATB).
|
Dec. 5, 2012.

**Attorneys and Law Firms**

Jesus Rodriguez, pro se.

Christopher W. Hall, AAG, for the Defendants.

## ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

 **\*1** This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In this civil rights complaint, plaintiff alleges that defendant Rosner denied plaintiff constitutionally adequate medical care when he refused to prescribe orthopedic boots for plaintiff. (Compl. ¶ 6; Dkt. No. 1). Plaintiff subsequently filed a substantial number of documents in support of his complaint. (Dkt. No. 13). Plaintiff seeks injunctive as well as substantial monetary relief. (Compl.¶ 8).

Presently before the court is defendant's motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16). Plaintiff has responded in opposition to the motion to dismiss and has filed a separate motion for appointment of counsel. (Dkt.Nos.19, 20). For the following reasons this court will recommend granting defendant's motion and dismissing this action without prejudice to plaintiff re-filing the action. The court will also order the denial of plaintiff's motion for appointment of counsel without prejudice.

## DISCUSSION

### I. *Facts*

In his complaint, plaintiff alleges that he is a Type II diabetic, who has had skin grafts taken from the soles of his feet, leaving him with abnormally thin skin on the bottom of his feet. (Compl. Facts ¶¶ 2–3). Plaintiff states that he is in constant discomfort due to his condition, and in May of 2011, while he was incarcerated at Oneida Correctional Facility, he was referred to Dr. Baldauf, a podiatrist, who determined that plaintiff suffered from plantar fascitis. (*Id.* ¶¶ 8–9). Plaintiff states that Dr. Baldauf recommended that plaintiff be fitted for orthopedic boots. (*Id.* ¶ 11). Impressions of plaintiff's feet were taken while he was still at Oneida, and the boots were ordered in July of 2011. (*Id.* ¶ 12).

2012 WL 7160117

Prior to receiving his boots, plaintiff was transferred to Watertown Correctional Facility, where he was examined by defendant Dr. Rosner. (*Id.* ¶¶ 13–15). Plaintiff states that he made several requests, but was never given the boots. (*Id.* ¶ 14). Dr. Rosner, who is not a podiatrist, conducted his own examination of plaintiff's feet and determined that plaintiff did not require orthopedic boots. (*Id.* ¶ 16). Plaintiff claims that the medical records supporting Dr. Baldauf's diagnosis and prescription of orthopedic boots was missing from plaintiff's file. (*Id.* ¶ 20). Plaintiff believes that defendant Rosner has intentionally destroyed or hidden these records. (*Id.* ¶ 21).

Plaintiff states that defendant Rosner refused to locate these records, even though plaintiff filed a grievance. (*Id.* ¶ 22). Plaintiff also claims that defendant Rosner "deflects" all investigations by stating that plaintiff refused new state-issued boots, but never mentions that these "new" boots were not the orthopedic boots that plaintiff had been prescribed at Oneida. (*Id* .¶ 23).

## II. *Motion to Dismiss*

### A. Legal Standards

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### B. Application

Rodriguez v. Rosner, Not Reported in F.Supp.2d (2012)
2012 WL 7160117

**\*3** Subsequent to the filing of his complaint, plaintiff submitted documents in support of the complaint, including a substantial number of medical records, many of which address the issue of his request for special boots. (Dkt. No. 13). Among the records submitted by plaintiff are his grievance documents. (Dkt. No. 13 at 34–43). Plaintiff also included a complaint that he made to the New York State Department of Health, Office of Professional Misconduct, [1] regarding defendant's denial of orthopedic boots and a complaint to the New York State Office of the Inspector General. (Dkt. No. 13 at 44–47, 48). On October 25, 2012, plaintiff filed a letter, attaching a copy of the final response to his grievance by the Central Office Review Committee. (Dkt. No. 15). This court may consider all of the documents attached to the complaint, or submitted in conjunction with the complaint in its decision, although it need not consider all of them in order to decide this motion.

[1] This set of documents includes plaintiff's complaint, the Department's response, plaintiff's letter objecting to the Department's conclusion, and the Department's review of its action. (Dkt. No. 13 at 44–47).

### III. *Exhaustion of Administrative Remedies*

#### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance prior to filing the federal action.

**\*4** The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [2] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants'

2012 WL 7160117

own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

2    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford,* it has applied the three-part inquiry in recent cases. *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009); *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011). 3

3    This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 548 U.S. at 104 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates.*" *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

### 2. Application

Defendant argues that plaintiff has admittedly failed to exhaust his administrative remedies. In his complaint, signed on June 10, 2012, and filed on June 13, 2012, plaintiff states that he filed his grievance on April 2, 2012, received an adverse decision and appealed to the Superintendent on April 26, 2012. (Compl.

¶ 4(b)(i)). Plaintiff states that he appealed the Superintendent's decision to the CORC on May 4, 2012, but that "[n]o decision [was] rendered to date." (*Id.* ¶ 4(b)(ii)). Plaintiff specifically states that the "appeal [is] still pending at CORC in Albany." (*Id.*) Thus, at the time plaintiff filed his complaint, he had not exhausted his administrative remedies.

In the complaint, plaintiff cited no reason for failing to wait for the CORC's decision. The first two *Brownell* factors do not apply to this case. Plaintiff does not claim that the grievance procedure was not "available," nor does he claim that defendant's actions prevented plaintiff from utilizing the available procedures. Thus, the court must consider whether there are "special circumstances" justifying plaintiff's failure to exhaust. Based on the facts in this case, the inquiry will be whether there are special circumstances justifying plaintiff's failure to await the CORC decision.

 **\*5** Plaintiff ultimately received a decision by the CORC, dated September 26, 2012, accepting his grievance to the extent that "a referral was submitted for a consult for special boots for the grievant on 9/18/12." (Dkt. No. 15). Plaintiff filed the CORC decision with the court on October 25, 2012. (*Id.*) While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies **before** filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. 267 F.3d at 122–23.

In plaintiff's response to the motion to dismiss, he argues that he did everything he could to exhaust his remedies, and that he should be excused from obtaining the final decision of the CORC because he had already filed the appeal to the CORC when he filed his federal action, and there were "extenuating medical circumstances." (Dkt. No. 19 at 1–2). The court understands

2012 WL 7160117

that plaintiff claims he was in pain, however, he received the CORC decision before the court even had an opportunity to rule on any of the merits of his claims. Thus, plaintiff's premature filing of this federal action did not benefit plaintiff or solve his medical problem. The CORC noted that plaintiff was referred for his medical boots in September of 2012. In fact, if plaintiff had waited, he would not have had to request injunctive relief because it appears that he will be afforded his special boots if medically appropriate.

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action for damages because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.* The scenario envisioned by the court in *Neal* occurred in this case, even before the CORC accepted the grievance because plaintiff received the referral to the specialist in September of 2012. This is true, notwithstanding that plaintiff may still file a complaint for damages alone if he chooses to do so.

## IV. *Appointment of Counsel*

Because this court is recommending dismissal without prejudice at this time, plaintiff's motion for appointment of counsel (Dkt. No. 20) is denied as moot. If plaintiff re-files his action, he may request appointment of counsel at the appropriate time.

**WHEREFORE,** based on the findings above, it is

**\*6  RECOMMENDED,** that defendant's motion to dismiss (Dkt. No. 16) be **GRANTED,** and the complaint **DISMISSED WITHOUT PREJUDICE TO REFILING,** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 20) is **DENIED AS MOOT AT THIS TIME.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 7160117

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 614360
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jesus RODRIGUEZ, Plaintiff,

v.

David ROSNER, Medical Doctor, Watertown Correctional Facility, Defendant.

No. 9:12–CV–958.
|
Feb. 19, 2013.

**Attorneys and Law Firms**

Jesus Rodriguez, Wallkill, NY, pro se.

Christopher W. Hall, Office of Attorney General, Albany, NY, for Defendant.

### DECISION & ORDER

THOMAS J. McAVOY, District Judge.

 **\*1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the December 5, 2012 Report–Recommendation were raised by the parties. After examining the record, the Court determined that the ReportRecommendation is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report–Recommendation for the reasons stated therein.

Thus, it is ordered that: (1) Defendant's motion to dismiss be **GRANTED;** (2) Plaintiff's complaint be **DISMISSED WITHOUT PREJUDICE**; and (3) Plaintiff's motion for appointment of counsel be **DENIED** as moot.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 614360

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2316687

2018 WL 2316687
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Angel RODRIGUEZ, Plaintiff,

v.

Laura HEIT, Registered Nurse; and Clinton County Jail, Defendants.

9:16-CV-0706 (GTS/ATB)
|
Signed 05/22/2018

**Attorneys and Law Firms**

ANGEL RODRIGUEZ, 24314052, Metropolitan Detention Center—Brooklyn, Inmate Mail/Parcels, P.O. Box 329002, Brooklyn, New York 11232, OF COUNSEL, Pro Se.

LEMIRE, JOHNSON & HIGGINS, LLC, P.O. Box 2485, 2534 Route 9, Malta, New York 12020, GREGG T. JOHNSON, ESQ., APRIL J. LAWS, ESQ., Counsel for Defendants.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Angel Rodriguez ("Plaintiff") against Clinton County Jail and one of its employees ("Defendants"), are (1) Defendants' motion for summary judgment seeking dismissal of the Complaint due to Plaintiff's failure to exhaust his available administrative remedies before filing suit pursuant to the Prison Litigation Reform Act ("PLRA"), and (2) United States Magistrate Judge Andrew T. Baxter's Report-Recommendation recommending that Defendants' motion for summary judgment be granted, that Plaintiff's Complaint be dismissed, and that (to the extent that Plaintiff's response to Defendants' motion for summary judgment can be construed a cross-motion for summary judgment) Plaintiff's cross-motion for summary judgment be denied. (Dkt. Nos. 74, 83, 90.) None of the parties have filed Objections to the Report-Recommendation and the deadline in which to do so has expired. (*See generally* Docket Sheet.)

After carefully reviewing the relevant papers herein, including Magistrate Judge Baxter's thorough Report-Recommendation, the Court can find no clear error [1] in the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 90.) As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein. (*Id.*) To those reasons, the Court adds only four points.

1      When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear-error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a clear-error review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

First, while a cursory review of the docket sheet suggests that Plaintiff's notice of change of address (from Rensselaer County Jail to Metropolitan Detention Center) was not received and processed until April 5, 2018 (six days after the issuance of Magistrate Judge Baxter's Report-Recommendation on March 30, 2018), a closer examination of the electronic service receipt

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 84 of 105

Rodriguez v. Heit, Not Reported in Fed. Supp. (2018)
2018 WL 2316687

for the Report-Recommendation reveals that the Report-Recommendation was indeed mailed to Plaintiff at his new address (at Metropolitan Detention Center on March 30, 2018), because his change of address had been noted March 29, 2018. (Dkt. Nos. 85, 86, 90, 91.)

Second, while Plaintiff submitted a document bearing a postage date stamp of April 2, 2018 (and thus deemed "filed" on that date pursuant to the Prison Mailbox Rule), the document was not an Objection to the Report-Recommendation but an attempt to supplement his opposition to Defendants' motion for summary judgment with "Exhibit D." (Dkt. No. 83.) The Court rejects that attempt. The deadline for Plaintiff's opposition to Defendants' motion expired on March 28, 2018, and Plaintiff has not provided good cause for an extension of that deadline (especially a retroactive one). (*Compare* Dkt. No. 77 [extending deadline for opposition by more than six weeks] *with* Dkt. No. 93 [attempting to supplement opposition].) Nor will the Court consider the exhibit in reviewing the Report-Recommendation: a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Finally, the exhibit (which contains World Health Organization guidelines on HIV infection and AIDS in prisons) would not alter the Court's Decision and Order, even if the Court were to consider it. Setting aside the fact that Plaintiff's claim arises under the Eighth Amendment (not international guidelines), Defendants' motion was based on a failure to exhaust administrative remedies, which has nothing to do with World Health Organization guidelines.

[2]    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*2**    Third, in his opposition, Plaintiff fails to submit a Rule 7.1 Response to Defendants' properly supported Rule 7.1 Statement. (*Compare* Dkt. No. 74, Attach. 10 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 83 [Plf.'s Response].) Before submitting his opposition, Plaintiff had repeatedly been specifically advised of the requirement that he file a Rule 7.1 Response, and the consequences of not doing so. (*See, e.g.,* Dkt. No. 74, at 4; Dkt. No. 75, at 2.) As a result, the facts asserted in Defendants' Rule 7.1 Statement may be, and are, deemed admitted by Plaintiff. N.D.N.Y. L.R. 7.1(a)(3).

Fourth, in the Report-Recommendation, Magistrate Judge Baxter notes a contradiction between Plaintiff's deposition testimony of May 24, 2017, and Plaintiff's affidavit testimony of March 6, 2018. (Dkt. No. 90, at 17, n.11.) To the extent that Magistrate Judge Baxter rejected that affidavit testimony, he was correct in doing so. Setting aside the fact that an errata sheet to a deposition transcript (and not a subsequent affidavit) is generally the proper means by which to correct deposition testimony, [3] the point of law exists that a court may resolve an issue of credibility on a motion for summary judgment in the narrow circumstances present here (i.e., a piece of testimony is unsubstantiated by any other direct evidence and contradicts the witness's other testimony). [4]

[3]    *See, e.g., Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A]n affidavit ... that, by omission or addition, contradicts the affiant's previous deposition testimony' is insufficient to create a genuine issue of fact."); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.") (collecting cases).

4       *See Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether ... there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.... In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, ... we hold that the District Court did not err by awarding summary judgment. Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, ... conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted].

For all of these reasons, Defendants' motion for summary judgment is granted, Plaintiff's Complaint is dismissed in its entirety, and Plaintiff's cross-motion for summary judgment is denied.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 90) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

 **\*3  ORDERED** that Defendant's motion for summary judgment (Dkt. No. 74) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 83) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** in its entirety.

The Court certifies that an appeal from this Decision and Order would not be taken in good faith.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2316687

---

**End of Document**                               © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2159199

2010 WL 2159199
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,

v.

Edith ONUA, Edwin Oduro, and June Yazzo Liason, Defendants.

No. 09 Civ. 7227(SAS).
|
May 26, 2010.

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

Robert F. Meehan, Westchester County Attorney, Fay Angela Jones, Senior Assistant Westchester County Attorney, White Plains, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

 **\*1**  Donald Mack Bennett, presently incarcerated and proceeding pro se, brings this action against Edith Onua, Edwin Oduro, and June Yazzo Liason [1] pursuant to section 1983 of Title 42 of the United States Code. Bennett seeks monetary damages in the amount of $5,000,000 for alleged emotional distress, negligence, deliberate indifference, and medical malpractice. Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(c) for failure to exhaust administrative remedies under 42 U.S.C. § 1197e(a) and failure to state a claim under 42 U.S.C. § 1983. For the reasons stated below, the motion to dismiss is granted.

1       Hereinafter, "Defendants."

**II. BACKGROUND** [2]

2       The facts recited here are drawn from the Complaint ("Compl."), attached as Ex. A to the Declaration of Fay Angela Jones ("Fay Decl."), Senior Assistant County Attorney.

Bennett was incarcerated at the Westchester County Jail ("WCJ") from February 20, 2009, through February 27, 2009. [3]  On February 20, 2009, Bennett was examined by Edwin Odoro, a physician's assistant ("P.A."). [4]  At the time of the examination, Bennett had in his possession a hospital discharge paper with all his prescribed medications. [5]  During the week of February 20, 2009 until Bennett's court date (on February 27, 2009), he allegedly submitted five "sick-call slips" but was not contacted until Edith Onua, also a P.A., called to tell him she could not prescribe his "life sustaining medication." [6]

2010 WL 2159199

3      *See* Compl. Section II–D.

4      *See id.*

5      *See id.*

6      *Id.*

On February 27, 2009, Bennett was taken to court without being given his medication. [7] Bennett subsequently became ill and was taken to Sound Shore Medical Center, where he was treated and released. [8] Bennett claims defendant June Yazzo Liason, also a P.A., purposely informed the WCJ staff that nothing was wrong with him because she is racially biased against him. [9] Bennett further claims that Yazzo denies any grievance he files on the same racially-motivated grounds. [10]

7      *See id.*

8      *See id.* Bennett alleges he had a "massive heart attack, grand mal seizure, and almost had a stroke" and that he "ran blood pressure 196 over 145, heart rate running over 230 beats." *Id.* Defendants include WCJ documentation of Bennett's lengthy medical problems. *See* Ex. C to Fay Decl.

9      *See* Compl. Section II–D.

10     *See id.*

## III. APPLICABLE LAW

### A. Rule 12(c)

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial. [11] Judgment on the pleadings should be granted if it is clear that the moving party is entitled to judgment as a matter of law. [12] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim. [13] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint" [14] and "draw all reasonable inferences in the plaintiff's favor." [15] Even so, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." [16] In deciding a motion for judgment on the pleadings, a court may consider

11     *See* Fed.R.Civ.P. 12(c).

12     *See Burns Int'l. Sec. Servs. v. International Union,* 47 F.3d 14, 16 (2d Cir.1995).

13     *See Patel v. Contemporary Classics,* 259 F.3d 123, 126 (2d Cir.2001).

14     *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 572 (2007). *Accord Rescuecom Corp. v. Google Inc.,* 562 F.3d 123, 127 (2d Cir.2009).

15     *Ofori–Tenkorang v. American Int'l. Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

16     *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

2010 WL 2159199

the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings. [17]

[17]    *Prentice v. Apfel,* 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)).

### B. Prison Litigation Reform Act

**\*2**  The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [18]  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [19]  "[A]s long as other forms of relief are obtainable through administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings." [20]

[18]    *See* 42 U.S.C. § 1997e(a) (providing that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."). *See also Porter v. Nussle,* 534 U.S. 516, 516 (2002).

[19]    *Porter,* 534 U.S. at 532.

[20]    *Booth v. Churner,* 532 U.S. 731, 741 (2001) (requiring an inmate to complete the prison administrative process before suing over prison conditions even where the inmate sought only money damages, which could not be recovered through the administrative process).

Failure to exhaust is an absolute bar to an inmate's action in federal court as "[section] 1997e(a) *requires* exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." [21]  Failure to exhaust is an affirmative defense, however. [22]  As such, plaintiff need not plead exhaustion in the complaint. [23]

[21]    *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *rev'd. on other grounds* (quotation marks and citation omitted) (emphasis in original).

[22]    *See Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999).

[23]    *See Jones v. Bock,* 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available [24] to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [25]

---

[24]    To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738. In some circumstances, the behavior of the defendant may render administrative remedies unavailable. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (remanding case to the district court to determine whether some seemingly available remedies were rendered unavailable by threats made by correction officers).

[25]    *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

When any of the above are present, the affirmative defense of non-exhaustion fails. [26] Where (1) administrative remedies were available to the plaintiff, (2) defendants are not estopped and have not forfeited their non-exhaustion defense, and yet (3) plaintiff did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged to justify "the prisoner's failure to comply with administrative procedural requirements." [27]

[26]    *See Hemphill,* 380 F.3d at 686.

[27]    *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute proper exhaustion." [28] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [29]

[28]    *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005)) (noting that Braham cannot survive *Woodford v. Ngo,* 548 U.S. 81, 94–95 (2006), which states that plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to [prison] staff.").

[29]    *Id.* (quoting *Woodford,* 548 U.S. at 95).

### C. Westchester County Department of Corrections Inmate Grievance Program

The Westchester County Department of Corrections ("WCDOC"), Jail Division, has an established Inmate Grievance Program ("IGP") approved by the New York State Commission on Correction ("NYSCOC") . [30] A "grievance" is defined as "any inmate/ detainee complaint relating to any facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility ." [31] In 2009, the IGP allowed inmates to make informal complaints to the Block Officer, who would log such complaint and attempt to resolve them. [32] Grievances that could not be resolved in this manner entered a formal process affording two levels of subsequent appeal. [33]

[30]    *See* Affidavit of Anthony Amicucci ("Amicucci Aff."), Warden of the Westchester County Department of Correction, ¶ 5; *see also* Ex. 1 to Amicucci Aff. (copy of the WCDOC grievance procedures).

[31]    Amicucci Aff. ¶ 8.

[32]    *See id.* ¶ 9.

[33]    *See id.* ¶¶ 11–13. *See also* Westchester County Department of Correction Policy and Procedure, Ex. 1 to Amicucci Aff. at 4 (attached as Ex. E to Fay Deck) (chart showing time schedule for grievance filing and appeal).

## IV. DISCUSSION

### A. Defendants Have Adequately Demonstrated Bennett's Failure to Exhaust Administrative Remedies

**\*3** Despite Bennett's claim that he filed a grievance at WCJ that was denied, [34] a search of the grievance log records maintained by WCDOC between February 20 and February 27, 2009 did not reveal any record of a grievance by Bennett concerning his medical care. [35] Bennett claims he informed Warden Amicucci of his grievance. [36] Warden Amicucci states in his sworn affidavit that Bennett never contacted him about any claims. [37] Regardless, notice to a prison official is insufficient. [38] As such, Defendants have adequately supported the affirmative defense of failure to exhaust.

[34]   *See* Compl. Section IV–F.

[35]   *See* Amicucci Aff. ¶ 17. Although Bennett completed Complaint Section IV–F, which asks the inmate to describe the grievance claim if one had been made, he also completed Section IV–G, which states, "If you did *not* file a grievance, did you inform any officials of your claim(s)?" Also, in describing "all efforts to appeal [the instant claim] to the highest level of the grievance process," Bennett simply writes that he has "always appeal [sic] and never sign agreeing." Compl. Section IV–F(3). Bennett cannot have appealed if he never filed an initial grievance.

[36]   *See* Compl. Section IV–G

[37]   *See* Amicucci Aff. ¶ 18.

[38]   *See Macias,* 495 F.3d at 44.

**B. Bennett Has Not Sufficiently Alleged Facts Supporting an Exemption From the Exhaustion Requirement**
In light of Defendants' affirmative defense of non-exhaustion, the instant motion now presents three issues: (1) whether administrative remedies were available to Bennett, (2) whether Defendants are estopped from asserting exhaustion as a defense, and (3) whether special circumstances excuse Bennett's failure to exhaust administrative remedies. Bennett has not alleged any facts to support an exemption from the exhaustion requirement.

*First,* Bennett does not allege that all available administrative remedies were procedurally unavailable at WCJ. When first processed into WCJ, inmates receive a packet called "The Inmate Rules and Regulations." [39] The Inmate Rules and Regulations advise inmates that grievance forms are available from the correction staff and from the Law Library. [40] Bennett does not allege that these forms were not available to him or that they did not "afford the possibility of some relief for the action complained of." [41]

[39]   *See* Amicucci Aff. ¶ 6; *see also* Ex. 2 to Amicucci Aff. (copy of the Inmate Rules and Regulations packet).

[40]   *See* Amicucci Aff. ¶ 6.

[41]   *Booth,* 532 U.S. at 738. Bennett was allegedly familiar with the WCJ grievance process, having filed an unrelated grievance about two years prior to commencing this action. *See* Amicucci Aff ¶ 19; *see also* Ex. 3 to Amicucci Aff. (photocopy of WCJ's log of Bennett's unrelated May 2007 grievance).

*Second,* Bennett does not allege that all available administrative remedies were rendered unavailable by any action of any defendant. *Third,* Bennett does not allege that any defendant ever acted in any way that would estop Defendants from asserting non-exhaustion as a defense, or that any special circumstances exist to justify Bennett's failure to exhaust all possible remedies.

**V. CONCLUSION**
Because Defendants have adequately supported the affirmative defense of failure to exhaust and because Bennett has not presented any facts on which this Court could base an exception, his Complaint is dismissed without prejudice. Bennett may file a new action once he has exhausted all remedies, as required by PLRA section 1997e(a). Accordingly, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion [Docket No. 17] and this case.

**Bennett v. Onua, Not Reported in F.Supp.2d (2010)**

2010 WL 2159199

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2159199

---

**End of Document**                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1131413

2021 WL 1131413
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Steve OSBORN, Plaintiff,
v.
Deborah HARRIS, et al., Defendants.

9:20-CV-673 (TJM/ATB)
|
Signed 01/15/2021

**Attorneys and Law Firms**

STEVE OSBORN, Plaintiff pro se.

DAVID H. WALSH, IV, ESQ. for defendants Conklin, Devins, Mosher, and Lalonde.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report-Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In the relevant portions of plaintiff's civil rights complaint, he alleges that the remaining [1] defendants John Doe #1, John Doe #2, Conklin, Devins, Harris, Mosher and Lalonde violated plaintiff's constitutional rights while he was incarcerated in the Oneida County Correctional Facility ("OCCF") between April and June of 2020. (Complaint ("Compl.") at 7-8, 10, 12-13).

[1] Plaintiff originally named several other defendants. (Compl. *generally*). However, on initial review of the complaint, Senior Judge McAvoy dismissed many of plaintiff's claims and several of the defendants. (Dkt. No. 10). Although some of plaintiff's original claims were dismissed without prejudice to amendment, he has chosen not to amend and to proceed with the claims that Senior Judge McAvoy allowed to proceed in the initial order. (Dkt. No. 10 at 24-25). The John Doe defendants have not yet been identified, and plaintiff has been advised that he must take reasonable steps to identify and serve the unknown defendant or the case may be dismissed as to those individuals. (Dkt. No. 10 at 25). Plaintiff recently attempted to obtain court assistance in naming these defendants, but was directed that he must endeavor to identify the unknown defendants through discovery and that he must await the outcome of this motion to dismiss. (Dkt. No. 33). If this recommendation is adopted, there will be no necessity to proceed with such identification.

The remaining claims and defendants are as follows:

(1) First Amendment religion claims against defendants Conklin, Devins, and John Does ##1 and 2. Plaintiff alleges that these defendants delivered plaintiff's morning Ramadan meal too late for him to be able to eat it. (Compl. at 7-8).

(2) First Amendment retaliation claims against defendants Harris, Mosher, and Lalonde. Plaintiff alleges that defendant Harris interfered with plaintiff's April 30, 2020 grievance in retaliation for complaining about the way that Muslim food was being handled. (Compl. at 7-8). Defendants Mosher and Lalonde gave plaintiff a misbehavior report in retaliation for complaining about a sexual harassment issue. (Compl. at 12).

2021 WL 1131413

Presently before the court is the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 25). Plaintiff has responded in opposition to the motion. For the following reasons, this court recommends granting the defendants' motion in part and denying motion in part, without prejudice to filing a motion for summary judgment.

## I. Relevant Facts

Plaintiff alleges that on April 30, 2020, he submitted a "complaint form," objecting to the way that Ramadan [2] food was being handled at OCCF. [3] (Compl. at 7). Plaintiff claims that on May 4, 2020, defendant Harris "sent" him his complaint and told plaintiff that he could either "agree" or "disagree" with her "response." [4] Plaintiff alleges that he "disagreed," and that he put the complaint form back on "Dep. Blue's" [5] desk. (*Id.*) Deputy Blue allegedly brought the complaint back to defendant Harris, as is the proper "procedure." (*Id.*)

[2]     Ramadan is the ninth month of the Islamic year, observed as sacred with fasting from dawn to sunset. https://www.merriam-webster.com/dictionary/Ramadan.

[3]     Plaintiff objected to the religious meals being handled by non-Muslims and explained in his "complaint form" that New York State facilities show Ramadan a great deal of respect, while OCCF was not following the proper law. (Compl. at 7).

[4]     Plaintiff does not specify what that response was, but the court assumes that since plaintiff "disagreed" with it, the response did not favor his request.

[5]     "Blue" is apparently not this deputy's name, and he or she is not a defendant in this case. Plaintiff states that he is "protecting" this deputy by using the pseudonym, "Blue." (Compl. at 7). Plaintiff states that he has used these pseudonyms to protect the officers from retaliation by their co-workers. (Compl. at 8).

**\*2** Plaintiff states that on May 3 and 4, 2020, his Ramadan breakfast was brought to him by the John Doe defendants after daybreak so that plaintiff could not eat it. [6] (Compl. at 7). On May 5, 2020, defendant Conklin brought plaintiff's Ramadan breakfast too late for him to be able to eat it. Plaintiff states that he did not say anything to defendant Conklin at the time, instead, he wrote another "complaint" which he sent to defendant Harris. (Compl. at 7). Plaintiff states that defendant Harris came to see him after he wrote the complaint on May 5, and argued with him about the appropriate time for his breakfast to be brought by the guards. When plaintiff challenged her opinion about the time, defendant Harris allegedly slammed plaintiff's complaint form on the desk, told plaintiff to sign it and get it back to her, and left the unit. (*Id.*)

[6]     It appears that a different officer brought plaintiff's breakfast on each of the two days, resulting in the two John Doe defendants.

Plaintiff alleges that on May 6, 2020, his Ramadan breakfast was delivered by defendant Devins, but it was again too late for plaintiff to eat it. (Compl. at 8). When plaintiff asked why the meal was late, defendant Devins made some disparaging remarks and walked away. Later that morning, defendant Harris came to speak with plaintiff about his May 5th [7] complaint. (Compl. at 8). When plaintiff told defendant Harris that his breakfast had again been brought too late on May 6th, defendant Harris attempted to change the subject by asking plaintiff why he gave away his dinner the night before. (*Id.*) Plaintiff attempted to explain the situation, [8] but defendant Harris told plaintiff that she did not "give a damn," and started walking away. (*Id.*) As defendant Harris was walking away, she turned and told plaintiff that his April 30th complaint had "disappeared," and that she could not find it. (Compl. at 8). Defendant Harris then allegedly smiled and left the unit. (*Id.*)

[7]     The plaintiff's federal complaint states that defendant Harris brought him his "May 4th complaint," but it is clear from the previous page that he wrote a complaint form on May 5th after his breakfast was late the third time. (Compl. at 7).

8    Plaintiff apparently has a medical problem which renders him unable to eat spicy food. He states that he was brought a dinner tray which contained food that he could not eat, so he gave the food to another inmate and was given a misbehavior report for doing so. (Compl. at 7-8).

Plaintiff claims that Dep. Blue, "a good and respectful officer," told plaintiff the he "personally" put the complaint form in defendant Harris's mailbox. Later in the evening on May 6, 2020, another officer, who plaintiff refers to as "Dep. Good Guy" told plaintiff that defendant Harris said that plaintiff was making her sick and threw his complaint in the trash. (Compl. at 8-9). Another officer, who plaintiff calls "Dep. Friend" told plaintiff that former defendant Carollo "put the word out" that defendant Harris wanted plaintiff "silenced." (Compl. at 9). This involved "writing up" plaintiff for "everything." (Compl. at 9).

With respect to defendants Mosher and Lalonde, plaintiff states that, on the morning of May 18, 2020, he told defendant Mosher that he needed to speak with defendant Lalonde about a "P.R.E.A." [9] issue. (Compl. at 12). Plaintiff states that defendant Lalonde came to his unit, but left without speaking to plaintiff. (Compl. at 13). Defendant Mosher told plaintiff that defendant Lalonde was too busy to speak with him. (*Id.*) During lunch, another inmate gave plaintiff a piece of cake, but plaintiff could not eat it because he was fasting, and he wrapped it up to save for later. (*Id.*) Defendant Mosher apparently witnessed the exchange and gave plaintiff a misbehavior report, charging him with "trading possessions." (*Id.*) The report included the statement that defendant Mosher observed plaintiff taking cake off of a tray during Ramadan. (Compl. at 12). Plaintiff states that defendant Mosher wrote the ticket, and that defendant Lalonde " 'found time' " to write it up for him. (Compl. at 13). The court interpreted plaintiff's complaint as alleging that defendants Mosher and Lalonde issued the misbehavior report because plaintiff told defendant Mosher that he wished to speak with defendant Lalonde about a P.R.E.A. issue. [10] (Dkt. No. 10 at 15).

9    "P.R.E.A." stands for the Prison Rape Elimination Act, 42 U.S.C. § 30301 et seq.

10    These facts may be related to plaintiff's previous statement that on May 18, 2020, he filed a "confidential complaint" against former defendants Delorenzo and Laberta, charging them with sexual harassment and threats, but was told to file a grievance. (Compl. at 12). Plaintiff stated that, because his complaints often "went missing," he decided to wait until he saw a sergeant rather than filing a grievance. (*Id.*) This was the introduction to plaintiff's claims against defendants Mosher and Lalonde. The claims against defendants Delorenzo and Laberta were dismissed in Senior Judge McAvoy's initial order. (Dkt. No. 10 at 20-21) (verbal sexual harassment and threats are not actionable under section 1983). The retaliation claim against defendants Mosher and Lalonde survived initial review even though the underlying sexual harassment/threats claim did not.

## II. Motion to Dismiss

**\*3**  To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555, 127 S.Ct. 1955). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.*, 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v.*

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 95 of 105

Osborn v. Harris, Not Reported in Fed. Supp. (2021)
2021 WL 1131413

*Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing *inter alia County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)). *See also Combier-Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at *6 (D. Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

**\*4** The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

Grievance programs and procedures in *county* facilities are contained in the regulations governing the New York State Commission of Correction, appearing in the chapter entitled "Minimum Standards and Regulations for Management of County Jails and Penitentiaries," in the part specifically entitled "Grievance Program." N.Y. CODE RULES & REGS. tit. 9, §§ 7032.1-7032.11. These regulations specifically provide that the chief administrative officer of the correctional facility shall establish and maintain a formal inmate grievance procedure. *Id.* § 7032.1. The regulations provide that the facility shall maintain grievance forms for the inmates to use and shall make those forms readily available to inmates. *Id.* §§ 7032.4(d), 7032.6. The regulations also provide that instructions for filing a grievance shall be included in the facility rules and regulations as required by section 7002.9(a)(15), and that "[e]ach inmate at any facility shall be advised in writing as to the availability of grievance forms upon admission." *Id.* § 7032.4(b), (c).

An inmate must file his grievance within five days of the date of the conduct giving rise to the complaint. *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, and the regulations provide that each grievance shall be fully investigated by an individual who was not personally involved in the circumstances giving rise to the grievance. *Id.* § 7032.4(e), (f). The regulations specify minimum requirements for the type of information that must be gathered during the investigation of the inmate's grievance. *Id.* § 7032.4 (g)(1)-(g)(4).

The grievance coordinator must issue a written decision within five business days, containing the "facts and reasons underlying the coordinator's determination," and a copy of the determination must be provided to the inmate. *Id.* at 7032.4(i). The plaintiff

may appeal an adverse determination to the chief administrative officer or his designee within two business days of receiving the adverse determination. *Id.* § 7032.4 (j). The chief administrative officer renders a decision within five business days, and if the inmate is still not satisfied, he may appeal the adverse decision directly to the Commission of Correction within three business days. *Id.* §§ 7032.4(k), 7032.5.

Within three business days after receiving the appeal from the inmate, the chief administrative officer of the facility must mail the appeal to the Commission's Citizens Policy and Complaint Review Council ("CPCRC"), and the grievance coordinator must provide the inmate with a receipt of mailing. *Id.* § 7032.5(c). The CPCRC has forty-five days within which to issue a written decision. *Id.* § 7032.5(d). In certain circumstances, inmates will be provided assistance at any stage of the proceedings. *Id.* § 7032.9. The chief administrative officer of the facility must keep a centralized record of all grievances, and facility employees are given an orientation on the grievance procedures.[11] *Id.* §§ 7032.10, 7032.11.

[11]     The regulations also provide that if an inmate is released or transferred to another facility prior to the resolution of a grievance, the chief administrative officer "shall cause a determination to be made on such grievance ...", and if the grievance is denied, the chief administrative officer "shall submit the grievance to the [CPCRC] as set forth in section 7032.5 of this Part." 9 N.Y.C.R.R. § 7032.7.

 **\*5**  Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, –––– U.S. ––––, 136 S. Ct. 1850, 1857, 195 L.Ed.2d 117 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, –––– U.S. ––––, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, –––– U.S. ––––, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at \*2, 656 Fed.Appx. 577. Defendants bear the burden of proving that administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Williams v. Priatno*, 829 F.3d 118, 122, 126 n.6 (2d Cir. 2016).

### B. Analysis

#### 1. First Amendment Claims (Conklin, Devins, John Does ##1, 2)

Defendants argue that plaintiff has failed to exhaust his administrative remedies as to his claim that defendants Conklin, Devins and John Does ## 1 and 2 violated his First Amendment rights when they delivered his Ramadan breakfasts too late for him to eat them on four different occasions, from May 3 through May 6, 2020. (Def.s' Mem. of Law at 7-9) (Dkt. No. 25-1). Defendants argue that the earliest that plaintiff filed a grievance regarding these incidents was May 6, 2020, only 12 to 15 days before he signed his federal civil rights complaint and not enough time for him to complete the exhaustion process.

Although defendants argue that plaintiff signed his complaint on May 18, 2020, there are parts of the complaint in which he discusses incidents occurring in late May and early June 2020. His complaint was dated June 8, 2020 [12] and filed on June 16, 2020. (Compl. at 15) (Dkt. No. 1). Defendants argue that plaintiff could not have exhausted his administrative remedies in so short a time. In making this argument, the defendants fail to cite the regulations upon which they rely, and the cases they cite

Osborn v. Harris, Not Reported in Fed. Supp. (2021)

2021 WL 1131413

all refer to the regulations applicable to New York State facilities. *See e.g. Livingston v. Hoffnagle*, No. 9:17-CV-1158 (MAD/DEP), 2019 WL 409366, at *5 (N.D.N.Y. Feb. 1, 2019) (discussing regulations governing the New York State Department of Corrections and Community Supervision ("DOCCS") administrative remedy procedures).

12      While the page cited by defendants is dated May 18, 2020 (Compl. at 16), clearly, the complaint was not mailed on that date because the prior page of the complaint is dated June 8, 2020. (Compl. at 15).

**\*6** This plaintiff is in a *county* facility, and the regulations governing the administrative remedy procedures in such facilities are different than the New York State rules. [13] The initial grievance procedures follow a much shorter time frame for submitting and for responding to grievances. It is true that the ultimate appeal to the CPCRC may take up to forty-five days, 9 N.Y.C.R.R. § 7032.5(d), and therefore it is still unlikely that plaintiff would have had the opportunity to complete the administrative process prior to filing this complaint if the grievance followed the normal procedures.

13      DOCCS facilities are governed by 7 N.Y.C.R.R. §§ 701.5 et seq., and County facilities are governed by 9 N.Y.C.R.R. §§ 7032.1-7032.11, as discussed above.

However, the court must still assess whether the remedies were "available" in the plaintiff's stated situation. Defendant Harris is apparently the individual to whom grievances are initially sent at OCCF, and plaintiff has alleged that defendant Harris "lost" or threw away plaintiff's grievances. In his complaint, plaintiff states that he has been told by other officers that defendant Harris wished to have him "silenced," and that she has told plaintiff herself that she "lost" his April 30, 2020 grievance. [14] In his opposition to defendants' motion to dismiss, plaintiff alleges that he "put in at least (6) complaints" that defendant Harris said she would "forward to Albany," [15] but that as of October of 2020, he had heard nothing about any of them. [16] (Dkt. No. 34 at 1).

14      The April 30, 2020 grievance was not regarding the remaining issues in this case, but involved a claim in which plaintiff complained that the Ramadan meals were being handled by non-Muslims.

15      It is unclear to what plaintiff was referring in this statement. The first appeal of a grievance would be decided by the facility's Chief Administrator, and the final appeal is sent to the CPCRC, which has 45 days to respond. 9 N.Y.C.R.R. §§ 7032.4(j), 7032.4(k), 7032.5. *See Dickinson v. York*, 828 F. App'x 780, 783 (2d Cir. 2020) (discussing procedure for appeals of county facility grievances if the grievance is filed and is proceeding through the proper channels).

16      In his response to the defendants' motion, plaintiff also states that he "complained on the kiosk under special investigations." (Dkt. No. 34 at 2). However, when he met with an investigator, he was told that the investigation could take up to 12 months. (*Id.*) It is not clear to which "complaints" plaintiff was referring.

Even though it may be unlikely that plaintiff "completed" the administrative process, if defendant Harris attempted to prevent plaintiff from filing a grievance, his failure to exhaust could be excused even under *Ross*. 136 S. Ct. at 1858 (availability and estoppel are still valid excuses for failure to exhaust - availability is a textual exception and estoppel is a factor in determining availability). Because exhaustion is an affirmative defense, and the burden of proof is on the defendant, a motion to dismiss is inappropriate in these circumstances, particularly when plaintiff is claiming that his ability to file grievances was somehow obstructed by at least one of the defendant's actions. It is true that in the context of a summary judgment motion, plaintiff's general claim that his grievances were lost or destroyed may be insufficient, without more, to excuse his failure to exhaust. *See Abreu v. Miller*, No. 9:15-CV-1306 (TJM/DJS), 2018 WL 5660409, at *7 (N.D.N.Y. Aug. 16, 2018) (citations omitted), *report-recommendation adopted on reconsideration*, 2019 WL 761639 (N.D.N.Y. Feb. 21, 2019). However, in the context of a motion to dismiss, the court must accept the plaintiff's allegations as true.

**\*7** Plaintiff claims that he wrote a grievance, or more than one grievance, regarding his meals being brought too late for him to eat them, but that defendant Harris, who appears to be in charge of receiving grievances at OCCF "lost or destroyed" these documents. If the person who is allegedly tampering with the grievances is the individual to which all grievances must be sent in the first instance, exhausting administrative remedies could be impossible. In his response to the motion to dismiss, plaintiff

2021 WL 1131413

alleges that he wrote to the CPCRC, after defendant Harris told plaintiff that she could not "find" his April 30, 2020 grievance, but that he received no response. (Pl.'s Mem. at 1).

Based on the allegations in the complaint, it is unclear what plaintiff could have done to follow up on any grievances that he unsuccessfully attempted to file. In *Willaims v. Priatno*, the court found that a New York State procedure, providing for an appeal to the next step if there was no response to a grievance, was "unavailable" if a grievance was never "filed." 829 F.3d at 124-27. The same reasoning could apply to grievances that were never "filed" in a county facility. In addition, unlike the New York State regulations governing grievances, the regulations governing county facilities do ***not*** provide a mechanism for appeal if the inmate does not receive a response a filed grievance. [17] *Compare* 7 N.Y.C.R.R. § 701.6(g)(2), 701.8(g) (allowing an appeal to the next step if no response is received within the mandated time) *with* 9 N.Y.C.R.R. §§ 7032.4 and 7032.5 (no mention of appeals from grievances with no response).

[17]   As stated above, the circumstances of which plaintiff complained in the April 30, 2020 grievance are not at issue in this case. Rather, plaintiff's allegations about that grievance provide support for his claim that defendant Harris was interfering with plaintiff's grievances. In any event, even the circumstances regarding the April 30, 2020 grievance are unclear. Plaintiff appears to allege that defendant Harris denied the grievance, plaintiff did not accept the denial, and then defendant Harris "lost" it, so that plaintiff's appeal was never sent to "Albany." Either way, it appears, based on the pleadings, that plaintiff had no recourse if defendant Harris "lost" or "destroyed" his grievance after denying it or if he received "no response" from Albany after he inquired about the grievance. As stated above, it also appears that a step in the grievance procedure could be missing from plaintiff's description. There is no indication that the Chief Administrative Officer of the facility saw the grievance appeal. The Chief Administrative Officer at OCCF is listed as Lisa Zurek. https://scoc.ny.gov/jailadminaddres.htm.

Given the plaintiff's allegations, the court is unwilling to recommend granting the motion to dismiss based on the affirmative defense of failure to exhaust, even though this action was filed before a decision from CPCRC would have been due, if a grievance appeal regarding plaintiff's Ramadan breakfast had been sent to the CPCRC. I am not addressing the ultimate merits of an exhaustion defense to plaintiff's first claim. Rather, I am only stating my conclusion that defendants cannot prevail based on this defense without further support beyond the scope of the pleadings.

### 2. Retaliation Claims Against Harris, Mosher, and Lalonde

Plaintiff does not specifically allege that he filed any grievance claiming that defendant Harris retaliated against him for filing grievances about his religious rights by interfering with his later grievances. Nor does plaintiff claim that he filed any grievance against defendants Mosher and Lalonde regarding their alleged retaliation for plaintiff attempting to bring a P.R.E.A. claim. Plaintiff needed to file a separate grievance claiming that the defendants were retaliating against him either by destroying his grievances (Harris) or by issuing misbehavior reports in retaliation for his filing grievances (Mosher & Lalonde). Because defendants Mosher's and Lalonde's alleged retaliation did not occur until late May 2020, and plaintiff filed this action in early June of 2020, it is unlikely that he would have had time to complete the grievance process before he filed the action. Thus, plaintiff has likely failed to exhaust his administrative remedies with respect to the retaliation claims against these three defendants.

**\*8**  However, given that defendant Harris appears to be the individual with whom plaintiff would have to file grievances, if she was interfering with plaintiff's grievances, there is an argument that the grievance process would not be "available" to plaintiff due to the defendants' actions. As stated above, plaintiff appears to allege that he spoke to officers, albeit officers who he declined to identify by name, who told plaintiff that defendant Harris was obstructing his ability to file grievances. This court must accept plaintiff's allegations as true in the context of a motion to dismiss. Without a statement from defendant Harris or any other further support, this court cannot reject the plaintiff's allegations. [18]  Therefore, at this time, the court will

2021 WL 1131413

not recommend dismissal of any of plaintiff's claims based on failure to exhaust. If adopted, this recommendation would not prevent the defendants from making a better-supported argument in a motion for summary judgment.

18    In his complaint, plaintiff states that on May 18, 2020, defendant Harris told plaintiff that she knew he was suing her, that he would not win, and that Harris was "serving jail justice." (Compl. at 13). Plaintiff claims that on May 23, 2020, an inmate law clerk, named "Thomas" told plaintiff that he was instructed by defendant Harris to take plaintiff's papers and forget he ever had them. (*Id.*)

Defendants have also moved to dismiss both of plaintiff's claims on the merits, notwithstanding the failure to exhaust. The court will turn to a discussion of the merits of plaintiff's claims.

## IV. First Amendment Religion Claim

### A. Legal Standards

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349, 107 S.Ct. 2400 (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. 2254). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75,; *Ford, supra* at 592, (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly. [19] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (discussing the unsettled status of the substantial burden test).

19    This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

**\*9** Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No.

02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

### B. Analysis

Defendants argue that plaintiff fails to state a First Amendment claim regarding the late meals because he alleges insufficient facts to establish that the challenged practice of the prison officials infringes upon his religious beliefs to the required extent. (Def.'s Mem. at 10). Defendants argue that even if plaintiff's food was delivered too late for him to eat for breakfast, there was no indication that he was denied food during the night when he was able to eat or that he was unable to store the food in his cell to save until the sun went down. (*Id.*) Such conduct was at most a "de minimis" burden on plaintiff's First Amendment rights. Defendants also ask the court to take judicial notice that on May 6, 2020, the sun rose later than plaintiff claims, making his meal delivery at 5:42 a.m. timely for purposes of Ramadan. (*Id.*) Thus, at worst, only three of his Ramadan were served too late for him to eat.

In his opposition to defendants' motion, plaintiff specifically alleges that he was not allowed to keep food (other than commissary purchases)[20] in his cell until the evening, and for purposes of the motion to dismiss, the court assumes this to be true. (Pl.'s Mem. at 2). Thus, plaintiff arguably was not able to eat until his evening meal on four occasions. Defendants argue that the case law demonstrates that an "isolated" number of meals that do not comply with an inmate's religious requirements or the denial of an "isolated" number of meals are a de minimis burden on the plaintiff. *See DeJesus v. Bradt*, 174 F. Supp. 3d 777, 786 (W.D.N.Y. 2016) (citations omitted).

[20]    Plaintiff also states that his account statements would show that he had not been to the commissary in years. (Pl.'s Mem. at 2).

In 2019, the Second Circuit decided *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019), holding that the district court erred in finding as a matter of law that 10 non-compliant meals constituted a de minimis burden, stating that "it would be absurd to require that courts, in order to determine what constitutes a substantial burden, be made to decide the number of violations of a particular religious tenet that make a sin grievous." However, in *Brandon*, the court also stated that its holding did not preclude finding that "a single meal or a smaller number of meals spread out over a longer period of time might perhaps be considered isolated incidents, such that the burden they impose is de minimis." *Id.* at 36 n.11 (citations omitted).

This is one such instance. Although the improperly provided meals were not "spread out over a longer period of time, plaintiff states that four different individuals brought his breakfast late on four separate occasions in one week. He does not know the names of two of these individuals. Defendant Devins told plaintiff that he was late because he had been "with" plaintiff's girlfriend, a vulgar response to plaintiff's question, but there is no indication that the lateness was intentional. Finally, plaintiff states that he did not even ask defendant Conklin why he was late with his breakfast. Plaintiff does not claim that he had problems with the lateness of his breakfast for the rest of month of Ramadan or that any of the defendants repeated the alleged violation more than once. Thus, this court finds that plaintiff has failed to sufficiently state a First Amendment claim relating to his Ramadan meals from May 3 to May 6, 2020 against defendants Conklin and Devins, and the court will recommend dismissing plaintiff's first claim against all of the defendants.

## V. Retaliation

### A. Legal Standards

**\*10** To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial

2021 WL 1131413

intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso*, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation. [21] *Cruz,* 2014 WL 2176256, at *6 (citing *Colon*, 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)).

[21]    This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

### B. Analysis

### 1. Defendant Harris

Plaintiff alleges that defendant Harris interfered with his grievances in retaliation for previous grievances relating to his religious practices. (Compl. at 7-9, Pl.'s Mem. at 3). Plaintiff also alleges that defendant Harris told other officers that she wanted plaintiff "silenced." [22] (Compl. at 9). Judge McAvoy found that plaintiff's allegations were sufficient to state a claim, and plaintiff has only added to his allegations in his response to defendant's motion to dismiss. Because the court must assume that plaintiff's factual allegations are true, at this stage, the court will recommend denying defendant Harris's motion to dismiss, without prejudice to defendant filing a properly supported motion for summary judgment.

[22]    Plaintiff states that "my complaint from April 20, 2020 going 'missing' and receiving a ticket for giving food to the hungry - which is part of my religion and part of Ramadan is in <u>retaliation for complaining about</u> how Oneida County is treating Muslims during Ramadan...." (Compl. at 9) (emphasis in original). The court notes that plaintiff's complaint about getting a "ticket" for giving food to the hungry was dismissed to the extent that it alleged retaliation against him because there were only conclusory allegations regarding his motives. (Dkt. No. 10 at 15-16). However, Senior Judge McAvoy allowed the retaliation claims to proceed past initial review as they related to defendant Harris.

### 2. Defendants Mosher and Lalonde

The court does not make the same finding regarding plaintiff's retaliation claims against defendants Mosher and Lalonde. Plaintiff argues that these defendants retaliated against him by filing a misbehavior report against him for taking cake from another inmate during Ramadan after he told defendant Mosher that he wished to speak with defendant Lalonde about a P.R.E.A. issue. (Compl. at 12-13). Defendant Mosher told plaintiff that defendant Lalonde was too busy to speak with him, but later that day, defendant Mosher issued a misbehavior report which was "written up" by defendant Lalonde. (*Id.*)

**\*11** It is unclear even what the protected activity is alleged to be in this situation. Plaintiff states that on May 18, 2020, he told defendant Mosher that he had a P.R.E.A. issue, not that he was filing a complaint. [23] (Compl. at 12). He stated he wished

**Osborn v. Harris, Not Reported in Fed. Supp. (2021)**

2021 WL 1131413

to speak with defendant Lalonde, but defendant Mosher told plaintiff that defendant Lalonde was too busy to speak with him; but then, defendant Lalonde was not too "busy" to approve the misbehavior report, written later that day by defendant Mosher. There is no indication from the complaint that either defendant Mosher, or more particularly defendant Lalonde, had any idea of what plaintiff's P.R.E.A. issue was, or who it may have implicated. In fact, plaintiff admits in the complaint that another inmate gave him a piece of cake, which he wrapped up to save for later. (Compl. at 12). Neither of these defendants are alleged to have known about any other grievances, nor of any other protected conduct in which plaintiff might have been involved.

23    In fact, plaintiff alleges that he did not write the P.R.E.A. complaint until May 20, 2020, at which time he gave it to defendant Damico, who plaintiff claims mishandled the complaint. (Compl. at 12). The claims against defendant Damico did not involve retaliation and were dismissed by Judge McAvoy on initial review. (Compl. at 19).

Generally the court considers "dual motivation," in the context of a motion for summary judgment, where plaintiff has sufficiently alleged a retaliatory motive, and defendants must show that they would have taken the same action without the retaliatory motive. *Yunus v. Jones*, No. 9:16-CV-1282 (GTS/ATB), 2019 WL 5196982, at *4 (N.D.N.Y. June 21, 2019) (citing inter alia *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)), *report-recommendation adopted*, 2019 WL 4010260 (N.D.N.Y. Aug. 26, 2019). However, in this case, plaintiff has failed to allege that he engaged in protected conduct of which the defendants were aware and has admitted that he committed the violation for which defendant Mosher issued the misbehavior report. [24] Thus, this court will recommend granting the defendants' motion to dismiss as it relates to plaintiff's retaliation claims against defendants Mosher and Lalonde.

24    It is unclear from the complaint whether defendant Lalonde actually observed the conduct. Plaintiff states that both defendants "wrote me" a misbehavior report, but plaintiff quotes the misbehavior report as stating that "I [defendant Mosher] observed" plaintiff committing the violation. (Compl. at 12-13).

## VI. Qualified Immunity

### A. Legal Standards

A defendant may establish that he or she is entitled to qualified immunity if she can show that either her actions did not violate clearly established law, or (b) it was objectively reasonable for her to believe that her actions did not violate such law. *M.C. v. Cty. of Westchester, New York*, No. 16-CV-3013 (NSR), 2020 WL 7481023, at *23 (S.D.N.Y. Dec. 18, 2020) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001)). The right is clearly established when " '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* (quoting *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) and citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

A court must consider "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support[s] the existence of the right in question; and (3) whether under preexisting law a reasonable official would have understood that his or her acts were unlawful." *Id.* (quoting *Burns v. Citarella*, 443 F. Supp. 2d 464, 470 (S.D.N.Y. 2006)) (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

### B. Analysis

Defendants argue that they would in any event be entitled to qualified immunity. Because I am recommending dismissal as to all defendants except defendant Harris, I will discuss qualified immunity only with respect to the retaliation claims against her. Plaintiff alleges that defendant Harris tampered with his grievances in retaliation for plaintiff's attempt to complain about the treatment of Muslim inmates. If true, defendant Harris would not be entitled to qualified immunity. It is well-established that the right to complain to public officials and to seek administrative and judicial relief from their actions is protected by the First Amendment. *Id.* (citing inter alia *Franco v. Kelly*, 854 F.2d 584, 588-89 (2d Cir. 1988)) (noting that "the right to petition

Case 9:24-cv-00109-ECC-CBF   Document 76   Filed 03/11/26   Page 103 of 105

**Osborn v. Harris, Not Reported in Fed. Supp. (2021)**
2021 WL 1131413

government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.' ") Thus, this court will not recommend granting defendants' motion to dismiss based on qualified immunity at this time.

**\*12** **WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants motion to dismiss (Dkt. No. 25) be **GRANTED IN PART AND DENIED IN PART**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 25) be **DENIED**, with respect to plaintiff's First Amendment Retaliation claim against defendant **Harris**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all other respects as discussed above [25] as against all other defendants, [26] and the plaintiff's complaint **DISMISSED WITHOUT PREJUDICE** as to all other defendants and all other claims.

[25] As discussed above, the court would not recommend granting defendants' motion to dismiss to the extent it asserted that plaintiff failed to exhaust available administrative remedies.

[26] The court notes that plaintiff fails to state a claim against the John Doe defendants, but no such defendants have been identified or served. If plaintiff should attempt to amend his complaint to add any claims, he must also identify and serve the John Does. Failure to do so may result in the dismissal of plaintiff's complaint "with prejudice" as to the unnamed and unserved defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1131413

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1124575

Case 9:24-cv-00109-ECC-CBF    Document 76    Filed 03/11/26    Page 104 of 105

2021 WL 1124575
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Steve OSBORN, Plaintiff,

v.

Deborah HARRIS, et al., Defendants.

9:20-CV-673 (TJM/ATB)
|
Signed 03/24/2021

**Attorneys and Law Firms**

Steve Osborn, Marcy, NY, pro se.

David H. Walsh, IV, Kenney Shelton Liptak Nowak LLP, Jamesville, NY, for Defendants.

**DECISION & ORDER**

Thomas J. McAvoy, Sr. U.S. District Judge

**\*1** The Court referred this *pro se* Complaint to Magistrate Judge Andrew T. Baxter for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff alleges that Defendants, guards at the Oneida County Correctional Facility, violated his First Amendment rights during his incarceration there.

Magistrate Judge Baxter's Report-Recommendation, dkt. # 6, issued on January 15, 2021, recommends that the Court grant Defendants' motion to dismiss in part and deny their motion to dismiss in part. Magistrate Judge Baxter concludes that, while Plaintiff's failure to exhaust his administrative remedies can be excused because such remedies were not available to him, he has largely failed to state substantive claims. Magistrate Judge Baxter recommends dismissal of Plaintiff's claim that Defendants excessively burdened his right to practice his religion by failing on a few occasions to bring him his breakfast before daylight during Ramadan. He also recommends that the Court dismiss all First Amendment retaliation claims against the Defendants except for Plaintiff's claim against Defendant Deborah Harris.

Petitioner did not object to the Report-Recommendation. The time for such objections has passed. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice and the Court will accept and adopt the Report-Recommendation for the reasons stated therein.

Accordingly,

The Report-Recommendation of Magistrate Judge Baxter, dkt. # 35, is hereby **ACCEPTED** and **ADOPTED**. Defendants motion to dismiss, dkt. # 25, is hereby **GRANTED IN PART** and **DENIED IN PART**, as follows: The motion is **DENIED** with respect to Plaintiff's First Amendment Retaliation claim against Defendant Harris and **GRANTED** in all other respects. The Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE as to all Defendants except Harris and as to all other claims except the First Amendment Retaliation claim against Harris.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1124575

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.